**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

```
-------------------------------------------------------- x
                                                          :
In re:                                                    :    Chapter 11
                                                          :
FAT BRANDS INC., et al.,                                  :    Case No. 26-90126 (ARP)
                                                          :
                    Debtors.¹                             :    (Joint Administration Requested)
                                                          :
-------------------------------------------------------- x
```

**DECLARATION OF JOHN C. DIDONATO IN SUPPORT OF**
**DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY RELIEF**

I, John C. DiDonato, pursuant to section 1746 of title 28 of the United States Code, hereby declare that the following is true and correct:

1. I am the Chief Restructuring Officer of FAT Brands Inc. ("***FAT Brands***"), Twin Hospitality Group Inc. ("***Twin Hospitality***"), and their debtor affiliates in the above-captioned chapter 11 cases (collectively, the "***Debtors***").

2. In addition to being the Debtors' Chief Restructuring Officer, I am a Managing Director and Business Advisory Capability Leader of Huron Consulting Services LLC ("***Huron***"), the proposed financial advisor to the Debtors. Huron is an operationally focused consulting firm that specializes in, among other things, bankruptcy and restructuring consulting, interim management, and financial and operational consulting to financially distressed companies. I have more than thirty-five (35) years of experience counseling challenged companies through operational turnarounds, capital raising, buy and sell side advisories, merger integrations, and other

---

[1]  A complete list of the Debtors in the Chapter 11 Cases and the last four digits of each Debtor's taxpayer identification number (if applicable) may be obtained on the website of the Debtors' proposed claims and noticing agent at https://omniagentsolutions.com/FatBrands-TwinHospitality. The Debtors' mailing address for purposes of the Chapter 11 Cases is 9720 Wilshire Blvd., Suite 500, Beverly Hills, CA 90212.

financial consulting and bankruptcy assignments in both out-of-court and in-court situations.  I have served more than 250 companies, functioning for many as a chief restructuring officer and lead fiduciary.  My expertise encompasses a wide range of industries, including the food and beverage, restaurant, retail, logistics, distribution, transformation, automotive supplier, aerospace supplier, engineering and construction, metals, and equipment leasing industries.

3.      Prior to my appointment as Chief Restructuring Officer on the Petition Date, I led the Huron team serving as the financial advisor to the Debtors since October 2025.  In these capacities, I have become familiar with the Debtors' financial affairs and business operations.  In addition, I have been responsible for overseeing the Debtors' preparations for the above-captioned chapter 11 cases (the "***Chapter 11 Cases***") and related issues, including those related to case financing.  I have further familiarized myself with the Debtors' day-to-day operations, organizational structure, and books and records by reviewing key financial documents and engaging in discussions with other members of the Debtors' management team and the Huron professionals providing financial advisory services to the Debtors.  Except as otherwise indicated herein, the facts set forth in this Declaration are based on my personal knowledge; my review of relevant documents; information provided to me by the Debtors' other officers, directors, and restructuring advisors, including professionals at Latham & Watkins LLP ("***Latham***") and GLC Advisors & Co., LLC ("***GLC***" and together with Huron and Latham, the "***Advisors***") and employees working  under my supervision at Huron; and/or my opinion based on experience, knowledge, and information concerning the Debtors' operations and financial condition.  If called upon to testify, I would testify to the facts set forth in this Declaration.

4.      On January 26, 2026 (the "***Petition Date***"), the Debtors each filed a voluntary petition in the United States Bankruptcy Court for the Southern District of Texas (the "***Court***"),

commencing the Chapter 11 Cases for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").   The Debtors have filed various motions and applications seeking certain "first day" relief (collectively, the "**First Day Pleadings**") to minimize any disruption that filing the Chapter 11 Cases may have on their operations.   I submit this Declaration to assist the Court and parties in interest in understanding the circumstances compelling the commencement of the Chapter 11 Cases and in support of the Debtors' chapter 11 petitions and the First Day Pleadings filed contemporaneously herewith.

## PRELIMINARY STATEMENT

5.      The Debtors comprise a leading multi-brand restaurant company that includes eighteen (18) franchised or wholly owned restaurant brands: (i) Round Table Pizza; (ii) Fatburger; (iii) Marble Slab Creamery; (iv) Johnny Rockets; (v) Fazoli's; (vi) Twin Peaks; (vii) Smokey Bones; (viii) Great American Cookies; (ix) Hot Dog on a Stick; (x) Buffalo's Cafe; (xi) Buffalo's Express; (xii) Hurricane Grill & Wings; (xiii) Pretzelmaker; (xiv) Elevation Burger; (xv) Native Grill & Wings; (xvi) Yalla Mediterranean; (xvii) Ponderosa Steakhouse; and (xviii) Bonanza Steakhouse.

6.      The Debtors' operations currently include approximately 2,200 locations (including both company-owned and franchised locations) open or under construction, making them one of the largest restaurant companies in the United States by number of locations.   Such significant operations are possible only because of the approximately 7,500 individuals directly employed by the Debtors across the country and the approximately 45,000 store-level employees who are employed by the Debtors' franchisees across the world.

7.      As described in further detail below, the acquisition of a large part of the Debtors' brands was financed through, and the Debtors' capital structure is primarily comprised of, fixed-

rate securitization notes (collectively, the "***Securitization Notes***") issued by five separate special-purpose financing subsidiaries of the Debtors (collectively, the "***Securitization Issuers***") in the total principal amount of approximately $1.4 billion.  The Securitization Notes issued by four of the Securitization Issuers—the GFG Notes, the Royalty Notes, the Fazoli's Notes, and the Twin Notes (each as defined below)—are secured by substantially all of the Debtors' material revenue-generating assets, which are held by certain of the direct and indirect subsidiaries of the Securitization Issuers for such notes (collectively, the "***Securitization Guarantors***" and, together with the Securitization Issuers, the "***Securitization Entities***") and form four separate whole business securitization structures (collectively, the "***WBS***").  The fifth series of notes, the Resid Notes (as defined below), is supported by (a) the future Management Fees (as defined below) payable to FAT Brands as manager of the FAT Securitization Entities, as well as any future residual amounts that the GFG Issuer, the Royalty Issuer, and the Fazoli's Issuer are permitted to remit to FAT Brands under the applicable Base Indentures (as defined below), and (b) certain shares of Class A Common Stock held by FAT Brands in Twin Hospitality at the time of the Twin Hospitality public offering, which represents approximately 86% of the outstanding Class A Common Stock of Twin Hospitality.[2]

8.     The Securitization Entities under the Twin Notes are parties to a management agreement with Twin Hospitality (in such capacity, the "***Twin Manager***"), and the remainder of the Securitization Entities are party to management agreements with FAT Brands (in such capacity, the "***FAT Manager***" and, together with the Twin Manager, the "***Managers***").  These agreements require that the Managers provide key management services to the Securitization

---

[2]     The shares of Class B Common Stock held by FAT Brands in Twin Hospitality, which hold additional voting rights, are not pledged.

Entities and the Securitization Entities pay monthly management fees to the Managers (the "***Management Fees***").

9.      Generally, the waterfalls under the Securitization Notes provide that the Management Fees are paid ahead of the debt service obligations and, after satisfaction of the debt service obligations, any residual amounts may be used to satisfy other operating expenses or distributed to the Managers (the "***Residual Amounts***").  The Management Fees are paid near the top of priority waterfall to provide the Managers with the funds to provide integral centralized functions that enable the Securitization Entities and their brands to operate and generate revenue. However, while the quantum of such fees should at minimum ensure that the Managers can cover the costs of operating the underlying assets of the Securitization Entities, the funds received from the Management Fees generally have not covered the actual operating costs of the businesses.

10.      Although most of the Debtors' businesses are adjusted EBITDA-positive due to the success and history of their celebrated household brands, the Debtors have experienced a series of challenges since the acquisitions in addition to the inadequacy of the Management Fees noted above.  In particular, the Debtors' debt service obligations have become increasingly unsustainable due to ratcheting penalties (in the form of penalty interest and penalty amortization payments), with the Debtors having paid over $72 million in penalty interest and amortization payments since 2022.  At the same time, the Debtors were affected by inflationary pressure, significant legal fees stemming from various governmental litigations, and industry headwinds.

11.      To fund the operations of the Securitization Entities and to fill any liquidity gaps, for over three years, the Debtors relied on non-securitization debt, common and preferred equity raises, underspent advertising costs, and the sale of additional Securitization Notes that were

retained or purchased by the Debtors.[3]  However, these resources could not sustain the business's operating expenses and mounting debt obligations indefinitely and such resources were ultimately exhausted as a result of a confluence of the following factors (which were exacerbated by certain challenges the Debtors have faced):

    i.    *First*, and as noted, the funds received from the Management Fees—which are below market when compared to industry standards—have not covered the actual costs of operating the Securitization Entities, resulting in the Managers spending more to operate the entities than they receive in Management Fees, and the significant penalties on the debt service obligations under the Securitization Notes eliminated the ability to fund operations from Residual Amounts.

    ii.    *Second*, the Debtors have exhausted their ability to incur additional debt.

    iii.    *Third*, the Securitization Notes retained by the Debtors are no longer a source of liquidity because the Trustees (as defined below) under the Securitization Notes froze the Debtors' ability to sell such notes.

12.    The Debtors tried to find more sustainable solutions to their liquidity issues via the debt and equity markets.  But those efforts proved fruitless as well.  In particular, the Debtors' ability to obtain financing through public equity markets was not possible due to the unfavorable market for restaurant stocks generally and FAT Brands and Twin Hospitality's stocks specifically. The Debtors have exhausted their options for funding the continued operations of the business.

13.    Without alternative sources of financing, the Debtors had no choice but to resort to using certain WBS collections to fund their operations rather than depositing such collections into certain accounts as required under the Base Indentures.  Such failure, in addition to certain other events that are described in greater detail below, resulted in events of default and manager termination events under the Securitization Notes, which, absent commencement of these Chapter 11 Cases and imposition of the automatic stay, would permit the holders of the

---

[3]    These retained notes are held by FAT Brands outside of the WBS.

Securitization Notes (the "**Securitization Noteholders**") to direct the Trustees to immediately install a back-up manager at the Securitization Entities.  Notably, the Securitization Noteholders did not exercise these rights prepetition and no back-up manager has been appointed.

14.     Against that backdrop, the Debtors engaged the Advisors to evaluate strategies to address their burdensome debt obligations and liquidity issues and considered all available strategic alternatives, including both in- and out-of-court transactions, with an eye towards maximizing value for the Debtors' stakeholders.  Starting in summer 2025, the Debtors began engaging in discussions with an ad hoc group of the Securitization Noteholders (the "**WBS Ad Hoc Group**") represented by White & Case LLP and Houlihan Lokey Capital, Inc., to explore potential consensual transactions to address the Debtors' capital structure.  In late 2025, the Debtors also began engaging in discussions with certain holders of the Resid Notes that are not part of the WBS Ad Hoc Group—the Resid Noteholders (as defined below).  Ultimately, however, the Debtors were unable to reach an agreement regarding a potential restructuring with the WBS Ad Hoc Group in advance of the Petition Date.

15.     Accordingly, the Debtors determined that the commencement of these Chapter 11 Cases is the best path to achieve a comprehensive and value-maximizing solution for all stakeholders, while engaging with the Securitization Noteholders and other key constituents.  To this end, the Debtors propose to use cash collateral and future cash receipts pursuant to a four-week budget to operate the business on an interim basis and preserve going-concern value.  The Debtors are entering these Chapter 11 Cases with extremely limited cash on hand and cannot continue to operate in chapter 11 without additional liquidity in the form of debtor-in-possession financing (whether through the WBS Ad Hoc Group or otherwise).  Therefore, the Debtors are seeking to immediately commence mediation with the WBS Ad Hoc Group and other stakeholders,

as appropriate, on an expedited timeline to negotiate the path forward and, importantly, secure debtor-in-possession financing.  In this respect, the Debtors shared a proposed stipulated mediation order (the "***Mediation Order***") with the WBS Ad Hoc Group in advance of the chapter 11 filing.  While the WBS Ad Hoc Group has not yet agreed to the Mediation Order, the Debtors have filed the Mediation Order contemporaneously herewith as they are optimistic that the WBS Ad Hoc Group will agree that proceeding with a prompt and efficient mediation between the parties will maximize value for all stakeholders.

16.     Pursuant to the proposed mediation process and throughout the Chapter 11 Cases, the Debtors intend to engage proactively and productively with the WBS Ad Hoc Group and other stakeholders, as appropriate, to achieve a negotiated restructuring that will maximize value for the Debtors and their estates.   In this vein, the Debtors have undertaken significant governance measures, including, immediately prior to the commencement of these Chapter 11 Cases, appointing me as the Chief Restructuring Officer and Abhimanyu Gupta as Deputy Chief Restructuring Officer and forming a special committee of two highly experienced, independent directors (the "***Special Committee***") to review and evaluate strategic alternatives that may be available to the Debtors.  The Debtors believe that these measures will, ultimately, pave the way for the Debtors' businesses to emerge from chapter 11 with a sustainable capital structure, and enable the Debtors to continue investing in their brands, serving customers and franchisees, and supporting the employment of the Debtors' approximately 7,500 employees and the 45,000 individuals employed by the Debtors' franchisees.

17.     This Declaration is organized into four parts.  The **first** provides an overview of the Debtors' history and business operations.  The **second** describes the Debtors' prepetition corporate

and capital structure.  The **third** discusses the circumstances leading to the commencement of the Chapter 11 Cases.  The **fourth** provides a summary of the First Day Pleadings.

## I.     OVERVIEW OF THE DEBTORS' HISTORY AND OPERATIONS

### A.     Corporate History

18.     The origin of the Debtors' restaurant portfolio traces back twenty-plus years when, in June of 2003, they acquired Fatburger—an iconic, all-American hamburger restaurant that was founded in Los Angeles in 1947.  Following the sustained growth of Fatburger, the Debtors acquired Buffalo's Cafe, a wing-centric brand focused on fresh-never-frozen wings, in December 2011.  In September 2013, the Debtors formed a fast casual model of Buffalo's Cafe called Buffalo's Express.

19.     In March 2017, the Debtors launched FAT Brands, a Delaware corporation that was a wholly-owned subsidiary of Fog Cutter Capital Group, Inc.  Initially, FAT Brands served as a holding company for the Fatburger, Buffalo's Cafe, and Buffalo's Express brands.  To facilitate its continued growth and goal of becoming a multi-brand restaurant franchising company focused on developing, marketing, and acquiring predominantly fast casual restaurant concepts, FAT Brands completed its initial public offering in October 2017.  FAT Brands is a publicly traded company, with its shares listed under the symbol "FAT" on Nasdaq.

20.     Since its initial public offering, FAT Brands has continued to grow by acquiring numerous globally recognized restaurant brands, including:

- Ponderosa and Bonanza Steakhouses in October 2017;
- Hurricane Grill & Wings in June 2018;
- Yalla Mediterranean in August 2018;
- Elevation Burger in June 2019;
- Johnny Rockets in September 2020;

- Global Franchise Group ("**GFG**") (which includes Round Table Pizza, Hot Dog on a Stick, Great American Cookies, Pretzelmaker, and Marble Slab Creamery) in July 2021;

- Twin Peaks in October 2021;

- Native Grill & Wings and Fazoli's in December 2021; and

- Smokey Bones in September 2023.



21.     Through their portfolio of brands, the Debtors provide customers with a wide variety of culinary experiences, ranging from pasta to pizza, wings, and burgers.  The Debtors' extensive portfolio enables them to pair complementary restaurants together at the same location to capitalize on synergies and fuel growth.  Since 2022, the Debtors have launched locations that pair different combinations of Fatburger, Buffalo's Express, Pretzelmaker, Hot Dog on a Stick, and Round Table Pizza.  In addition, FAT Brands has developed multi-brand concepts across its four operating silos, including Cookies & Cream (a collaboration between Great American Cookies and Marble Slab Creamery) and Cookies & Pretzels (a collaboration between Great American Cookies and Pretzelmaker).

22.     Today, the Debtors have 670 franchise partners with restaurants operating across 30 countries:



23.     The Debtors' brands also have locations in 46 states within the United States, Washington D.C., and Puerto Rico:



24.     Following the acquisition of Smokey Bones, FAT Brands contributed the Smokey Bones brand to its subsidiary Twin Hospitality, which also owns the Twin Peaks brand.  On January 29, 2025, FAT Brands distributed approximately 5% of fully diluted shares of Class A Common Stock of Twin Hospitality to FAT Brands's common shareholders.  As a result, such stock is now publicly traded under the symbol "TWNP" on Nasdaq.  Approximately 95%[4] of the Class A Common Stock and 100% of Class B Common Stock of Twin Hospitality remains owned by FAT Brands.

### B.      Current Operations

#### 1.      *Debtors' Workforce*

25.     As of the Petition Date, the Debtors have approximately 7,500 employees, over 1,600 of whom are full-time employees.  Most of these employees—over 5,600—work in the Twin Peaks and Smokey Bones restaurants directly owned by Twin Hospitality.  The remainder of these employees work directly for FAT Brands in a corporate capacity, at FAT Brands's factory in Atlanta, Georgia, or in the restaurants owned by FAT Brands.  Of the Debtors' employees, approximately 700 are salaried and the remainder are hourly.  The Debtors' employees are essential to the operations of the Debtors' brands.  Many are quite literally the arms and legs of the Debtors, providing food to the Debtors' valued customers at the Company-Owned Restaurants (as defined below).  And others are the corporate employees who provide accounting and finance services, business development, marketing and information technology support, product design and testing, and logistics and supply chain support to the Company-Owned Restaurants and the franchisees.

---

[4]     This percentage excludes certain warrants issued to the Securitization Noteholders to buy Twin Hospitality Class A Common Stock.  When such warrants are factored in, FAT Brands owns approximately 93% of the Twin Hospitality Class A Common Stock.

26.     Although the majority of the Debtors' workforce is spread throughout the country, many are employed at FAT Brands's corporate headquarters in Beverly Hills, California or the headquarters for the other key brands (Dallas, Texas for Twin Peaks, Plantation, Florida for Smokey Bones, and Lexington, Kentucky for Fazoli's).  The employees directly employed by FAT Brands and Twin Hospitality perform a variety of critical functions associated with the Debtors' operations, including, among other things, assisting in the management, marketing, advertising, accounting, store development, branding and training of franchisees.[5]

27.     In addition to the Debtors' direct employees, the workforce of the Debtors' franchisees includes approximately 45,000 individuals who work at over 1,900 franchised restaurant locations.  Of these individuals, approximately 12,500 individuals work for Twin Peaks and Smokey Bones restaurants and the other 32,500 are spread across the remaining brands.

2.     ***Debtors' Franchise System***

28.     The Debtors operate, particularly for the Securitization Entities managed by FAT Brands, primarily as a franchisor for the brands owned by the direct and indirect subsidiaries of the Securitization Issuers.  They are party to franchise agreements (the "***Franchise Agreements***") with about 700 franchisees who operate over 1,900 franchisee restaurants across the world.  As such, the Debtors generate most of their revenue—approximately $86.3 million in royalties and $5.7 million in franchise fees in 2025—by collecting certain franchise fees, royalties, and other fees associated with providing certain services to franchised restaurants in accordance with the Franchise Agreements.

---

[5]     There are also employees of the Debtors that sit within the Fazoli's Silo and the Twin Silo, specifically at Smokey Bones entities, that perform similar functions.

29.     The Debtors' franchise system is rooted in a centralized management platform through which FAT Brands provides management services to the Securitization Entities, including both the FAT Securitization Entities and the Twin Securitization Entities (each as defined below). Through this platform, the Debtors select franchisees if they fulfill certain qualifications and satisfactorily complete the FAT Brands training program.  The selection process ensures that each franchisee meets the high standards of the Debtors' brands.

30.     For any approved franchisees, the Debtors' management platform supports such franchisees by providing robust support services, which generally fall into six categories: (i) operations, supply chain, training, and new store opening support, including in the form of real estate and construction departments that help franchisees locate and build out new stores; (ii) administrative and financial services; (iii) sales and marketing functions, including franchisee expansion; (iv) technology support; (v) governance, risk management, and compliance support, including legal services and human resources support; and (vi) production and supply services through the Atlanta Factory.  The Debtors' management platform also develops and produces innovative marketing initiatives and is run using unified technology and administrative functions, resulting in franchisees benefiting from broader technology support, unified legal management of intellectual property, payroll processing, and human resources training, and a centralized technology system.  Centralized services ensure performance is consistent across restaurant locations and enhances purchasing power, strengthens vendor relationships, and streamlines product management, creating significant cost advantages for operators.  Under the Franchise Agreements, the Debtors charge franchisees an upfront fee, a monthly marketing fee, and weekly/monthly royalties for an initial term, with an option to renew.  Franchisees that open multiple locations receive certain discounts on the franchise fees.

3.      ***Company-Owned Restaurants and Manufacturing Facility***

31.     For certain brands—including Fazoli's, Hot Dog on a Stick, Fatburger, Smokey Bones, and Twin Peaks—the Debtors also directly own and operate certain restaurant locations. As of the Petition Date, the Debtors directly own and operate over 150 restaurants (the "***Company-Owned Restaurants***").  The revenue of the Company-Owned Restaurants comes from three major categories: (i) food; (ii) bar; and (iii) merchandise.  The Company-Owned Restaurants generated approximately $389.4 million of revenue in 2025.

32.     The Debtors also own and operate a manufacturing facility in Atlanta, Georgia that supplies raw cookie dough to certain of their quick service restaurant brands and dry pretzel mix to Pretzelmaker franchisees (the "***Atlanta Factory***").  In particular, the Atlanta Factory is the sole cookie dough supplier for the Great American Cookies franchise, shipping directly to franchisees at over 400 locations.  The Atlanta Factory also produces products that are indirectly distributed to Fazoli's, Johnny Rockets, and Elevation Burger locations.  The Atlanta Factory employs fifty (50) individuals, thirteen (13) of whom are salaried and thirty-seven (37) of whom are hourly.

33.     In 2025, the Atlanta Factory generated approximately $39.4 million of revenue. The 40,000 square foot plant comprising the Atlanta Factory currently operates at approximately 40% capacity.  Although the Atlanta Factory was negatively impacted by tariffs, demand decreases, and strategic relationships, the Debtors are executing a strategy to capitalize on the excess capacity at the Atlanta Factory.  This strategy includes expanding the facility's production by offering cookie batter to other brand categories within the Debtors' portfolio and exploring third-party manufacturing contracts.

34.     The Debtors also own and operate an in-house brewery for Twin Peaks in Irving, Texas (the "***Twin Brewery***"), through which the Debtors brew all the signature beer sold at Twin

Peaks restaurants in Texas.  The Twin Brewery produces approximately 12,000 kegs per year and is licensed to brew approximately 20,000 kegs per year.  The Twin Brewery employs three (3) employees, two (2) salaried and one (1) hourly.

## II.    DEBTORS' PREPETITION CORPORATE AND CAPITAL STRUCTURE

### A.    Corporate Organization and Governance

35.    A detailed chart of the Debtors' corporate structure is attached hereto as **Exhibit A** (the "*Organizational Chart*").  In addition, the following diagram (the "*Securitization Diagram*") provides a high-level summary of the Debtors' corporate structure and the WBS.



1.      *Parent Entities*

36.      As shown in the Organizational Chart and the Securitization Diagram, FAT Brands is the ultimate parent of, and owns (directly or indirectly) 100% of, all Debtor entities other than Twin Hospitality and Twin Hospitality's subsidiaries.  Although a portion of the Class A Common Stock of Twin Hospitality is publicly traded, FAT Brands maintains a controlling interest in Twin Hospitality, holding approximately 95% of the Class A Common Stock of Twin Hospitality and 100% of the Class B Common Stock of Twin Hospitality.

37.      FAT Brands is governed by a Board of Directors (the "***FAT Brands Board***").  Prior to the appointment of the Special Committee, the FAT Brands Board consisted of thirteen (13) directors, seven (7) of whom are independent.  Twin Hospitality is governed by its own Board of Directors (the "***Twin Board***" and, together with the FAT Brands Board, the "***Parent Boards***").  Prior to the appointment of the Special Committee, the Twin Board consisted of four (4) directors, three (3) of whom are independent.

38.      In connection with (and immediately prior to) commencing the Chapter 11 Cases, the Debtors formed the Special Committee, which includes two directors—Patrick Bartels and Neal Goldman—sitting at both of the Parent Boards.  The Special Committee is authorized to, among other things, review, evaluate, analyze, negotiate, and make recommendations to approve or reject any restructuring transactions.  The Debtors also appointed me as Chief Restructuring Officer, to report to the Special Committee and the Parent Boards.  With the appointment of the Special Committee, the FAT Brands Board has increased to fifteen (15) directors, nine (9) of whom are independent, and the Twin Board has increased to six (6) directors, five (5) of whom are independent.

2.      *Issuers and Securitization Guarantors*

39.      As further shown in the Organizational Chart and the Securitization Diagram, FAT Brands directly owns 100% of all the Securitization Issuers other than Twin Hospitality I, LLC (f/k/a FAT Brands Twin Peaks I, LLC) (the "***Twin Issuer***"), which is 100% directly owned by Twin Hospitality.

40.      Substantially all of the Debtors' material operating assets are held by the Securitization Guarantors that are the direct and indirect subsidiaries of four of the Securitization Issuers—the Twin Issuer, FAT Brands Royalty I, LLC (the "***Royalty Issuer***"), FAT Brands GFG Royalty I, LLC (the "***GFG Issuer***"), and FAT Brands Fazoli's Native I, LLC (the "***Fazoli's Issuer***").  The Securitization Guarantors guarantee, and substantially all their assets secure, the Securitization Notes issued by each of the Securitization Issuers.

a.      <u>Securitization Entities</u>

41.      All of the Debtors' brands, except Twin Peaks and Smokey Bones, are held by the direct and/or indirect subsidiaries of the Royalty Issuer (collectively, the "***Royalty Securitization Guarantors***" and, together with the Royalty Issuer, the "***Royalty Securitization Entities***"), the direct and/or indirect subsidiaries of the GFG Issuer (collectively, the "***GFG Subsidiaries***"), and the direct and/or indirect subsidiaries of the Fazoli's Issuer (collectively, the "***Fazoli's Subsidiaries***").

- ***The Royalty Securitization Entities***.  The Royalty Securitization Guarantors—which are the guarantors under the Royalty Notes—own the following brands: Bonanza Steakhouse, Buffalo's Cafe, Buffalo's Express, Elevation Burger, Fatburger, Hurricane Grill & Wings, Johnny Rockets, Ponderosa Steakhouse, and Yalla Mediterranean (the "***Royalty Silo***").  The Royalty Silo includes about 502 franchised locations but zero Company-Owned Restaurants within the WBS.[6]  As such, all employees in the silo are employed directly by the franchisees.  Over the last twelve months, the Royalty

---

[6]      There is one Company-Owned Restaurant, a Fatburger location, which does not sit within the WBS.

Securitization Entities generated adjusted EBITDA of $8.7 million through December 2025.

- ***The GFG Securitization Entities***.  The GFG Subsidiaries—certain of which are the guarantors of the GFG Notes (as defined below) (collectively, the "***GFG Securitization Guarantors***" and, together with the GFG Issuer, the "***GFG Securitization Entities***")— own the following brands:  Great American Cookies, Marble Slab Creamery, Pretzelmaker, Round Table Pizza, and Hot Dog on a Stick[7] (the "***GFG Silo***").  The GFG Silo includes about 1,175 franchised locations but zero Company-Owned Restaurants.  It does, however, include the Atlanta Factory, which is fully operated by direct employees and contractors of the Debtors.  Over the last twelve months, the GFG Securitization Entities generated adjusted EBITDA of $31.5 million through December 2025.  Approximately $15.4 million of adjusted EBITDA was generated from the Atlanta Factory in 2025.

- ***The Fazoli's Securitization Entities***.  The Fazoli's Subsidiaries—certain of which are the guarantors of the Fazoli's Notes (collectively, the "***Fazoli's Securitization Guarantors***" and, together with the Fazoli's Issuer, the "***Fazoli's Securitization Entities***" and, together with the Royalty Securitization Entities and the GFG Securitization Entities, the "***FAT Securitization Entities***")—own the Fazoli's and Native Grill & Wings brands (the "***Fazoli's Silo***" and, together with the Royalty Silo and the GFG Silo, the "***FAT Brands Silos***").  The Fazoli's Silo includes about 143 franchised locations and 56 Company-Owned Restaurants with over 1,000 employees employed directly by the Debtors.  Over the last twelve months, the Fazoli's Securitization Entities generated adjusted EBITDA of negative $0.7 million through December 2025.

42.    As shown in the Securitization Diagram, a fourth Securitization Issuer sits under FAT Brands—FB Resid Holdings I, LLC (the "***Resid Issuer***").  Unlike the other Securitization Issuers, the Resid Issuer does not have any subsidiaries or operating assets.  As such, no brands or employees sit under this entity.  Instead, the Resid Issuer has a pledge of (i) future Management Fees payable to the FAT Manager by the FAT Securitization Entities, (ii) any residual cash flow amounts that remain at the FAT Securitization Entities after debt service obligations are satisfied that are payable to the FAT Manager, and (iii) certain of FAT Brands's ownership of Twin

---

[7]    The franchising entity for the Hot Dog on a Stick brand, HDOS Franchising, LLC, is one of the Securitization Entities in the GFG Silo.  The intellectual property for the Hot Dog on a Stick brand sits within the GFG Silo.  However, HDOS Acquisition LLC, which holds the Company-Owned Restaurants under the Hot Dog on a Stick brand, sits outside of the WBS.

Hospitality's Class A Common Stock.  The underlying Management Agreements, however, are not pledged to support the Resid Notes.

43.     The direct and indirect subsidiaries of the Twin Issuer—certain of which are the guarantors under the Twin Notes (collectively, the "***Twin Securitization Guarantors***" and, together with the Twin Issuer, the "***Twin Securitization Entities***")—own the Twin Peaks and Smokey Bones brands (the "***Twin Silo***").  Of the restaurants within the Twin Silo, approximately 50% of the locations are franchised, while the remaining 50% are Company-Owned Restaurants. The Twin Silo includes about 79 franchised locations and 66 Company-Owned Restaurants with over 5,600 employees employed directly by the Debtors.  Over the last twelve months, the Twin Securitization Entities generated adjusted EBITDA of $16.7 million through December 2025.



b.     <u>Management of the Securitization Entities</u>

44.     Pursuant to separate management agreements (the "***Management Agreements***"), (i) the FAT Manager is designated as the manager of the Royalty Securitization Entities, the GFG

Securitization Entities, the Fazoli's Securitization Entities, and the Resid Issuer, and (ii) the Twin Manager is designated as the manager of the Twin Securitization Entities. Pursuant to the Management Agreements and developed practice amongst the Managers and the Securitization Entities, the FAT Manager provides critical services to the Securitization Entities, including the Twin Securitization Entities.[8] These services include certain franchising, marketing, real estate, intellectual property, operational, accounting, and reporting services. The FAT Manager is also responsible for collecting franchisee fees received from the franchised restaurants and proceeds from the Company-Owned Restaurants within the FAT Brands Silos and, under the Base Indentures, remitting collections into the concentration account as shown in the Securitization Diagram.

45.     The operational know-how for the FAT Brands Silos also rests with the FAT Manager. As such, the Securitization Entities cannot operate in a functional manner without support of the FAT Manager and the services it provides. By way of example, the FAT Manager helps the Company-Owned Restaurants and franchisees within the FAT Brands Silos utilize the related brand recognition and develop marketing and advertising materials. The FAT Manager also supplies key technology and supply-chain support and manages rebates and vendor payments across the FAT Securitization Entities. The FAT Manager develops and runs the business strategy for these restaurants and tracks all unit operations. Without the FAT Manager, the Company-Owned Restaurants and the franchisees in the FAT Brands Silos would not have access to the Debtors' curated brand strategy or marketing and advertising materials. They would lose key technology and supply chain support, and they would no longer have a cash management system

---

[8]  The FAT Manager supports the Twin Manager in providing management services to the Twin Securitization Entities.

or a larger brand-based business plan.  The FAT Manager's services are, thus, integral to the Securitization Entities.

46.     These services are funded by the Management Fees totaling approximately $1.5 million per month: about $200,000 from the Royalty Securitization Entities, $413,000 from the GFG Securitization Entities, $542,000 from the Fazoli's Securitization Entities, $25,000 from the Resid Issuer, and $292,000 from the Twin Securitization Entities.  Over the course of the year, the Managers receive about $17 million total in Management Fees.  At the same time, in 2024, these services cost the Managers approximately $8 million per month and close to $96 million per year.

47.     Pursuant to the Management Agreements and the respective Base Indentures, the FAT Manager may, from time to time, advance funds to, and on behalf of, the respective Securitization Entities (collectively, the "***Manager Advances***") in connection with the operation of the assets at such entities.  As discussed above, because the funds received from the Management Fees have not covered the full operating costs, the FAT Manager has provided ongoing financial support to the Securitization Entities that may constitute Manager Advances and which, as noted below, would be entitled to repayment ahead of the Securitization Notes and debt service under the Base Indentures.

c.     Non-Securitization Entities

48.     FAT Brands also owns multiple subsidiaries that are not Securitization Entities and therefore not part of the WBS (the "***Non-Securitization Entities***").  The Non-Securitization Entities include, among others, certain entities that own some of the Company-Owned Restaurants related to brands in the GFG Silo and the Royalty Silo and that employ certain employees to work on matters related to the GFG Securitization Entities.  However, the Non-Securitization Entities

hold relatively small amounts of assets, and substantially all the Debtors' assets are within the WBS.

        3.    *Priority Waterfall*

    49.    As described in greater detail in the following section, each of the Securitization Notes is governed by a Base Indenture that provides a payment waterfall for the application of funds the Securitization Entities receive from the operation of the Company-Owned Restaurants and franchised restaurants (collectively, the "***Payment Waterfalls***").   Although each Payment Waterfall varies slightly, the Payment Waterfalls generally follow this priority order in distributing the Retained Collections:

*[Remainder of Page Intentionally Blank]*



Payment Summary Waterfall Chart

50.      Pursuant to the Base Indentures (as defined below), the collections received by the Securitization Issuers are split into collections that are to be paid out and certain excluded amounts. The collections to be paid out—*i.e.*, the difference between the total collections and excluded amounts over a period—are referred to as the "***Retained Collections***." The Base Indentures provide that the Retained Collections get distributed according to the Payment Waterfalls.

Pursuant to the Base Indentures, the Securitization Issuers are obligated to reimburse the Manager Advances, if any, and the Management Fees on a priority basis. Thereafter, they must pay certain operating expenses of the Securitization Entities—such as accrued and unpaid taxes, fees and expenses to external accountants and legal counsel, and independent director fees and Management Fees—and then quarterly debt service obligations. Any cash flow in excess of the debt service obligations is then remitted at the direction of the applicable Securitization Issuer.

        **B.**       **Prepetition Capital Structure**

     51.    As of the Petition Date, approximately $1.45 billion of funded debt obligations remain outstanding, including the Securitization Notes retained by the Debtors and non-WBS debt. A summary of the approximate outstanding principal amounts of the Debtors' funded debt obligations as of the Petition Date is set forth below.[9]

| Instrument | Approx. Principal Amount Outstanding on the Petition Date (Millions) | Collateral |
|---|---|---|
| *Royalty Notes* | | |
| Class A-2 Notes | $134 | Substantially all assets of the Royalty Securitization Guarantors |
| Class B-2 Notes | $45 | |
| Class M-2 Notes | $22 | |
| Retained M-2 Notes | $11 | |
| *Total Outstanding* | *$212* | |
| *GFG Notes* | | |
| Class A-2 Notes | $266 | Substantially all assets of the GFG Securitization Guarantors |
| Class B-2 Notes | $100 | |
| Class M-2 Notes | $44 | |
| Retained M-2 Notes | $35 | |
| *Total Outstanding* | *$445* | |
| *Fazoli's Notes* | | |
| Class A-2 Notes | $124 | Substantially all assets of the Fazoli's Securitization Guarantors |
| Class B-2 Notes | $16 | |
| Class M-2 Notes | $0 | |
| Retained B-2 Notes | $8 | |

---

[9]   This summary is for informational purposes only and is qualified in its entirety by the documents memorializing the terms of such obligations.

| Instrument | Approx. Principal Amount Outstanding on the Petition Date (Millions) | Collateral |
|---|---|---|
| Retained M-2 Notes | $39 | |
| *Total Outstanding* | *$187* | |
| *Resid Notes* | | |
| Class A-1 Notes | $54 | Substantially all assets of the Resid Issuer |
| Class A-2 Notes | $56 | |
| Retained A-1 Notes | $26 | |
| Retained A-2 Notes | $23 | |
| *Total Outstanding* | *$159* | |
| *Twin Notes* | | |
| Class A-1 Notes | $12 | Substantially all assets of the Twin Securitization Guarantors |
| Class A-2 Notes | $266 | |
| Class B-2 Notes | $57 | |
| Class M-2 Notes | $68 | |
| Retained M-2 Notes | $10 | |
| *Total Outstanding* | *$413* | |
| *Non-Securitization Secured Debt* | | |
| Twin Peaks Equipment Loans | $4 | Financed equipment |
| GFG Percent Promissory Notes | $8.4 | Substantially all assets of FAT GFG Notes I, LLC |
| Royalty Percent Promissory Notes | $6.2 | Substantially all assets of FAT Royalty Notes I, LLC |
| Riverside Refi Loan | $18.75 | Substantially all assets of HDOS Acquisition, LLC |
| Waterfall Loan | $10 | 7,139,667 shares of stock in Twin Hospitality |
| *Non-Securitization Unsecured Debt* | | |
| Elevation Note | $2 | -- |

1.      *Securitization Debt*

52.     The WBS consists of four series of Securitization Notes: (i) the Royalty Notes; (ii) the GFG Notes; (iii) the Fazoli's Notes; and (iv) the Twin Notes.  The Debtors' business also includes a fifth series of Securitization Notes: the Resid Notes.

a.      Royalty Notes

53.     On March 6, 2020, the Royalty Issuer entered into that certain Base Indenture (as amended, restated, amended and restated, modified, or supplemented prior to the Petition Date,

26

the "***Royalty Base Indenture***") with UMB Bank, N.A. as trustee and securities intermediary (in such capacity under the Royalty Base Indenture, the "***Royalty Trustee***").

54.    On April 26, 2021, the Royalty Issuer issued three series of notes under the Royalty Base Indenture with each series having a maturity date of April 25, 2051:  (i) $97,104,000 in principal amount of Class A-2 senior secured notes with an interest rate of 4.75% (the "***Series 2021-1 Royalty Class A-2 Notes***"); (ii) $32,368,000 in principal amount of Class B-2 senior subordinated notes with an interest rate of 8.00% (the "***Series 2021-1 Royalty Class B-2 Notes***"); and (iii) $15 million in principal amount of Class M-2 subordinated notes with an interest rate of 9.00% (the "***Series 2021-1 Royalty Class M-2 Notes***").

55.    On July 6, 2022, the Royalty Issuer issued three additional series of notes under the Royalty Base Indenture with each series having a maturity date of April 25, 2051:  (i) $42,696,000 in principal amount of Class A-2 senior secured notes with an interest rate of 4.75% (together with the Series 2021-1 Royalty Class A-2 Notes, the "***Royalty Class A-2 Notes***"); (ii) $14,232,000 in principal amount of Class B-2 senior subordinated notes with an interest rate of 8.00% (together with the Series 2021-1 Royalty Class B-2 Notes, the "***Royalty Class B-2 Notes***"); and (iii) $19,617,000 in principal amount of Class M-2 subordinated notes with an interest rate of 9.00% (together with the Series 2021-1 Royalty Class M-2 Notes, the "***Royalty Class M-2 Notes***"). The Royalty Class A-2 Notes, the Royalty Class B-2 Notes, and the Royalty Class M-2 Notes are collectively referred to as the "***Royalty Notes***," and the holders of the Royalty Notes are collectively referred to as the "***Royalty Noteholders***".[10]  The Royalty Issuer's obligations under

---

[10]    Of the $76.5 million aggregate principal amount of Royalty Notes, $30.0 million was sold privately during the third quarter of 2022, resulting in net proceeds of $27.1 million (net of debt offering costs of $0.6 million and original issue discount of $2.3 million).  The remaining $46.5 million in aggregate principal of Royalty Notes was sold privately on October 21, 2022, when the Company entered into an Exchange Agreement with the Twin Peaks Sellers (as defined below) and redeemed 1,821,831 shares of the FAT Preferred Stock (as defined below) at a price of $23.69 per share, plus accrued and unpaid dividends to the date of redemption, in exchange for

the Royalty Notes are guaranteed by, and secured by substantially all the assets of, the Royalty Securitization Guarantors.[11]

56.     As of the Petition Date, approximately $134 million of the Royalty Class A-2 Notes, $45 million of the Royalty Class B-2 Notes, and $33 million of the Royalty Class M-2 Notes remain outstanding (approximately $11 million of which are retained by FAT Brands), including outstanding principal and accrued and unpaid interest, fees (including any attorneys' and financial advisors' fees), costs, expenses, and all other amounts incurred or accrued with respect to the foregoing pursuant to, and in accordance with, the Royalty Base Indenture.

b.     GFG Notes

57.     On July 22, 2021, the GFG Issuer entered into that certain Base Indenture (as amended, restated, amended and restated, modified, or supplemented prior to the Petition Date, the "***GFG Base Indenture***") with UMB Bank, N.A. as trustee and securities intermediary (in such capacity under the GFG Base Indenture, the "***GFG Trustee***"), and issued three series of notes under the GFG Base Indenture with each series having a maturity date of July 25, 2051: (i) $209 million in principal amount of Class A-2 senior secured notes with an interest rate of 6.00% (the "***Series 2021-1 GFG Class A-2 Notes***"); (ii) $84 million in principal amount of Class B-2 senior subordinated notes with an interest rate of 7.00% (the "***Series 2021-1 GFG Class B-2 Notes***"); and (iii) $57 million in principal amount of Class M-2 subordinated notes with an interest rate of 9.50% (the "***Series 2021-1 GFG Class M-2 Notes***").  On that same date, FAT Brands and the GFG Trustee entered into a limited guaranty agreement, pursuant to which FAT Brands is liable for any loss to the GFG Trustee incurred on behalf of the GFG Noteholders (as

---

$46.5 million aggregate principal amount of secured debt ($43.2 million net of debt offering costs and original issue discount).

[11]   The Royalty Securitization Entities are the entities with light blue solid and/or striped boxes on the Organizational Chart.

defined below) resulting from certain trigger events, including any of the GFG Securitization Entities hindering the collection and payment of collateral, causing material diminution in value of the collateral or failing to cooperate after an event of default.

58.     On December 15, 2022, the GFG Issuer issued three additional series of notes under the GFG Base Indenture with each series having a maturity date of July 25, 2051:  (i) $ 67,756,000 in principal amount of Class A-2 senior secured notes with an interest rate of 6.00% (together with the Series 2021-1 GFG Class A-2 Notes, the "***GFG Class A-2 Notes***"); (ii) $20,261,000 in principal amount of Class B-2 senior subordinated notes with an interest rate of 7.00% (together with the Series 2021-1 GFG Class B-2 Notes, the "***GFG Class B-2 Notes***"); and (iii) $25,450,000 in principal amount of Class M-2 subordinated notes with an interest rate of 9.50% (together with the Series 2021-1 GFG Class M-2 Notes, the "***GFG Class M-2 Notes***").  The GFG Class A-2 Notes, the GFG Class B-2 Notes, and the GFG Class M-2 Notes are collectively referred to as the "***GFG Notes***," and such holders of the GFG Notes are collectively referred to as the "***GFG Noteholders***."[12]  The GFG Issuer's obligations under the GFG Notes are guaranteed by, and secured by substantially all the assets of, the GFG Securitization Guarantors.[13]

59.     As of the Petition Date, approximately $266 million of the GFG Class A-2 Notes, $100 million of the GFG Class B-2 Notes, and $79 million of the GFG Class M-2 Notes remain outstanding (approximately $35 million of which are retained by FAT Brands), including

---

[12]   Of the $113.5 million aggregate principal amount of GFG Notes, $25 million was sold privately during the fourth quarter of 2022, resulting in net proceeds of $22.3 million (net of debt offering costs of $0.4 million and original issue discount of $2.3 million).  The remaining $88.5 million in aggregate principal of GFG Notes was issued to FAT Brands, pending sale to third party investors, and has been eliminated in consolidation as of December 25, 2022.  In January 2023, an additional $40.0 million aggregate principal amount of GFG Notes was sold privately, resulting in net proceeds of $34.8 million net of debt offering costs and original issue discount.

[13]   The GFG Securitization Entities are the entities with green solid and/or striped boxes on the Organizational Chart. With respect to the Atlanta Factory, only the profits from the Atlanta Factory (and not the factory itself) guarantee and secure the GFG Notes.

outstanding principal and accrued and unpaid interest, fees (including any attorneys' and financial advisors' fees), costs, expenses, and all other amounts incurred or accrued with respect to the foregoing pursuant to, and in accordance with, the GFG Base Indenture.

c.     Fazoli's Notes

60.     On December 15, 2021, the Fazoli's Issuer entered into that certain Base Indenture (as amended, restated, amended and restated, modified, or supplemented prior to the Petition Date, the "***Fazoli's Base Indenture***") with UMB Bank, N.A. as trustee and securities intermediary (in such capacity under the Fazoli's Base Indenture, the "***Fazoli's Trustee***"), and issued three series of notes under the Fazoli's Base Indenture with each series having a maturity date of July 25, 2051: (i) $128,760,000 in principal amount of Class A-2 senior secured notes with an interest rate of 6.00% (the "***Fazoli's Class A-2 Notes***"); (ii) $25 million in principal amount of Class B-2 senior subordinated secured notes with an interest rate of 7.00% (the "***Fazoli's Class B-2 Notes***"); and (iii) $40 million in principal amount of Class M-2 subordinated notes with an interest rate of 9.00% (the "***Fazoli's Class M-2 Notes***" and, together with the Fazoli's Class A-2 Notes and the Fazoli's Class B-2 Notes, the "***Fazoli's Notes***" and, such holders of the Fazoli's Notes, the "***Fazoli's Noteholders***").   On that same date, FAT Brands and the Fazoli's Trustee entered into a limited guaranty agreement, pursuant to which FAT Brands is liable for any loss to the Fazoli's Trustee incurred on behalf of the Fazoli's Noteholders resulting from certain trigger events, including any of the Fazoli's Securitization Entities hindering the collection and payment of collateral, causing any material diminution in value of the collateral or failing to cooperate after an event of default.

The Fazoli's Issuer's obligations under the Fazoli's Notes are guaranteed by, and secured by substantially all the assets of, the Fazoli's Securitization Guarantors.[14]

61.　As of the Petition Date, approximately $124 million of the Fazoli's Class A-2 Notes and $24 million of the Fazoli's Class B-2 Notes remain outstanding (approximately $8 million of which are retained by FAT Brands), including outstanding principal and accrued and unpaid interest, fees (including any attorneys' and financial advisors' fees), costs, expenses, and all other amounts incurred or accrued with respect to the foregoing pursuant to, and in accordance with, the Fazoli's Base Indenture.　No Fazoli's Class M-2 notes remain outstanding other than the $39 million of the Fazoli's Class M-2 Notes retained by FAT Brands.

### d.　Resid Notes

62.　On July 10, 2023, the Resid Issuer entered into that certain Base Indenture (as amended, restated, amended and restated, modified, or supplemented prior to the Petition Date, the "***Resid Base Indenture***") with UMB Bank, N.A. as trustee and securities intermediary (in such capacity under the Resid Base Indenture, the "***Resid Trustee***").　Pursuant to the Resid Base Indenture, the Resid Issuer issued two (2) series of notes with each series having a maturity date of July 25, 2027: (i) $75 million in principal amount of Class A-1 senior secured notes with an interest rate of 10.00% (the "***Resid Class A-1 Notes***"); and (ii) $75 million in principal amount of Class A-2 senior subordinated secured notes with an interest rate of 10.00% (the "***Resid Class A-2 Notes***" and, together with the Resid Class A-1 Notes, the "***Resid Notes***," and the holders of the Resid Notes, the "***Resid Noteholders***").[15]

---

[14]　The Fazoli's Securitization Entities are the entities with red solid and/or striped boxes on the Organizational Chart.　With respect to the Company-Owned Restaurants within the Fazoli's Silo, only the profits from the restaurants (and not the restaurants themselves) guarantee and secure the Fazoli's Notes.

[15]　Of the $150.0 million aggregate principal amount of Resid Notes, $105.8 million were sold privately, resulting in net proceeds of $105.3 million.　A portion of the proceeds was used to purchase $64.6 million of outstanding Securitization Notes to be held for re-sale to third party investors.　The remaining $44.2 million in aggregate

63.     The Resid Notes are secured by a security interest in the future Management Fees and residual amounts paid to FAT Brands by the other Securitization Entities.  The Resid Notes are also secured by 44,638,745 shares of Class A Common Stock of Twin Hospitality (the "***Pledged Shares***") owned by FAT Brands.  The Pledged Shares represent approximately 86% of Class A Common Stock of Twin Hospitality but, given the voting control rights explained below, approximately 22.5% of the voting control of Twin Hospitality.

64.     As of the Petition Date, approximately $80 million of the Resid Class A-1 Notes (approximately $26 million of which is retained by FAT Brands) and $79 million of the Resid Class A-2 Notes (approximately $23 million of which is retained by FAT Brands) remain outstanding, including outstanding principal and accrued and unpaid interest, fees (including any attorneys' and financial advisors' fees), costs, expenses, and all other amounts incurred or accrued with respect to the foregoing pursuant to, and in accordance with, the Resid Base Indenture.

e.     Twin Notes

65.     On November 21, 2024, the Twin Issuer entered into that certain Base Indenture (as amended, restated, amended and restated, modified, or supplemented prior to the Petition Date, the "***Twin Base Indenture***" and, together with the Royalty Base Indenture, the GFG Base Indenture, the Fazoli's Base Indenture, and the Resid Base Indenture, the "***Base Indentures***") with UMB Bank, N.A. as trustee and securities intermediary (in such capacity under the Twin Base Indenture, the "***Twin Trustee***" and, together with the Royalty Trustee, the GFG Trustee, the Fazoli's Trustee, and the Resid Trustee, the "***Trustees***").  Pursuant to the Twin Base Indenture, the Twin Issuer issued four series of notes on November 21, 2024 with each series having a maturity date of October 26, 2054:  (i) $12,124,000 in principal amount of Class A-1 super senior secured

_____

principal of notes issued by FB Resid was issued to a wholly-owned subsidiary of FAT Brands, pending sale to third-party investors.

notes with an interest rate of 9.00% (the "**Twin Class A-1 Notes**"); (ii) $269,257,000 in principal amount of Class A-2 senior secured notes with an interest rate of 9.00% (the "**Twin Class A-2 Notes**"); (iii) $57,619,000 in principal amount of Class B-2 senior subordinated notes with an interest rate of 10.00% (the "**Twin Class B-2 Notes**"); and (iv) $77,711,000 in principal amount of Class M-2 subordinated notes with an interest rate of 11.00% (the "**Twin Class M-2 Notes**" and, together with the Twin Class A-1 Notes, the Twin Class A-2 Notes, and the Twin Class B-2 Notes, the "**Twin Notes**," and the holders of the Twin Notes, the "**Twin Noteholders**").  On that same date, Twin Hospitality and the Twin Trustee entered into a limited guaranty agreement, pursuant to which Twin Hospitality is liable for any loss to the Twin Trustee incurred on behalf of the Twin Noteholders resulting from certain trigger events, including one of the Twin Securitization Entities hindering the collection and payment of collateral, causing any material diminution in value of the collateral or failing to cooperate after an event of default.  The Twin Issuer's obligations under the Twin Notes are guaranteed by, and secured by substantially all of the assets of, the Twin Securitization Guarantors.[16]

66.    As of the Petition Date, approximately $12 million of the Twin Class A-1 Notes, $266 million of the Twin Class A-2 Notes, $57 million of the Twin Class B-2 Notes, and $78 million of the Twin Class M-2 Notes remain outstanding (approximately $10 million of which are retained by FAT Brands), including outstanding principal and accrued and unpaid interest, fees (including any attorneys' and financial advisors' fees), costs, expenses, and all other amounts incurred or accrued with respect to the foregoing pursuant to, and in accordance with, the Twin Base Indenture.

---

[16]    The Twin Securitization Entities are the entities with navy blue solid and/or striped boxes on the Organizational Chart.  With respect to the Company-Owned Restaurants within the Twin Silo, only the profits from the restaurants (and not the restaurants themselves) guarantee and secure the Twin Notes.

2.      *Non-Securitization Secured Debt*

a.      Twin Peaks Equipment Loans

67.      Between February 25, 2022 and December 17, 2024, certain Twin Hospitality entities—including Twin Restaurant Brandon, LLC, Twin Restaurant Burleson, LLC, Twin Restaurant Lakeland, LLC, Twin Restaurant McKinney RE, LLC, Twin Restaurant Terrell RE, LLC, TP Franchise Venture I, LLC, Twin Restaurant Investment Company II, LLC, Twin Restaurant Investment Company, LLC, Twin Restaurant Lewisville, LLC, Twin Restaurant Live Oak, LLC, and Twin Restaurant, LLC (collectively, the "*Equipment Borrowers*")—entered into a series of equipment financing agreements with Amur Equipment Finance Inc. (each as amended, restated, amended and restated, modified, or supplemented prior to the Petition Date, an "*Equipment Financing Agreement*") for certain equipment loans (the "*Equipment Loans*"). The Equipment Loans had principal amounts ranging from approximately $17,871 to $801,252, a per diem (*e.g.*, interest) payment equal to one-thirtieth (1/30) of the highest periodic payment amount owed under the applicable Equipment Financing Agreement, and terms ranging from forty-eight (48) to seventy-two (72) months.  Each Equipment Financing Agreement is secured by certain equipment of the respective Equipment Borrower.

68.      As of December 31, 2025, approximately $4 million remains outstanding on the Equipment Loans, including outstanding principal and accrued and unpaid interest, fees (including any attorneys' and financial advisors' fees), costs, expenses, and all other amounts incurred or accrued with respect to the foregoing pursuant to, and in accordance with, the Equipment Financing Agreements.

b.     Percent Promissory Notes

69.     On October 31, 2024, FAT GFG Notes I, LLC (the "***Percent Obligor***") entered into that certain Promissory Note (the "***GFG Percent Promissory Note***") to borrow $1,950,000 (plus certain additional draws upon request) from Cadence Group Platform, LLC (the "***Percent Lender***").  In total, the Percent Obligor has borrowed $8,560,173 from the Percent Lender.  The GFG Percent Promissory Note bears interest at 16.90% per annum and matures on July 25, 2026.  The GFG Percent Promissory Note is secured by approximately $14 million of the retained GFG Class M-2 Notes and substantially all of the assets of the Percent Obligor.  The GFG Percent Promissory Note is guaranteed by FAT Brands pursuant to that certain limited guaranty agreement entered into by FAT Brands for the benefit of the Percent Lender, dated October 31, 2024.

70.     On April 23, 2025, FAT Royalty Notes I, LLC (the "***Royalty Percent Borrower***") entered into that certain Promissory Note to borrow $1,277,538 (plus certain additional draws upon request) from the Percent Lender (the "***Royalty Percent Promissory Note***," and together with the GFG Percent Promissory Note, the "***Percent Promissory Notes***").  In total, the Royalty Percent Borrower has borrowed $6,230,078 from the Percent Lender.  The Royalty Percent Promissory Note bears interest at 17.00% per annum and matures on July 25, 2026.  The Royalty Percent Promissory Note is secured by approximately $11 million of retained Royalty Class M-2 Notes and substantially all of the assets of the Royalty Percent Borrower.  The Royalty Percent Promissory Note is guaranteed by FAT Brands pursuant to that certain limited guaranty agreement entered into by FAT Brands for the benefit of the Percent Lender, dated April 23, 2025.

71.     As of December 31, 2025, approximately $8.4 million remains outstanding on the GFG Percent Promissory Note and approximately $6.2 million remains outstanding on the Royalty Percent Promissory Note, including outstanding principal and accrued and unpaid interest, fees

(including any attorneys' and financial advisors' fees), costs, expenses, and all other amounts incurred or accrued with respect to the foregoing pursuant to, and in accordance with, the Percent Promissory Notes.

c. <u>Riverside Refi Loan</u>

72. FAT Brands from time to time, executed promissory notes (collectively, the "***Riverside Notes***") with Gold Cap LLC in the principal amount of approximately $20 million. On January 20, 2026, HDOS Acquisition, LLC (the "***Riverside Refi Obligor***") and Insight Capital, LLC (the "***Riverside Refi Lender***") entered into that certain loan agreement dated January 20, 2026, pursuant to which the Riverside Refi Lender loaned the Riverside Refi Obligor $18.75 million (the "***Riverside Refi Loan***").  The proceeds from the Riverside Refi Loan were used to satisfy the Riverside Notes in full.  The Riverside Refi Loan is secured by substantially all of the assets of the Riverside Refi Obligor, including the tangible and intangible assets of twenty-eight (28) Hot Dog on a Stick Company-Owned Restaurants.  Additionally, on January 20, 2026, FAT Brands executed a Security and Hypothecation Agreement, pursuant to which it pledged all of its membership interests in the Riverside Refi Obligor.

73. As of the Petition Date, $18.75 million in principal remains outstanding and due to the Riverside Refi Lender on the Riverside Refi Loan.

d. <u>Waterfall Loan</u>

74. On June 6, 2025, FAT Brands and Waterfall Bridge Capital LLC entered into that certain promissory note and related loan agreement (the "***Waterfall Loan Agreement***") to borrow up to $10 million in aggregate principal amount (the "***Waterfall Loan***").  The Waterfall Loan bears interest at 13.5% per annum and matures as of June 6, 2026.

36

75.     Pursuant to that certain Pledge Agreement dated June 6, 2025, the Waterfall Loan is secured by over eight (8) million shares of Class A Common Stock in Twin Hospitality owned by FAT Brands,[17] and all proceeds, products, accessions, rents and profits of or in respect of the pledged stock.

76.     As of the Petition Date, the amount outstanding on the Waterfall Loan is $10 million, including outstanding principal and accrued and unpaid interest, fees (including any attorneys' and financial advisors' fees), costs, expenses, and all other amounts incurred or accrued with respect to the foregoing pursuant to, and in accordance with, the Waterfall Loan Agreement.

3.     ***Non-Securitization Unsecured Debt***

a.     <u>Elevation Note</u>

77.     As part of the Debtors' acquisition of Elevation Burger in June 2019, a portion of the purchase price included the issuance to Elevation Franchise Ventures, LLC of a convertible subordinated, unsecured promissory note.  Accordingly, on June 19, 2019, FAT Brands issued a promissory note with a principal amount of approximately $7,509,816, bearing interest at 6.0% per year and maturing on July 19, 2026 (the "***Elevation Note***").  The Elevation Note is convertible under certain circumstances into shares of the FAT Brands's common stock at $12 per share.

78.     As of the Petition Date, approximately $2 million remains outstanding on the Elevation Note, including outstanding principal and accrued and unpaid interest, fees (including any attorneys' and financial advisors' fees), costs, expenses, and all other amounts incurred or accrued with respect to the foregoing pursuant to, and in accordance with, the Elevation Note.

---

[17]   The pledged stock was received by FAT Brands from an Exchange Agreement, dated June 4, 2025, pursuant to which FAT Brands exchanged assets due to it by Twin Hospitality for additional shares of common stock at market value.

b.        Tax Liabilities

79.        The Debtors paid a total of approximately $25,610,000 in taxes and fees for the

calendar year 2024.  The following table provides a summary of the approximate total amounts

paid by the Debtors in calendar year 2024:

| Category | Approximate Total Amount Paid in 2024 Calendar Year |
|---|---|
| Property Taxes | $110,000 |
| Sales and Use Taxes | $24,000,000 |
| Franchise and Gross Receipts Taxes and Income Taxes | $1,200,000 |
| Regulatory Assessments and Other Miscellaneous Fees | $300,000 |
| **TOTAL** | $25,610,000 |

80.        Certain of the Debtors have failed to timely pay certain taxes and fees that became

due and owing prior to the Petition Date (collectively, the "***Past-Due Taxes***").[18]  Based on these

Past-Due Taxes, certain taxing authorities have placed liens against the Debtors.  As of the Petition

Date, the Past-Due Taxes are asserted against certain Debtors in the amount of approximately

$5,000,000.  The Debtors are not currently seeking authority to remit any "catch-up" payments,

late penalties, or similar fees to any taxing authorities on account of the Past-Due Taxes.

c.        Other General Unsecured Claims

81.        As of the Petition Date, the Debtors estimate approximately $104 million of general

unsecured claims, which are not entitled to priority payment under the Bankruptcy Code (other

---

[18]   The majority of Past Due Taxes are liabilities of legacy entities that sit outside the Debtors' WBS structure.

than intercompany claims and claims of trade creditors described herein).  This number remains subject to ongoing review and analysis.

### 4. *Equity Interests*

82.     As noted earlier in this Declaration, the Debtor entities include two publicly traded entities: FAT Brands and Twin Hospitality.  FAT Brands has issued preferred and common stock, while Twin Hospitality has issued only common stock.

### a.     FAT Preferred Stock

83.     FAT Brands's Certificate of Incorporation, as amended and restated, authorizes the issuance of up to 15 million shares of preferred stock, of which 11.5 million shares have been designated as Series B Cumulative Preferred Stock (the "***FAT Preferred Stock***").  The FAT Preferred Stock has liquidation and dividend rights superior to the rights of FAT Brands's common stock and trades on the Nasdaq Stock Market under the symbol "FATBP."  To date, FAT Brands has issued an aggregate of 10,430,220 shares of FAT Preferred Stock, a portion of which was redeemed.  The cumulative cash dividend for the FAT Preferred Stock is 8.25% based on a $25 liquidation preference per share and generally payable monthly in arrears when dividends are declared.  The FAT Preferred Stock has no voting rights.  As of the Petition Date, 8,608,389 shares of FAT Preferred Stock remain issued and outstanding.

84.     A portion of the consideration for FAT Brands's acquisition of GFG on July 22, 2021, was 3,089,245 newly issued shares of FAT Preferred Stock valued at $67.3 million at the time of the acquisition (the "***GFG Preferred Stock Consideration***").  In connection therewith, on July 22, 2021, the sellers of GFG (the "***GFG Sellers***") and FAT Brands entered into a put/call agreement, pursuant to which FAT Brands received the option to purchase, and the GFG Sellers received the option to require FAT Brands to purchase, the GFG Preferred Stock Consideration

for $67.5 million, plus any accrued but unpaid dividends on or before August 20, 2022.  Following receipt of a put notice for the GFG Preferred Stock Consideration on March 22, 2022, FAT Brands failed to deliver the required cash proceeds to the GFG Sellers by August 20, 2022, resulting in such amounts accruing interest at an annual rate of 5.0%.  Since then, FAT Brands entered into agreements in 2022 and 2023 with certain of the GFG Sellers who hold claims on account of the exercised put option for the GFG Preferred Stock Consideration.  These agreements provide that the interest rates with respect to such GFG Sellers' claims have been increased to a 10% annual rate.  The obligations owed to the GFG Sellers on account of the put options exercised with respect to the GFG Preferred Stock Consideration, including all unpaid interest and dividends, were approximately $67.5 million as of the Petition Date, excluding interest and dividends payable.

85.     A portion of the consideration for FAT Brands's acquisition of Twin Peaks on October 1, 2021, included 2,847,393 shares of FAT Preferred Stock valued at $67.5 million at the time of the acquisition (the "***Twin Peaks Preferred Stock Consideration***").   In connection therewith, on October 1, 2021, the sellers of Twin Peaks (the "***Twin Peaks Sellers***") and FAT Brands entered into a put/call agreement, pursuant to which FAT Brands received the option to purchase, and the Twin Peaks Sellers received the option to require FAT Brands to purchase, 1,821,831 shares of the Twin Peaks Preferred Stock Consideration for $42.5 million, plus any accrued but unpaid dividends on or before March 31, 2022 (the "***Initial Twin Peaks Preferred Stock Consideration***") and the remaining 1,025,562 shares of the Twin Peaks Preferred Stock Consideration for $25 million, plus any accrued but unpaid dividends on or before September 30, 2022 (the "***Secondary Twin Peaks Preferred Stock Consideration***").  Following receipt of a put notice on the Initial Twin Peaks Preferred Stock Consideration on October 7, 2021, FAT Brands

redeemed the Initial Twin Peaks Preferred Stock Consideration (1,821,831 shares) pursuant to an exchange transaction on October 21, 2022.

86.     As of the Petition Date, 8,608,389 shares of FAT Preferred Stock remain outstanding.

b.      <u>FAT Common Stock</u>

87.     FAT Brands's Certificate of Incorporation, as amended and restated, authorizes the issuance of up to 50 million shares of Class A Common Stock and 1.6 million shares of Class B Common Stock.  Shares of FAT Brands's Class A Common Stock trade on the Nasdaq Stock Market under the symbol "FAT" and shares of its Class B Common Stock trade on the Nasdaq Stock Market under the symbol "FATBB."  Warrants to purchase FAT Brands's Class A Common Stock traded on the Nasdaq Stock Market under the symbol "FATBW" from July 2020 until their expiration in July 2025.

88.     Under its Certificate of Incorporation, FAT Brands's Class A Common Stock is required to receive equal or better economic treatment than FAT Brands's Class B Common Stock in transactions such as distributions, mergers, dissolution, or recapitalization.  However, Class B Common Stock practically exercises more control over FAT Brands through increased voting rights held by Class B Common Stock—while holders of Class A Common Stock are entitled to one vote per share, holders of Class B Common Stock are entitled to 2,000 votes per share.  Any dividends that are declared are ratably distributed amongst holders of Class A Common Stock and holders of Class B Common Stock.

89.     As of the Petition Date, 16,668,520 Class A Common Stock shares remain outstanding, 1,270,805 Class B Common Stock shares remain outstanding, and no Class A Common Stock warrants remain outstanding.  About 42.1% of the Class A Common Stock and

41

55.7% of the Class B Common Stock are owned by Fog Cutter Holdings LLC ("**Fog Cutter**"), which is the family investment arm of FAT Brands's founder and Chief Executive Officer.  Fog Cutter has significant influence over FAT Brands's management and affairs and can control virtually all matters requiring stockholder approval, including election of directors and significant corporate transactions.  As a result, FAT Brands is considered a "controlled company" under the corporate governance rules of the Nasdaq Stock Market LLC.

c.    <u>Twin Common Stock</u>

90.     Twin Hospitality's Certificate of Incorporation, as amended and restated, authorizes the issuance of 100 million shares of Class A Common Stock and 2.87 million shares of Class B Common Stock.  Twin Hospitality's Class A Common Stock is traded under the symbol "TWNP" on Nasdaq Global Market.  FAT Brands owns 100% of the Class B Common Stock, which is not publicly traded.

91.     Class A Common Stock is required to receive equal or better economic treatment than Class B Common Stock in transactions such as distributions, mergers, dissolution, or recapitalization.  However, while holders of Class A Common Stock receive one vote per share, holders of Class B Common Stock receive 50 votes per share, causing holders of Class B Common Stock to have greater influence over Twin Hospitality's decision making.

92.     As of the Petition Date, 55,862,854 Twin Hospitality Class A Common Stock shares remain outstanding and 2,870,000 Twin Hospitality Class B Common Stock shares remain outstanding.

## III.    <u>EVENTS LEADING TO COMMENCEMENT OF THE CHAPTER 11 CASES</u>

93.     The revenues generated by the Debtors' operating businesses are consistent with comparable companies in the Debtors' industry.  The brands remain popular with customers as

42

same store sales continue to follow industry trends while still generating positive EBITDA.  The Debtors' capital and operating cost structure has, however, become unsustainable.  The Management Fees do not cover the operating costs in ordinary industry conditions.  And, in recent years, industry conditions have been anything but ordinary due to inflation and persistent economic uncertainty prompting low- and middle-income consumers to reduce discretionary spending.  As a result of the securitization structure, the Residual Amounts are only available to pay the required SG&A expenses to run the Debtors' businesses <u>after</u> debt service payments.  But the Debtors have no excess cash flow available after debt service to support such expenses.  Accordingly, the Debtors' liquidity has been stretched thin trying to make debt service payments and meet ordinary operating expenses.  To ensure that the Debtors' operations continue, and in an effort to maximize value, the Managers have been forced to find temporary solutions for the liquidity shortfalls (as outlined above) as they attempt to negotiate with the Securitization Noteholders regarding the terms of a consensual restructuring.  Because the Debtors have exhausted most of their liquidity, they have determined that seeking relief under chapter 11 and continuing their efforts to develop a value-maximizing plan while under the protection of the Bankruptcy Code is the best approach for the Debtors to maximize value for all stakeholders.

### A.    External and Internal Challenges

#### 1.    *Economic Factors*

94.    The Debtors' ability to service their debt and invest in their brands depends on significant positive cash flow.  Inflationary pressures across various sectors and economic uncertainty in the broader economy, however, have impacted the restaurant industry as a whole and, to an extent, the Debtors' operations.

95.      Economic factors have shifted consumer preferences.  The initial shift away from in-restaurant dining experiences sparked by the COVID-19 pandemic has had lasting impacts. Since then, heightened rates of inflation coupled with stagnating wage growth have made consumers increasingly cost-conscious, and dining preferences have begun to shift to more cost-efficient alternatives.

96.      In addition, the Debtors have experienced higher costs and lower margins as a result of several factors.  For example, the Debtors' import of certain products for the Atlanta Factory has been subject to tariffs, which increased the Debtors' cost of producing their cookie dough products.  In addition, lasting effects of the COVID-19 pandemic and the ongoing war in Ukraine have disrupted supply chains, which has raised the prices for the Debtors' inputs.  Finally, labor costs have increased due to a tight national labor market for food service workers.

97.      The Debtors bear the cost of these challenges directly at the Company-Owned Restaurants but also indirectly via their franchisees.  Indeed, one key pillar of the Debtors' business model is the opening of additional domestic and international franchisee-owned restaurants at the rate contemplated by the Debtors' business forecasts.  As a result of changes in dining preferences, global economic uncertainty, and tariffs that increase the cost for potential franchisees to open a new franchise, the rate of such openings has slowed, and the Debtors have not met their projections.  In addition, delays in franchisees opening new locations on schedule have materially impacted the Debtors' revenue growth.

### 2.      *Ongoing Litigation*

98.      The Debtors' liquidity has been further hampered by significant litigation.  Of note, in December 2021, the U.S. Attorney's Office for the Central District of California and the U.S. Securities and Exchange Commission ("*SEC*") opened investigations into FAT Brands and its

44

Chief Executive Officer and issued a formal document request related thereto. On May 10, 2024, the U.S. Department of Justice indicted FAT Brands (the "*DOJ Suit*").[19] Concurrently with the DOJ Suit, the SEC filed a complaint against FAT Brands (the "*SEC Suit*").[20] The DOJ Suit was dismissed on August 7, 2025, and the Debtors and the SEC have reached an agreement in principle to resolve the SEC Suit, which remains subject to approval by the SEC commissioners. The Debtors incurred significant costs in defending both such suits.

99.     The Debtors have also faced ongoing civil suits, including multiple class action lawsuits and derivative suits in the Delaware Court of Chancery. On December 17, 2025, the Delaware Chancery Court approved a settlement in certain derivative suits. However, the Debtors still anticipate ongoing litigation in other matters. As a result of these lawsuits and other legal disputes, the Debtors have incurred close to $85.5 million in legal costs since 2021.

### 3.     *Capital Structure Overhang*

100.     The foregoing challenges have been severely amplified by the WBS.

#### a.     WBS Is Starving the Business

101.     The Debtors require both the funds received from the Management Fees and excess cash flow in the WBS waterfall to run their businesses, but excess cash flow has become non-existent. As described above, the Base Indentures require significant principal and interest payments, all of which must be satisfied before the Debtors can generate sufficient excess cash flow necessary to pay their operating expenses in full with the Residual Amounts (which are not

---

[19]   The indictment in the DOJ Suit alleged two violations of Section 402 of the Sarbanes-Oxley Act for directly and indirectly extending and/or arranging for the extension of credit in 2019 and 2020 to company personnel, including FAT Brands's Chief Executive Officer.

[20]   The complaint in the SEC Suit alleged violations of the Securities Act and the Securities Exchange Act for failing to disclose certain related party transactions and the salaries of certain company personnel, failing to maintain proper books and records and internal accounting controls, making false or misleading statements regarding FAT Brands's liquidity and use of proceeds from certain transactions, and directly or indirectly extending credit to its Chief Executive Officer in the form of a personal loan.

available).  Starting in 2023, as a result of penalties related to the Debtors' failure to pay the Securitization Notes by the applicable anticipated call dates, the Debtors were charged penalty interest in the amount of 1.0% on the outstanding principal amount of the applicable Securitization Notes in addition to significant penalty amortization payments, including a 2.0% amortization on the Royalty Notes, the GFG Notes, and the Fazoli's Notes.  The Twin Notes also experienced additional penalties including (i) 2.0% incremental base interest on the Twin Class A-2 Notes and 1.0% incremental base interest on the Twin Class B-2 Notes and the Twin Class M-2 Notes, (ii) 2.75% amortization on the Twin Class A-2 Notes and 2.0% amortization on the Twin Class B-2 Notes, and (iii) 3.0% penalty interest on the Twin Class A-2 Notes and 2.0% penalty interest on the Twin Class B-2 Notes, due to not completing a qualified equity offering by April 30, 2025.  The Debtors have paid over $72 million in penalty interest and penalty amortization payments under the Securitization Notes since the end of 2022.

102.    In part because of the significant increase in debt service obligations, the Debtors no longer have the necessary cash flow to run their businesses.  With limited to no excess cash flow after debt service, the Residual Amounts flowing through the Payment Waterfalls are no longer available and the Management Fees represent only a small portion of the overall operating costs and provide relatively low coverage relative to similar companies.  As shown in the below chart, comparable whole-business securitization structures are structured to fully cover selling, general, and administrative expenses ("***SG&A Expenses***").  The WBS, on the other hand, leaves 80% of the Debtors' SG&A Expenses uncovered.

| Company | Source | Baseline SG&A Coverage | | | | Supplemental SG&A Coverage | | | SG&A Covered |
| | | A Securitization Mgmt. Fee | B Income Outside WBS | C SG&A | (A+B)/C % SG&A Covered | D Residual Sec. CF | E (C-B-A) Uncovered SG&A | D/E Residual as % Uncovered | |
|---|---|---|---|---|---|---|---|---|---|
| Applebee's / IHOP | 10K/Q | $140 | $28 | $146 | 115% | $124 | $– | NA | Yes |
| Dominos | OM | 324 | 62 | 417 | 93% | 750 | 31 | 2,447% | Yes |
| Planet Fitness | 10K/Q | 76 | ??? | 121 | >63% | 498 | 45 | 1,109% | Yes |
| Wendy's | 10K/Q | 151 | – | 233 | 65% | 814 | 82 | 994% | Yes |
| Jack in the Box | 10K/Q | 58 | – | 90 | 64% | 245 | 32 | 763% | Yes |
| Wingstop | 10K/Q | 48 | 29 | 113 | 68% | 232 | 36 | 651% | Yes |
| Dunkin | OM | 97 | – | 190 | 51% | 525 | 93 | 565% | Yes |
| European Wax | 10K/Q | 36 | – | 53 | 68% | 61 | 17 | 360% | Yes |
| Jersey Mikes | OM | 45 | 7 | 170 | 31% | 270 | 118 | 229% | Yes |
| Bojangles | OM | 21 | – | 64 | 33% | 78 | 43 | 182% | Yes |
| Driven Brands | 10K/Q | 139 | 56 | 549 | 35% | 601 | 355 | 170% | Yes |
| Zaxbys | OM | 29 | – | 124 | 23% | 148 | 95 | 156% | Yes |
| **FAT Brands (Consolidated)** | | **$17** | **$–** | **$98** | **18%** | **$1** | **$81** | **2%** | **No** |

All other WBS cover a much higher % of SG&A with securitization management fees and other assets

~80% of FAT's SG&A is uncovered

103.    To address this deficit, the Debtors have had no choice but to look to non-securitization debt, underspent advertising costs,[21] common and preferred equity raises, and the sale of additional Securitization Notes that had been retained or purchased by the Debtors.[22] However, the Debtors have exhausted their ability to incur additional debt or raise equity, and the Securitization Notes retained by the Debtors are no longer a source of liquidity because the Trustees froze the Debtors' ability to sell such notes.  Put simply, complying with the WBS structure at this juncture would render the Debtors unable to pay their operating expenses.

b.    Debtors Resorted to Self Help

104.    With no other sources of liquidity to turn to, the Debtors were required to use the Retained Collections to meet the Debtors' business and operating expenses, including to fund payroll, consulting and legal fees, restructuring and advisory costs, and certain debt service obligations to mitigate business disruption and continue operations.  Such actions, which the

---

[21]    For example, the Debtors used approximately $8.6 million in underspent advertising costs as an additional source of liquidity.

[22]    Certain of the contributions by the FAT Manager to cover operating expenses of the Securitization Entities qualify as "Manager Advances" that are entitled to priority reimbursement under the applicable Base Indentures.

Debtors disclosed in their public filings (in addition to certain other events that are described below), have resulted in events of default and manager termination events under the Securitization Notes that would permit the holders of the Securitization Notes to exercise a suite of remedies.

105.    The Debtors have, accordingly, received multiple notices and letters from the Trustees and the WBS Ad Hoc Group since August 2025.  These notices have declared events of default, manager termination events that give the Securitization Noteholders the right to remove the Managers, rapid amortization events, and immediate acceleration of all outstanding principal and accrued interest under the Securitization Notes as a result of the Debtors' failure to retain required collections and other events of default.  However, as of the Petition Date, no remedies have been pursued by the Securitization Noteholders, and no manager terminations have occurred.

106.    While these actions enabled the continued preservation of the Debtors' businesses, the Debtors' liquidity is very constrained.  As of the end of day on January 23, 2026, the Debtors had approximately $2.1 million of unrestricted cash on hand and approximately $19.9 million of cash held in restricted accounts not under the Debtors' control.

107.    The Debtors are, thus, unable to continue operating their business in its current state or even think about investing in their brands and growing their franchises to generate cash to repay the Securitization Notes.  The Debtors' capital structure is no longer sustainable.

**B.      Prepetition Restructuring Efforts**

108.    Against that backdrop, the Debtors have spent substantial time and resources exploring options to right size their capital structure and maintain the strength of their brands.  Over the past two years, the Debtors have attempted to work with various members of the WBS Ad Hoc Group to restructure their outstanding obligations.  For example, over the course of 2024, the Debtors negotiated with certain members of the WBS Ad Hoc Group the refinancing of the

then-existing WBS for the Twin Peaks and Smokey Bones restaurants, culminating in the issuance of the Twin Notes in connection with the planned listing of Twin Hospitality as a standalone public company.  In the first quarter of 2025, the Debtors also worked with members of the WBS Ad Hoc Group to amend the Fazoli's Base Indenture to extend the anticipated repayment date for the Fazoli's Class A-2 Notes to July 2026 and relax certain financial covenants in exchange for more demanding interest payments on notes that are not timely repaid.

109.     After the Debtors completed the issuance of the Twin Notes, the Debtors attempted to utilize the equity of Twin Hospitality to raise liquidity and reduce their funded debt obligations. Specifically, on September 24, 2025, Twin Hospitality filed a Form 1-A for a $75 million equity offering.  However, because of the government shutdown and depreciation in the value of Twin Hospitality stock, such an equity raise was not a viable solution to raise meaningful capital. Additionally, the Debtors generally tried to cut spending by halting common equity dividends, accruing preferred dividends, stopping cash interest payments on preferred equity put agreements, reducing personnel headcounts, and reducing certain corporate overhead spending.

110.     The Debtors also sought to improve their financial position through organic growth in new business lines.

111.     Finally, the Debtors have used a series of financings to bolster liquidity.  These unsecured financings were backed by Twin Hospitality- and FAT Brands-held retained notes.  But these additional financing sources have run their course, and the Debtors need additional liquidity to operate their businesses and preserve value.

**C.     Discussions with the Securitization Noteholders and Acceleration Notices**

112.     Since summer 2025, the Debtors have had discussions with the WBS Ad Hoc Group regarding one or more potential transactions to address the Debtors' liquidity and capital

structure challenges.  By Fall 2025, the parties were focused on reaching an agreement on a forbearance construct that would give the Debtors time to raise equity to reduce their debt obligations.  These discussions, however, did not result in an agreement.

113.    The parties resumed discussions in the weeks leading up to the Petition Date.  In late 2025, the Debtors also began engaging in discussions with counsel to the Resid Noteholders.  Ultimately, however, the Debtors were unable to reach an agreement regarding a potential restructuring ahead of the chapter 11 filing.

114.    From these discussions, it became clear that an out-of-court restructuring was not feasible because a restructuring to make the capital structure sustainable would likely require unanimous creditor approval.  In addition, the WBS Ad Hoc Group indicated that, absent a chapter 11 filing, it would direct (i) the issuance of a notice of foreclosure on the collateral securing the Securitization Notes, (ii) the termination of the Managers, and (iii) the exercise of control over the Debtors' deposit accounts.  Accordingly, the Debtors have determined that filing chapter 11 is the best path forward for the Debtors to achieve a comprehensive and value-maximizing solution for their capital structure.

115.    Prior to commencing the Chapter 11 Cases, the Debtors (together with the Advisors) ran a preliminary marketing process in search of financing.  GLC initially solicited proposals for priming, junior, or unsecured postpetition financing from over twenty-seven (27) potential lenders.  Of those potential lenders, eight (8) are under non-disclosure agreement and in the process of analyzing diligence.  To date, the Debtors have not received any actionable financing proposals.  The Debtors received a debtor-in-possession proposal from the WBS Ad Hoc Group but, after review and discussion with the Advisors, the Debtors, in their business judgment,

determined that the proposal and related restructuring terms were not actionable.  The Debtors and their advisors intend to continue the process postpetition on an expedited timeline.

116.    As such, the Debtors must rely on cash collateral and future cash receipts in the initial phase of the Chapter 11 Cases; in fact, the Debtors' proposed cash collateral budget only contemplates four (4) weeks of cash collateral use.  The Debtors intend to use this initial period wisely and expeditiously, aware that the liquidity runway is limited and that the Debtors are cash constrained.  Although the Debtors are entering the Chapter 11 Cases without an agreed path forward, the Debtors intend to continue engaging with the WBS Ad Hoc Group and other key stakeholders, as appropriate, through formal mediation on an expedited timeline from the very outset of the Chapter 11 Cases.  As part of the mediation and on a contemporaneous timeline, the Debtors will continue to seek financing from all parties (including the WBS Ad Hoc Group) for the Chapter 11 Cases given that the cash collateral budget only contemplates four (4) weeks of use and the Debtors cannot continue to operate in chapter 11 without additional liquidity.  The Debtors encourage the WBS Ad Hoc Group to engage with the Debtors through consensual mediation quickly following the first day hearing.  Accordingly, the Debtors' boards of directors voted to approve the filing of the Chapter 11 Cases.

## IV.    FIRST-DAY PLEADINGS

117.    In furtherance of their objective of preserving value for all stakeholders, the Debtors have filed the following First Day Pleadings and proposed orders contemporaneously herewith and have therein requested that the Court consider entering the proposed orders granting the relief sought in First Day Pleadings.  For the avoidance of doubt, as to those First Day Pleadings that seek authorization to pay prepetition obligations, the Debtors seek authority, but not direction, to pay amounts or satisfy obligations that are the subject of the First Day Pleadings.  The facts set

forth in each of the First Day Pleadings are incorporated herein in their entirety. The First Day Pleadings include:

### A. Administrative and Procedural Pleadings

(i) *Emergency Motion of Debtors for Entry of an Order Directing Joint Administration of Chapter 11 Cases*

(ii) *Emergency Motion of Debtors for Entry of an Order (I) Authorizing the Debtors to File a Consolidated Creditor Matrix and List of the 30 Largest Unsecured Creditors; (II) Waiving the Requirement to File a List of Equity Security Holders; (III) Authorizing the Debtors to Redact Certain Personally Identifiable Information; (IV) Approving the Form and Manner of Notice of Commencement; and (V) Granting Related Relief*

(iii) *Emergency Ex Parte Application of Debtors for Entry of an Order Authorizing the Employment and Retention of Omni Agent Solutions, Inc. as Claims, Noticing, and Solicitation Agent*

(iv) *Emergency Motion of Debtors for Entry of an Order (I) Extending the Time to File Schedules of Assets and Liabilities, Schedules of Executory Contracts and Unexpired Leases, Statements of Financial Affairs, and 2015.3 Reports; (II) Modifying the Requirements of Bankruptcy Local Rule 2015-3; and (III) Granting Related Relief*

(v) *Notice of Designation as Complex Bankruptcy Case*

(vi) *Notice of Emergency Virtual Hearing on First Day Motions*

### B. Operational Motions

(i) *Emergency Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Continue Existing Cash Management System, (B) Maintain Existing Business Forms and Intercompany Arrangements, and (C) Continue Intercompany Transactions; and (II) Granting Related Relief*

(ii) *Emergency Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Claims of Essential Creditors; (II) Confirming Administrative Expense Priority of Undisputed and Outstanding Prepetition Orders; (III) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers; and (IV) Granting Related Relief*

(iii) *Emergency Motion of Debtors for Entry of an Order (I) Authorizing the Debtors to (A) Continue Insurance Programs, Including Maintenance of Insurance Policies, Letters of Credit, Premium Financing*

*Agreements, and Bonding Program, and (B) Pay All Obligations with Respect                                   Thereto;                                   and (II) Granting Related Relief*

(iv)     *Emergency Motion of Debtors for Entry of an Order (I) Authorizing Debtors to Pay Certain Prepetition Taxes and Fees and (II) Granting Related Relief*

(v)      *Emergency Motion of Debtors for Entry of an Order (I) Approving Debtors' Proposed Form of Adequate Assurance of Payment to Utility Providers; (II) Establishing Procedures for Resolving Requests for Additional Adequate Assurance; (III) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Service; and (IV) Granting Related Relief*

(vi)     *Emergency Motion of Debtors for Entry of an Order (I) Authorizing Debtors to (A) Honor Their Prepetition Obligations to Customers, and (B) Continue Their Customer and Franchisee Programs; and (II) Granting Related Relief*

(vii)    *Emergency Motion of Debtors for Entry of an Order (I) Authorizing Debtors to (A) Pay Prepetition Wages, Salaries, Employee Benefits, and Other Compensation, and (B) Maintain Employee Benefits Programs and Pay Related Obligations; and (II) Granting Related Relief*

**C.     Financing Motion**

(i)      *Emergency Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to Use Cash Collateral; (II) Granting Adequate Protection for the Use of Cash Collateral; (III) Scheduling a Final Hearing; and (IV) Granting Related Relief*

118.    I have reviewed each of the First Day Pleadings, proposed orders, and exhibits thereto, or have otherwise had their contents explained to me, and the facts set forth therein are true and correct to the best of my knowledge, information, and belief.  Moreover, I believe that the relief sought in each of the First Day Pleadings:  (i) is vital to enabling the Debtors to make the transition to, and operate in, chapter 11 with minimal employee attrition and disruption to their enterprise, and without loss of productivity or value; (ii) is necessary to preserve valuable relationships with creditors; and (iii) constitutes a critical element in the Debtors' ability to

successfully maximize value for the benefit of their estates and a prudent exercise of the Debtors' business judgment.

## **CONCLUSION**

119.    The above describes the Debtors' operations and capital structure, the factors that precipitated the commencement of the Chapter 11 Cases, and the critical need for the Debtors to obtain the relief set forth in the First Day Pleadings.  These Chapter 11 Cases will allow the Debtors to achieve their reorganization goals and emerge with a stable and healthier balance sheet.  With significant deleveraging, the Debtors will be better positioned to reach a consensus on a value-maximizing framework in the near term and maximize value for all stakeholders.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct.

Dated:   January 27, 2026
          Chicago, Illinois

                                     */s/ John C. DiDonato*
                                     Name: John C. DiDonato
                                     Title: Chief Restructuring Officer

## <u>CERTIFICATE OF SERVICE</u>

I certify that on January 27, 2026, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas on those parties registered to receive electronic notices.

*/s/ Timothy A. ("Tad") Davidson II*
Timothy A. ("Tad") Davidson II

**<u>Exhibit A</u>**

**Organizational Chart**

