**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| FAT BRANDS INC., *et al.*, | ) | Case No. 26-90126 (ARP) |
| | ) | |
| Debtors.[1] | ) | (Jointly Administered) |
| | ) | |

### THE AD HOC GROUP OF
### SECURITIZATION NOTEHOLDERS' MOTION FOR AN ORDER
### APPOINTING A CHAPTER 11 TRUSTEE FOR THE SECURITIZATION DEBTORS

The Ad Hoc Group of Securitization Noteholders (the "**Ad Hoc Group**"), collectively holding approximately $990 million (or 85%) of the notes outstanding under the Prepetition Securitizations, files this motion (the "**Motion**") under section 1104 of title 11 of the United States Code (the "**Bankruptcy Code**"), requesting entry of the attached order (the "**Order**") appointing a chapter 11 trustee for each of the Securitization Debtors (as defined below).[2]  In support of the Motion, the Ad Hoc Group relies upon the *Declaration of Laura J. Garr in Support of the Ad Hoc Group of Securitization Noteholders' (I) Motion for an Order Appointing a Chapter 11 Trustee and (II) Omnibus Objection to the Debtors' Cash Collateral Motion and Cash Management Motion* (the "**Garr Declaration**").

---

[1]  A complete list of the Debtors in the Chapter 11 Cases and the last four digits of each Debtor's taxpayer identification number (if applicable) may be obtained on the website of the Debtors' proposed claims and noticing agent at https://omniagentsolutions.com/FATBrands.  The Debtors' mailing address for purposes of the Chapter 11 Cases is 9720 Wilshire Blvd., Suite 500, Beverly Hills, CA 90212.

[2]  To the extent the Court requires additional evidentiary support for this Motion, the Ad Hoc Group reserves the right to seek discovery.

## PRELIMINARY STATEMENT[3]

1.     A chapter 11 trustee is required because the Debtors are currently run by a Chief Executive Officer and controlling shareholder, Andrew Wiederhorn, that treats these companies as his personal piggy bank.  The Debtors' first day pleadings are a fairytale, in which a well-intentioned parent company tried valiantly to provide essential services to the separately securitized subsidiaries that it managed even though (for some unexplained reason) it did not have sufficient cash to do its job.

2.     In truth, the Debtors' operating businesses, which are separately financed and securitized, generate sufficient income to support their basic operating expenses.  And the agreed management fee should be sufficient for the parent company to provide the management services to support the securitizations.  That is how the system is designed to work.  The reason these Debtors are short on cash is because Andrew Wiederhorn looted them to support himself and his family.  Sadly, this is par for the course with Mr. Wiederhorn, who pled guilty to felony charges stemming from loans made to him—and subsequently forgiven—by a company he controlled. Wiederhorn was indicted for running the same scheme on these Debtors.  While he may not have been criminally convicted this time, he nevertheless admitted to taking a $47 million loan from these Debtors that his hand-picked board then forgave.  Not surprisingly, this type of conduct has led to a rash of litigation all caused by Mr. Wiederhorn's looting.

3.     The Debtors' first day filings fail to explain the true reason for the Debtors' lack of liquidity, which they then use as an excuse for ignoring the highly negotiated cash controls and restrictions that should have protected the Securitization Debtors and which this Debtors' board and management team admits to systematically violating.  Four key facts explain what really

---

[3]   Capitalized terms used but not immediately defined in this Preliminary Statement shall have the meaning ascribed to such terms elsewhere in this Motion.

happened here.  **First**, the Debtors employ Mr. Wiederhorn and eight members of his family.  The total cost of salary, benefits, and consulting fees paid to Mr. Wiederhorn and his relatives totalled more than $22 million over the last two years.  This includes $1.1 million in "bonuses" paid on the eve of bankruptcy.  **Second**, the Debtors have loaned Andrew Wiederhorn over $47 million that he has never repaid and distributed an additional $17 million in dividends to him and his family in the past five years.  **Third**, the Debtors have subsidized Mr. Wiederhorn's extravagant lifestyle.  Between October 2017 and March 2021, the Debtors paid over $27 million on private jets, luxury vacations, jewelry and other personal expenses.  **Fourth**, a material portion of the $85.5 million in "litigation expenses" referred to in paragraph 99 of the First Day Declaration[4] were fees paid to Mr. Wiederhorn's personal lawyers and for defending against charges for tax evasion, wire fraud, and felony firearm possession, among others.  These amounts are just what has been identified already, without the benefit of discovery.  Sadly, there is likely more.

4.       Given these facts, the Court should not allow the Securitization Debtors to be managed by Mr. Wiederhorn and his hand-picked board members.

5.       The Debtors' recent appointment of a "Special Committee" does nothing to change this fact.  Prior to the appointment of the Special Committee, six of the thirteen board members were Mr. Wiederhorn's immediate or extended family, giving him total control over the board.  The "Special Committee," which includes only two independent board members, has no power to do anything.  As the First Day Declaration makes clear, the Special Committee only has the power to "make recommendations to approve or reject any restructuring transaction[]."[5]  The existing

---

[4]      *Declaration of John C. Didonato in Support of Debtors' Chapter 11 Petitions and First Day Relief* [Docket No. 15] (the "**First Day Declaration**").

[5]      First Day Decl. ¶ 38.

boards, which have presided over the Debtors' gross mismanagement, retain the power to make all decisions, and they can ignore the Special Committee's recommendations.

6.      This is a textbook case for application of section 1104(a). An independent fiduciary is required to run these chapter 11 estates, and the appointment of a chapter 11 trustee to replace FAT Brands, Inc. as Manager of FBR, FZ, and GFG, and Twin Hospitality, Inc. as Manager of the Twin securitization silo (Fat Brands, Inc. and Twin Hospitality, Inc., each a "**Manager**"), is critical to ensure that the chapter 11 cases will be administered in a transparent and fair manner to protect and maximize recoveries for the stakeholders of the Securitization Debtors.

## JURISDICTION AND VENUE

7.      The United States Bankruptcy Court for the Southern District of Texas (the "**Court**") has jurisdiction over this matter under 28 U.S.C. § 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b). Venue is proper under 28 U.S.C. §§ 1408 and 1409.

8.      The statutory predicates for the requested relief are sections 105 and 1104(a) of the Bankruptcy Code and Rule 2007.1 of the Federal Rules of Bankruptcy Procedure.

## BACKGROUND

I.      **The FAT Brand Companies Are Dominated by Andrew Wiederhorn**

9.      The Debtors are undeniably controlled by Andrew Wiederhorn. The fifteen member board of FAT Brands (the "**Board**"), includes Mr. Wiederhorn and six members of his family.[6] Several of these Wiederhorn-related board members also hold officer positions. While the remainder of the Board is not related to Mr. Wiederhorn, they are still controlled by him because the Wiederhorn family—in their individual capacity and through Mr. Wiederhorn's investment company—controls 55% of the Manager's voting stock. Wiederhorn therefore has the

---

[6]      FAT Brands Inc., Annual Report (Form 10-K) (FY 2024), Garr Decl. Ex. 12, at 43, 56-57.

ability to appoint or remove board members.  And these directors know it.  The current board was originally constituted in 2023, when Andrew Wiederhorn fired the previous board (except for himself) because board members cooperated with federal prosecutors that were investigating him.[7]  It is clear why Mr. Wiederhorn has been able to loot these companies for as long as he has.

10.     Below is an abbreviated summary of Andrew Wiederhorn's family tree, with current positions across the Debtors noted:



11.     The Managers serve as contractual and corporate managers to the remainder of the Debtors, which are wholly-owned special purpose subsidiaries that were created to finance the Managers' brand acquisitions.  In each financing transaction, the operating assets associated with specific brands (including the brands' intellectual property, franchise agreements, other contracts, accounts receivable, and inventory) were contributed to a newly created, wholly-owned special purpose subsidiary (each, a "**Securitization Debtor**"), which in turn issued secured notes through separate whole-business securitizations.  Four whole-business securitization notes issued by the Securitization Debtors were outstanding as of the Petition Date, totaling more than $1.15 billion

---

7       Indictment, *United States of America v. Andrew A. Wiederhorn, et. al*, Case No. 24-CR-00295-RGK (C.D. Cal. May 9, 2024) ¶ 6, Garr Decl. Ex. 15 at 3-4.

in funded indebtedness: the FBR Securitization,[8] the FZ Securitization,[9] the GFG Securitization[10] and the Twin Securitization.[11]   The members of the Ad Hoc Group hold approximately $990 million in the aggregate (approximately 85%) of the notes outstanding under the Prepetition Securitizations.

12.    The Managers were appointed as managing members under the limited liability agreement (the "**Securitization Debtor LLCAs**") for each of the Securitization Debtors.[12]   The Securitization Debtor LLCAs outline the Managers' duties to the Securitization Debtors and include covenants restricting certain actions by the Managers, including restrictions on commingling assets or making loans.[13]

13.    The Securitization Debtors are also parties to two management agreements with the Managers, granting the Managers the right to manage and operate each brand's assets in exchange for the payment of a management fee.[14]   The terms of these management agreements, including the restrictions on the Managers' actions to reinforce the protections of the securitization structure, were negotiated in accordance with market practice and were a crucial part of the Managers' ability to obtain the financing provided to the Securitization Debtors.

---

[8]    The "**FBR Securitization**" refers to the securitization issued between April 26, 2021 and July 6, 2022 by Debtor FAT Brands Royalty I, LLC ("**FBR**").

[9]    The "**FZ Securitization**" refers to the securitization issued on December 15, 2021 by Debtor FAT Brands Fazoli's Native I, LLC ("**FZ**").

[10]    The "**GFG Securitization**" refers to the securitization issued between July 22, 2021 and December 15, 2022by Debtor FAT Brands GFG Royalty I, LLC ("**GFG**").

[11]    The "**Twin Securitization**" refers to the securitization issued on November 21, 2024 by Debtor Twin Hospitality I, LLC ("**Twin**") (the Twin Securitization, together with the FBR Securitization, the FZ Securitization, the GFG Securitization, and the Twin Securitization, the "**Prepetition Securitizations**").

[12]    The Securitization Debtor LLCAs are attached to the Garr Declaration as Ex. 25 (FBR Limited Liability Company Agreement), Ex. 26 (FZ Limited Liability Company Agreement), Ex. 27 (GFG Limited Liability Company Agreement), and Ex. 28 (Twin Limited Liability Company Agreement).

[13]    *See*, *e.g.*, FZ Limited Liability Company Agreement, § 9(c)(v).

[14]    *See* First Day Decl. ¶ 8.

14.     The indentures governing the Prepetition Securitizations (collectively, the "**Securitization Indentures**")[15] contain a priority of payment waterfall which effectively restricts the Securitization Debtors' ability to transfer revenues generated from the brands' franchisees and restaurants to other Debtor entities (including the Securitization Debtors' ultimate parent—the Managers) without paying all amounts due under the Prepetition Securitizations.[16]  This structure is what allowed the Debtors to obtain a greater amount of financing at a lower interest rate than would otherwise be available in the corporate credit markets.

15.     The Securitization Indentures also include a series of restrictive covenants and noteholder protections with respect to the collection, reporting, and use of cash, reducing the risk profile of the Prepetition Securitizations and justifying the increased leverage and/or reduced pricing. For example, the Securitization Indentures require the Managers, on behalf of the Securitization Brands Debtors, to deposit all restaurant collections into a specified Concentration Account for each Prepetition Securitization within one business day of receipt.[17]  Then, on a monthly basis, amounts in the Concentration Account must be transferred to a Collection Account "to make payments and deposits in the order of priority" under the priority of payment waterfall.[18]  Both the Concentration Account and Collection Account were required to be pledged to UMB Bank, N.A. (the "**Prepetition Trustee**") and subject to its control under a DACA.[19]

---

[15]   The Securitization Indentures and other transaction documentation related to the Prepetition Securitizations are substantially similar in all relevant respects.  The Securitization Indentures are attached to the Garr Declaration as Ex. 1, 5, 6 (FBR Securitization Indenture), Ex. 2, 9 (FZ Securitization Indenture), Ex. 3, 7, 8 (GFG Securitization Indenture), and Ex. 4, 10 (Twin Securitization Indenture).

[16]   FAT Brands Inc., Annual Report (Form 10-K) (FY 2024), Garr Decl. Ex. 12, Note 10; *see also* First Day Decl. ¶ 49.

[17]   Twin Securitization Indenture § 8.35.

[18]   *Id.* § 5.9(b)(iv).

[19]   *Id.* § 5.1.

## II.    Mr. Wiederhorn and the Companies He Controls Are Not Fit to Serve As Fiduciaries of the Securitization Debtors

16.    Mr. Wiederhorn and the companies he controls should not be allowed to continue to manage the Chapter 11 Cases of the Securitization Debtors.

### A.    Improper Payments to Insiders

17.    As with the numerous other instances of fraud prior to the commencement of these Chapter 11 Cases that have been revealed in the Managers' own regulatory reporting, there are troubling signs that the Managers fraudulently siphoned assets away from their rightful owners. A substantial portion of the Managers' revenues are being used to fund substantial payments for insiders.  From the limited information available,[20] these improper payments, totaling more than $200 million, include at least:

- ***Indemnification Payments***.  Since 2021, the Debtors have paid almost $86 million in litigation costs for Mr. Wiederhorn and certain directors and officers to defend against litigation brought by the U.S. Department of Justice, Securities and Exchange Commission, and shareholders, among other plaintiffs, arising from Mr. Wiederhorn's misconduct and mismanagement.[21]

- ***Insider Dividends***.  Since 2021, the Debtors have distributed dividends to Mr. Wiederhorn and his family totaling $17 million—or 25% of the total dividends paid to all shareholders (including non-insiders) over the same period.[22]

- ***Family Compensation***.  From 2022 through October 31, 2025, Mr. Wiederhorn has received approximately $20 million in compensation from the Debtors.  Of that amount, approximately $15 million was structured as "consulting fees" as opposed to ordinary course salary or business payments.23  In addition, other

---

[20]    The amounts discussed in this section are based on public information available to the Ad Hoc Group as of the time of this filing.  The Ad Hoc Group expects to uncover additional instances of insider payments and misappropriation of the Securitization Noteholders' cash collateral following this filing.  It reserves all rights to identify any further improper payments to the Court and to pursue objections, claims, and any other available remedies on account of such transfers at the appropriate time.

[21]    First Day Decl. ¶ 104.

[22]    Insider dividends were calculated using Fat Brands, Inc.'s historical SEC filings – 10-Ks, 10-Qs, Form 3s, and Form 4s – which list total dividends paid, total number of existing shares, and total numbers of shares owned by the Wiederhorn family.

[23]    *See* FAT Brands Inc., Notice of Annual Meeting of Stockholders (FY2024 Proxy Statement (Schedule 14A)), Garr Decl. Ex. 37, at 22; FAT Brands Inc., Notice of Annual Meeting of Stockholders (FY2025 Proxy Statement (Schedule 14A)), Garr Decl. Ex. 38, at 23, 30.

members of the Wiederhorn family have received approximately $15.7 million in compensation from the Debtors during the same time period.[24]

- **Personal Expenses**.  Mr. Wiederhorn has caused the Debtors to spend at least $27 million for his personal expenses (including private jets, first class airfare, luxury vacations, rent and mortgage payments, shopping, and jewelry).[25]

- **Impermissible Shareholder Loans**.  The Debtors permitted at least $47 million in "shareholder loans" to Mr. Wiederhorn that he allegedly never repaid and allegedly caused the Debtors to forgive.[26]

- **Preferential Bonuses**.  On January 2, 2026, after admitting to Events of Default, including the misappropriation of the securitization cash collateral, the Debtors paid bonuses to certain officers, totaling $500,000 for their Chief Financial Officer (Kenneth Kuick), $550,000 for their Chief Operating Officer (Thayer Wiederhorn, Mr. Wiederhorn's son), and $550,000 for their Chief Development Officer (Taylor Wiederhorn, Mr. Wiederhorn's son).  The salaries of these officers were also nearly doubled, increasing from $550,000 to $950,000.[27]

## B.   Andrew Wiederhorn's Criminal Conduct and Regulatory Investigations

18.    These numerous instances of Wiederhorn's use of the Debtors' funds for personal benefit are even more troubling given his criminal record.  In 2004, Mr. Wiederhorn pled guilty to two federal felony charges: filing a false tax return and paying an illegal gratuity, both arising from his conduct as CEO of Wilshire Credit Corporation ("**Wilshire**").  While CEO of Wilshire, Mr. Wiederhorn took approximately $65 million in shareholder loans from Wilshire and subsequently caused Wilshire to forgive those loans without properly reporting the forgiven amounts as taxable income.  In addition, Mr. Wiederhorn paid an illegal gratuity to an investment associate in violation of ERISA's prohibition on self-dealing and conflicts of interest involving Wilshire's pension fund

---

[24]   *See* FAT Brands Inc., Notice of Annual Meeting of Stockholders (FY2025 Proxy Statement (Schedule 14A)), Garr Decl. Ex. 38, at 23, 30; FAT Brands Inc., Notice of Annual Meeting of Stockholders (FY2024 Proxy Statement (Schedule 14A)), Garr Decl. Ex. 37, at 22.

[25]   FAT Brands Inc., Annual Report (Form 10-K) (FY 2024), Garr Decl. Ex. 12, Note 16, at F-28; Indictment, *United States of America v. Andrew A. Wiederhorn,* 24-CR-00295-RGK, Garr Decl. Ex. 15 at 18.

[26]   FAT Brands Inc., Annual Report (Form 10-K) (FY 2024), Garr Decl. Ex. 12, Note 16, at F-28; Indictment, *United States of America v. Andrew A. Wiederhorn,* 24-CR-00295-RGK, Garr Decl. Ex. 15 at 2.

[27]   FAT Brands Inc., Current Report (Form 8-K) (January 7, 2026), Garr Decl. Ex. 11, at 1.

investments.  Ultimately, Mr. Wiederhorn served fifteen months in federal prison and paid a $2 million fine—though he caused his investment company, Fog Cutter Capital Group, to reimburse that fine and continue paying his Wilshire salary while in prison.[28]

19.     Mr. Wiederhorn appears to have engaged in substantially similar conduct while in control of the Debtors.  In 2024, a federal grand jury indicted him (among others) on 20 felony counts, including obstructing the administration of the Internal Revenue Code, tax evasion, wire fraud, making false statements and omissions to auditors, certifying faulty financial reports, and being a convicted felon in possession of a firearm and ammunition.  The federal government alleged that Mr. Wiederhorn extracted more than $47 million in shareholder loans from the Debtors, never paid interest on those loans, used their proceeds to fund his personal expenses, and then caused the Debtors to forgive the loans without reporting that cancellation as taxable income.[29]  Ultimately, on July 29, 2025, federal prosecutors filed a motion to dismiss the indictment.  It has been suggested that the reason for this dismissal was because the Assistant U.S. Attorney prosecuting Mr. Wiederhorn was let go by the Department of Justice.[30]  But while the indictment was dismissed, there is no question that the $47 million loan was made and not repaid.[31]

20.     At the same time as the criminal indictment, the SEC filed a civil complaint against Mr. Wiederhorn (among others) for fraud arising from deficient disclosures concerning the Debtors' related person transactions.  The SEC complaint alleges that from October 2017 through March 2021, Wiederhorn used almost $27 million of the Debtors' cash for personal expenses including private jets, first-class airfare, luxury vacations, rent and mortgage payments, shopping,

---

[28]   Indictment at ¶¶ 25-32, Garr Decl. Ex. 15 at 8-10.

[29]   *Id.* at ¶¶ 1-6.

[30]   Matt Hamilton & Harriet Ryan, *Fired Federal Prosecutor Alleges Ex-Fatburger CEO's 'Smears' Reached White House*, L.A. Times (May 3, 2025), Garr Decl. Ex. 14, available at https://www.latimes.com/california/story/2025-05-03/wiederhorn-justice-department. Garr Decl. Ex. 15 at 17-24.

[31]   Indictment at ¶¶ 52-80.

and jewelry.[32]   He allegedly made false and misleading statements to make it appear that the millions of dollars the Managers were spending on his personal expenses were actually company loans to Fog Cutter Capital Group for business expenses, which he diverted to himself, treated as "personal loans," and never repaid.[33]   According to the SEC, Wiederhorn's fraudulent scheme stripped FAT Brands of approximately 40 percent of its revenue, often leaving it with insufficient cash to pay its own bills.[34]   Notwithstanding the dismissal of the 2024 federal criminal indictment, the SEC litigation remains pending.

21.     Beyond this litigation commenced by the government, the Debtors have faced a torrent of litigation from shareholders and other private plaintiffs over the past several years.  This litigation all arises from Mr. Wiederhorn's criminal management of the Managers and their subsidiaries, fraudulent public disclosures, and theft of creditor collateral.[35]   Various subsidiaries of the Managers were also subject to two lawsuits brought by certain of the franchisees (the "**Franchisee Litigation**") alleging, among other things, that the franchisor-subsidiaries—who

---

[32]   *Securities & Exchange Commission v. Andrew Wiederhorn,*  No. 24-CV-03913 (May 10, 2024) ¶¶ 4-9, Garr Decl. Ex. 16 at 1-13.

[33]   *Id.*

[34]   *Id.* at ¶ 6.

[35]   *See, e.g.,* Second Amended Class Action Complaint, *Kates v. FAT Brands Inc.*, No. 2:24-cv-04775-MWF-MAA (C.D. Cal. Nov. 7, 2025) (class action alleging misleading material statements and omissions due to FAT Brands' SEC filings failing to report distributions to Mr. Wiederhorn, as well as making false statements regarding federal and state investigations into Mr. Wiederhorn's conduct), Garr Decl. Ex. 17; Shareholder Derivative Complaint, *Collura v. FAT Brands Inc.*, No. 2024-1305-NAC (Del. Ch. Dec. 23, 2024) (derivative suit alleging breach of fiduciary duties, unjust enrichment, abuse of control, gross mismanagement and waste, on account of scheme to distribute money to Wiederhorn and his family), Garr Decl. Ex. 18; Class Action Complaint, *Matthews v. FAT Brands Inc.*, No. 2:22-cv-01820 (C.D. Cal. Mar. 18, 2022) (class action alleging false and misleading statements by the Debtors, given failure to disclose interested transactions involving Mr. Wiederhorn and his son, Thayer Wiederhorn (as FAT Brands' COO)), Garr Decl. Ex. 19; Verified Stockholder Derivative Complaint, *Harris v. Junger*, No. 2021-0511-SG (Del. Ch. June 15, 2021) (derivative action arising from Mr. Wiederhorn's fraudulent shareholder loans), Garr Decl. Ex. 20; Verified Stockholder Derivative Complaint, *Harris v. Junger*, No. 2022-0254-SG (Del. Ch. Mar. 22, 2021) (derivative action alleging Mr. Wiederhorn improperly maintained voting control of Fat Brands through a recapitalization of the Company without consideration and without approval by a majority of minority stockholders), Garr Decl. Ex. 21.

were wholly owned and controlled by the Managers—improperly diverted advertising funds to unrelated expenses and personal enrichment of executives.[36]

22.     Specifically, in December 2024, nineteen out of the thirty-eight remaining currently opened Hurricane Grill & Wings restaurants—all of whom are parties to various franchise agreements with franchisor Hurricane AMT, LLC, an entity directly owned by FAT Brands—filed a lawsuit in the Circuit Court for the Fifteenth Judicial Circuit in and for Palm Beach County, Florida (the "**Hurricane Complaint**").[37]  As alleged in the Hurricane Complaint, despite receiving millions of dollars in royalty payments contractually earmarked for development and execution of marketing programs and activities for the direct benefit of the Hurricane franchisee system, FAT Brands "has neither accounted for nor used marketing fund contributions on meaningful or impactful marketing."[38]  Similarly, in November 2024, the Round Table Owners' Association filed a lawsuit against Round Table Franchise Corporation, a subsidiary of FAT Brands, alleging breach of contract claims and misuse of advertising funds.[39] As of late 2025, FAT Brands' total "Accrued

---

[36]   *See* Joanna Fantozzi, *Hurricane Grill & Wings Franchisees Sue Parent Company for Misappropriating Funds* (February 25, 2025), available at https://www.nrn.com/restaurant-finance/hurricane-grill-wings-franchisees-sue-parent-company-for-misappropriating-funds (quoting a spokesperson for the franchisee group stating that "This lawsuit is about accountability. We believe that Hurricane AMT has failed in their obligations, and we are seeking justice for the damage caused to our businesses."): *see also* Jonathan Maze, *Roud Table Pizza Franchisees Investigate Fat Brands' Use of Marketing Funds After the Chain Loses Advertising for Months* (October 6, 2025), available at https://www.restaurantbusinessonline.com/financing/round-table-pizza-franchisees-investigate-fat-brands-use-marketing-funds-after-chain (quoting the general counsel for the Round Table Association prior to the filing of the complaint stating that "[s]ubstantial concerns have arisen as to the misuse of advertising and marketing funds as a result of learning that a $14 million ad fund has been unable to timely pay marketing vendors' invoices, causing a disruption in advertising placement for several months.").

[37]   *See generally* Hurricane Complaint, *Crit2 Corp. et al. v. Hurricane AMT, LLC*, No. 50-2024-ca-011567-XXXA-MB (Fla. Cir. Ct. 2024).

[38]   *Id*. at ¶ 2.

[39]   *See* Jonathan Maze, *Franchisees Sue the Fat Brands-Owned Round Table Pizza Over Marketing* (November 25, 2025) available at https://www.restaurantbusinessonline.com/financing/franchisees-sue-fat-brands-owned-round-table-pizza-over-marketing.

Advertising" liability was reported as $9.2 million, with the balance increasing to approximately $3.9 million in year-to-date third quarter 2025.[40]

23.     In total, over the past four years, Mr. Wiederhorn has caused the Debtors to indemnify him (along with other officer and director co-defendants) over $86 million in defense costs on account of this litigation morass—which has severely depleted the Managers' available cash, which apparently caused the Managers to feel that they had no choice but to steal cash from the Securitization Debtors.[41]   Mr. Wiederhorn's demonstrated contempt for the law and the interests of the Securitization Debtors and other stakeholders means he cannot be expected to act as a responsible fiduciary in these Chapter 11 Cases, as required by the Bankruptcy Code.

**C.     The Managers' Breaches of Fiduciary Duties to the Securitization Debtors**

24.     The Managers are appointed under the Securitization Debtor LLCAs, with these agreements requiring that each Manager shall have fiduciary obligations of loyalty and care to the Securitization Debtors.[42]

25.     Prior to the Petition Date, as described above, the Managers admitted to looting the securitization silos in direct violation of both their fiduciary duties and the terms of the Securitization Indentures.   The breadth of the Managers' misconduct is stunning: the Managers have systematically failed to deposit brand collections into authorized accounts as and when required; commingled brand collections in non-securitization accounts with non-securitization cash; paid non-securitization expenses in violation of the priority of payment waterfall (including the substantial indemnification payments to Mr. Wiederhorn, bonuses to management, and other payments for personal expenses of Mr. Wiederhorn and his family members, as described above),

---

[40]   FAT Brands, Quarterly Report (Form 10-Q) (2025 Q3), Garr Decl. Ex. 13 at 3, 8.
[41]   First Day Decl. ¶ 104.
[42]   *See*, *e.g.*, FZ Limited Liability Company Agreement, § 11(h).

and actively concealed their ongoing violations of the Securitization Indentures from the Securitization Noteholders.  The Managers—controlled by Mr. Wiederhorn—have been looting the Securitization Debtors without any regard for their obligations under the Securitization Indentures and applicable law.

26.    Despite the Securitization Noteholders' repeated requests and attempts at resolution (detailed more fully below), the Managers refused to take any steps to remedy these violations or to prevent the further conversion of the Securitization Noteholders' collateral.  For several months prior to the Petition Date, if not longer, the Managers have simply ignored their obligation to collect receipts in the Concentration Account for monthly transfer to the Collection Account, converting funds owed to the Securitization Noteholders.  After receiving notice from the Prepetition Trustee that it had not received amounts required to be transferred from the Concentration Account to the Collection Account in September and October 2025,[43] the Managers filed quarterly reports with the SEC disclosing their receipt of the Prepetition Trustee's notice, and admitting that they deposited funds owed to the Securitization Debtors into "accounts not held by the Securitization [Debtors] or the [Prepetition] Trustee, as required by the related [Securitization Indentures]."[44]

27.    The Managers compounded the breach by commingling the cash collateral of the Prepetition Securitizations.  In the same quarterly reports, the Managers admitted that "the Company utilized certain cash receipts to support operation of the business during the fiscal quarter ended September 28, 2025, which would likely give rise to Events of Default and/or Manager Termination Events.  These include commingling cash receipts owed to the Securitization

---

[43]    FAT Brands Inc., Quarterly Report (Form 10-Q) (2025 Q3), Garr Decl. Ex. 13 at 16.

[44]    *Id*. at 15.

[Debtors] and cash of non-securitization entities."[45]  As explained in the Debtors' own first day filings, the Debtors admit that the Managers transferred various cash between accounts contained at the different Securitization Debtors.[46]  These actions by the Managers led to cascading events of default.  For example, under the Twin Securitization Indenture, these actions triggered qualifying events which required the Managers to utilize certain restaurant collections to amortize the Twin Prepetition Securitization.[47]  But the Managers instead used such funds to pay bonuses to Mr. Wiederhorn and other insiders, rather than to pay down principal on these notes as required by the Twin Securitization Indenture, constituting another event of default.

28.     Because the Ad Hoc Group's investigation is continuing, the Ad Hoc Group cannot currently estimate the total amount of cash collateral that the Managers have improperly siphoned and commingled since they began breaching the Securitization Indentures.  The limited information made available to date confirms that the net cash balance in the securitization deposit accounts has not changed over the last several months.  It therefore appears that the Managers have caused all restaurant collections—totaling hundreds of millions of dollars over the last several months—to be systematically deposited in accounts not owned by the Securitization Debtors.

### III.     The Ad Hoc Group's Attempted Restructuring Negotiations

29.     It has been clear for quite some time that the Managers were not sustainable and that a solution needed to be reached to protect the value of the Securitization Debtors and their assets.  To that end, the Ad Hoc Group provided a proposal for the consensual use of cash collateral

---

[45]   *Id.*

[46]   *See Emergency Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Continue Existing Cash Management System, (B) Maintain Existing Business Forms and Intercompany Arrangements, and (C) Continue Intercompany Transactions; and (II) Granting Related Relief* [Docket No. 14] at 19 (the "**Cash Management Motion**").

[47]   Twin Securitization Indenture §§ 5.10(xiii)-(xv); 9.2(b), Garr Decl. Ex. 4 at 38-39, 80.

and DIP financing.  The Managers refused to engage with the Ad Hoc Group's proposal because the key prerequisite was establishing appropriate governance.

30.     On September 29, 2025, following concerns regarding the Securitization Debtors' ability to meet its obligations under the Prepetition Securitizations but prior to the occurrence of an event of default, the Ad Hoc Group entered into a confidentiality agreement with the Company to negotiate a forbearance agreement and eventually a sale or other restructuring transaction. Despite the Ad Hoc Group's good-faith attempt to engage with the Debtors, the Debtors insisted that the forbearance agreement affirmatively authorize the Managers to continue converting cash collateral of the Prepetition Securitizations to pay junior obligations not permitted under the Securitization Indentures and the priority of payments waterfalls set forth therein.  The Ad Hoc Group made clear that it would not agree to that condition.  Afterwards, the Managers simply stopped responding to the Ad Hoc Group and the confidentiality agreement expired without agreement on a forbearance or broader transaction.

31.     In light of the breakdown in forbearance agreement negotiations and the Debtors' admitted defaults under the Securitization Indentures, the Ad Hoc Group directed the acceleration of all amounts due and owing under the Prepetition Securitizations on November 17, 2025.  At the same time, the Ad Hoc Group transmitted a letter to the Managers urging their boards and management to "take immediate corrective action" so that the Ad Hoc Group would not be forced to exercise remedies to protect its interests.[48]

32.     Facing the possibility of the Securitization Noteholders exercising their remedies under the Prepetition Securitization Indentures, the boards of the Managers took no meaningful steps to cure the Securitization Debtors' and Managers' defaults or prepare a viable sale or

---

[48]    B. Pfeiffer, Letter to Debtors (Nov. 18, 2025), Garr Decl. Ex. 22.

restructuring proposal.  During this period, the Managers made no effort to actively communicate with the Ad Hoc Group with respect to the restructuring process and options available to preserve value.  The Ad Hoc Group therefore prepared its own transaction proposal, which it delivered to the Managers on December 16, 2025 and which largely went unanswered by the boards.[49]  That term sheet proposed the Ad Hoc Group's funding of an efficient section 363 process for the Securitization Debtors' assets and required the Managers to appoint trustworthy independent directors and a Chief Restructuring Officer who would not report to Mr. Wiederhorn.

33.      Even at the brink, the Managers refused meaningful engagement with the Ad Hoc Group on the terms for a value-maximizing chapter 11 transaction.  Instead, they opted to commence these Chapter 11 Cases "without an agreed path forward"[50] and to seek the non-consensual use of the Ad Hoc Group's cash collateral.[51]

## ARGUMENT

## I.      Appointment of a Trustee for the Securitization Debtors is Warranted Pursuant to Section 1104(a) of the Bankruptcy Code

34.      The Court should appoint a chapter 11 trustee for the Securitization Debtors because "cause" for appointment under section 1104(a)(1) of the Bankruptcy Code exists given the extensive misconduct committed by the Managers current management.  Appointment of a chapter 11 trustee is also justified under section 1104(a)(2) of the Bankruptcy Code as being in the best interests of creditors and the estate.

---

[49]    B. Pfeiffer, Letter to Debtors (Dec. 16, 2025), Garr Decl. Ex. 23.

[50]    First Day Decl. ¶ 116.

[51]    In light of the Debtors' breaches of the Securitization Indentures, other misconduct, and utter failure to engage with the Ad Hoc Group in good faith, the Ad Hoc Group believes that the Securitization Noteholders hold valuable breach of fiduciary duty, fraudulent transfer, preference, corporate waste, and breach of contract claims, among others, against the Debtors, Mr. Wiederhorn, each member of his family holding positions at the Debtors, other members of management, and each member of the Debtors' boards of directors.  The Ad Hoc Group fully reserves its rights to bring such claims at the appropriate time.

**A.      Legal Standards Governing Appointment of a Chapter 11 Trustee.**

35.      Under section 1104(a) of the Bankruptcy Code, there are two standards to justify the appointment of a chapter 11 trustee:   "(1) for cause, **including fraud, dishonesty, incompetence or gross mismanagement of the affairs of the debtor by current management either before or after commencement of the case**"; or "(2) if such appointment is in the best interests of creditors. 11 U.S.C. § 1104(a)(1), (a)(2) (emphasis added).  Courts have recognized that other issues can constitute "cause," including the existence of "conflicts of interest" and inappropriate relationships between affiliated companies. *In re Funge Sys.*, 2002 Bankr. LEXIS 1937, at *17 (Bankr. E.D. Va. Oct. 17, 2002) ("a conflict of interest alone is sufficient justification under § 1104(a)(1) for the appointment of trustee."); *In re Westbank Holdings, LLC*, 2022 Bankr. LEXIS 2109, at *39 (Bankr. E.D. La. Aug. 1, 2022) ("a finding that the principals or managers of a debtor possess irremediable conflicts of interest can also serve as 'cause' to appoint a trustee under § 1104(a)(1)."); *In re Patman Drilling Int'l, Inc.*, 2008 Bankr. LEXIS 715, at *16 (Bankr. N.D. Tex. Mar. 14, 2008) ("'Cause' exists in this case because of the overwhelming conflicts of interest of the Debtor's management"). In determining whether cause exists to appoint a trustee, courts may consider misconduct occurring either prepetition or postpetition. *In re Klaynberg*, 643 B.R. 309, 317 (Bankr. S.D.N.Y. 2022); *In re Marshall*, 653 B.R. 509, 515 (Bankr. N.D.N.Y. 2023).

36.      If "cause" exists or the court determines it is in the best interest of creditors to appoint a trustee, appointment is mandatory.  11 U.S.C. § 1104(a) (providing that the court "shall order" appointment of a trustee where cause exists); *In re V. Savino Oil & Heating Co., Inc.*, 99 B.R. 518, 525 (Bankr. E.D.N.Y. 1989); *see also, In re Westbank Holdings,* 2022 WL 3052135 at *14 (quoting *In re Ford Steel, LLC*, 629 B.R. 871, 889–90 (Bankr. S.D. Tex. 2021) ("It is not necessary to find fault on the part of the debtor-in-possession before appointing a chapter 11 trustee

in the interests of creditors, any equity security holders, and other interests of the estate pursuant to § 1104(a)(2).")).

B.    **"Cause" Exists For the Appointment of a Trustee Under Section 1104(a)(1).**

37.    While any one of the four enumerated elements of section 1104(a)—fraud, dishonesty, incompetence and gross mismanagement—is sufficient cause to appoint a trustee for the Securitization Debtors, here, all four elements are clearly satisfied. As detailed above, the record is replete with examples of why the Securitization Debtors require independent management for these chapter 11 cases.

38.    *First*, the Managers' prepetition misconduct, particularly with respect to the Securitization Debtors, amounts to gross mismanagement, incompetence, and fraud. The Managers have repeatedly admitted that they, under the boards and management oversight, have operated the cash management system in complete disregard of the terms of its various financing agreements, including by improperly commingling cash. *See* FAT Brands Inc., Quarterly Report (Form 10-Q) (2025 Q3), at 15, Garr Decl. Ex. 13 at 15; *see also* Cash Management Motion at 19-20. As explained above, the Managers have been looting the securitization collateral for their own personal benefit, with no benefit to the Securitization Debtors. Not only have they admitted to these blatant violations of the Securitization Indentures, triggering several ongoing events of default, it appears that the Managers have used these funds to make substantial payments to insiders totalling nearly $200 million. This includes (i) $17 million in dividends to Mr. Wiederhorn, (ii) $27 million in personal expenses for Mr. Wiederhorn, including, among other things, expenses relating to Mr. Wiederhorn's use of private jets, first class airfare, luxury vacations, rent and mortgage payments, shopping, and jewelry, (iii) $19.6 million in compensation for Mr. Wiederhorn since 2022, largely composed of "consulting fees," and (iv) $85.5 million in

litigation costs for Mr. Wiederhorn and certain directors and officers to defend against the litigation outlined above. *See* supra at ¶ 17.

39.     *Second*, as explained above, Andrew Wiederhorn and the Debtors have been subject to criminal indictments, SEC investigations and several private litigations related to the Managers' allegedly fraudulent public disclosures and material omissions in the Managers' SEC reports. *See* supra ¶¶ 19-20.  Notably, each of these actions involve attempts by Mr. Wiederhorn to siphon value from the Debtors for his own personal gain.   These investigations and lawsuits highlight the Managers', and, more specifically, Mr. Wiederhorn's, pattern of deception and fraud, which has not only exposed the Debtors to costly litigation, but provides an ample showing of dishonesty. *See In re Westbank Holdings, LLC*, No. 22-10082, 2022 WL 3052135 at *13 (finding "'[a]lthough there is no Fifth Circuit case law that defines 'dishonesty' for purposes of § 1104, courts across the country recognize that "dishonesty' . . . may encompass a variety of actions' and '[t]he definitions used by these courts track with Merriam-Webster's definition of 'dishonesty' as 'lack of honesty or integrity: disposition to defraud or deceive.'") (quoting *In re Amerejuve, Inc.*, No. 14-35482, 2015 WL 2226344, at *9 (Bankr. S.D. Tex. Apr. 29, 2015)); *In re V. Savino Oil & Heating Co., Inc.*, 99 B.R. 518, 527 (Bankr. E.D.N.Y. 1989) (finding that misrepresentations singularly may "constitute 'cause' within the meaning of 1104(a)(1) for appointment of a reorganization trustee.").

40.     There is therefore sufficient "cause" to appoint a chapter 11 trustee to replace the Managers of the Securitization Debtors.

## C.     Appointment of a Trustee is in the "Best Interests" of the Estates Under Section 1104(a)(2).

41.     Even if this Court were to somehow find that cause does not exist under section 1104(a)(1), the appointment of a trustee is in the best interest of creditors under section 1104(a)(2)

of the Bankruptcy Code.  It is well established that the best interest of the creditors test in the section1104(a)(2) context is a flexible standard which gives courts wide discretion to appoint a chapter 11 trustee even when no cause under section 1104(a)(1) exists. *In re Westbank Holdings, LLC*, No. 22-10082, 2022 WL 3052135 at *14 (quoting *In re Ford Steel, LLC*, 629 B.R. at 889–90 ("It is not necessary to find fault on the part of the debtor-in-possession before appointing a chapter 11 trustee in the interests of creditors, any equity security holders, and other interests of the estate pursuant to § 1104(a)(2).")); *see also In re Ridgemour Meyer Properties*, *LLC*, 413 B.R. 101, 113 (Bankr. S.D.N.Y. 2008) ("Unlike § 1104(a)(1), § 1104(a)(2) does not require a finding of fault; the court may appoint a trustee even if no 'cause' exists."); *In re Ashley River Consulting, LLC*, No. 14-13407 (MG), 2015 WL 1540941 at *11 (Bankr. S.D.N.Y. Mar. 31, 2015) ("Section 1104(a)(2) envisions a flexible standard and gives the district court discretion to appoint a trustee when doing so would serve the parties' and estate's interests.") (internal quotations omitted).

42.     In determining whether to appoint a trustee under section 1104(a)(2), courts consider factors such as: (i) the trustworthiness of the debtor; (ii) debtor's past and present performance and prospects for rehabilitation; (iii) the confidence – or lack thereof – of the business community and of creditors in present management; and (iv) the benefits derived by the appointment of a trustee, balanced against the cost of appointment. *See Ionosphere Clubs*, 113 B.R. at 168 (citations omitted).  "In essence, § 1104(a)(2) reflects the practical reality that a trustee is needed." *Ashley River Consulting, LLC*, 2015 WL 1540941 at *11; *In re Royal Alice Props., LLC*, No. 19-12337, 2020 WL 5357795, *11 (Bankr. E.D. La. Sept. 4, 2020), *on reconsideration in part*, No. 19-12337, 2020 WL 5552576 (Bankr. E.D. La. Sept. 16, 2020) (quoting *In re Sharon Steel Corp.*, 86 B.R. 455, 457 (Bankr. W.D. Pa. 1988), *aff'd*, 871 F.2d 1217 (3d Cir. 1989)).

43.     Courts have also held that the interests of creditors require appointment of a trustee under § 1104(a)(2) where the debtors have material conflicts of interest. *See, e.g.*, *In re McCorhill Publ'g, Inc.*, 73 B.R. 1013, 1017 (Bankr. S.D.N.Y. 1987) ("[W]here there are questionable inter-company financial transfers and the principals of the debtor occupy conflicting positions in the transferee companies, a trustee should be appointed in the best interests of creditors and all parties in interest in order to investigate the financial affairs of the debtor."); *In re Taub*, 427 B.R. 208, 227–28 (Bankr. E.D.N.Y. 2010); *In re Phila. Athletic Club, Inc.*, 15 B.R. 60, 62–63 (Bankr. E.D. Pa. 1981) (appointing a trustee in the best interests of the creditors when the principals of the debtor occupied conflicting positions in transferee companies); *In re Grasso*, 2012 Bankr. LEXIS 6247, at *11 (Bankr. E.D. Pa. Oct. 16, 2012) ("The existence of potential claims against the Debtor's wife evidence a conflict of interest that warrants appointment of a Chapter 11 Trustee as being in the best interests of the Debtor's estate.").

44.     *First*, as explained in great detail above, Andrew Wiederhorn and the Manager entities he controls are not trustworthy.  It appears that the only thing Mr. Wiederhorn and his cronies can be counted on to do is to steal.

45.     *Second*, the Securitization Debtors' financial condition is rapidly deteriorating, largely due the Managers' gross mismanagement and conversion of securitization cash.  The Managers are hopelessly insolvent and may not have any prospects for reorganization. By the Debtors' own admission, all of the value in these Chapter 11 Cases sits at the Securitization Debtors.  *See* First Day Decl. ¶ 7.  The Securitization Noteholders should not be subjected to continued diminution of the value of their collateral to effectively fund a reorganization of the Managers that creditors and stakeholders have lost all confidence in.  Accordingly, a value-maximizing restructuring will necessarily require the appointment of a new manager for the

Securitization Debtors' businesses. A chapter 11 trustee can step in to provide independent governance over such a transition and sale.

46.      *Third*, not only have the Securitization Noteholders (the principal, if not only, creditors of the Securitization Debtors) lost all confidence in the Managers, the franchisees (the main source of income) have also lost all confidence in management. The Franchisee Litigation initiated against the Managers prior to the bankruptcy filing underscores the lack of trust in the Managers.

47.      *Fourth*, the benefits of appointing a chapter 11 trustee over the Securitization Debtors easily outweigh the cost of such appointment. The continuation of the current Board and management—in particular, Mr. Wiederhorn—could result in postpetition misconduct similar to that occurring prepetition. It will likely result in significant depletion of value from the Securitization Debtors as the Managers cannot be trusted to pursue a restructuring transaction that is truly in the best interests of the Securitization Debtors.

48.      Contrary to the Debtors' assertions, the Securitization Debtors and the Debtors' stakeholders would be better served by a chapter 11 trustee than the current Managers. The Debtors state, in the First Day Declaration, that both Managers provide "critical services to the Securitization [Debtors]," and that the Securitization Debtors would not be able to "operate in a functional manner without support of the [Managers] and the services [they] provide[]." *See* First Day Declaration ¶¶ 44-45. But, as explained above, management and the Board have been looting the Securitization Debtors by siphoning off its collateral for their own personal gain, destroying value at the Securitization Debtors level in the process. No level of "operational know-how" of the Managers can compensate for this misconduct.

49.     The only example provided by the Debtors of the "critical services" provided by these Managers is that these Managers help FAT Brand franchisees "utilize the related brand recognition and develop marketing and advertising materials," without which these franchisees "would not have access to the Debtors' curated brand strategy or marketing and advertising materials." *Id.* at ¶ 45.  As alleged in the Franchisee Litigation, these are the very same advertising services that the Debtors' franchisees assert has been withheld from them, despite the franchisees contributing millions of dollars in royalty payments to access such advertising and marketing programs. *See* supra ¶ 21.

50.     *Finally*, the Managers and their board members have debilitating conflicts of interests, which weighs in favor of appointment of a trustee.   They are likely subject to liability relating to their prepetition actions, but are highly unlikely to investigate and pursue claims relating to such misconduct.  *See Westbank Holdings*, No. 22-10082, 2022 WL 3052135 at * 13 ("a finding that the principals or managers of a debtor possess irremediable conflicts of interest can also serve as cause to appoint a trustee under§ 1104(a)(1).") (quoting *In re Cajun Elec. Power Co-op, Inc.*, 69 F.3d 746, 749 (5th Cir. 1995), *withdrawn in part on rehr'g*, 74 F.3d 599 (5th Cir. 1996) (withdrawing section IV and adopting reasoning of dissent in prior opinion).

51.     The Ad Hoc Group does not take the appointment of a chapter 11 trustee lightly.  It understands the seriousness of the relief that it is seeking.  But the facts presented in this case are extraordinary.  If ever there were a case that requires the appointment of a trustee, it is this one. The Ad Hoc Group therefore respectfully requests that the Court enter the Order appointing a chapter 11 trustee for the Securitization Debtors and grant further relief as the Court deems just and proper.

## **RESERVATION OF RIGHTS**

52.      The Ad Hoc Group reserves the right to amend or supplement this Motion, including without limitation to address additional issues identified in discovery or otherwise, and to respond to any objection of the Debtors or any other party in interest, either by further submission to the Court, at oral argument, or by testimony to be presented at the hearing on the Motion or any other hearing.

## **NOTICE**

53.      Notice of the Motion will be given to: (i) proposed counsel for the Debtors; (ii) the Office of the United States Trustee for the Southern District of Texas; (iii) parties on the Master Service List; and (v) any other party that, as of the filing of the Motion, has requested notice in these Chapter 11 Cases pursuant to Bankruptcy Rule 2002.  Under the specific circumstances of these Chapter 11 Cases, the Ad Hoc Group submits that no other or further notice of the Motion should be required.

*[Remainder of Page Intentionally Left Blank]*

Dated: January 27, 2026
        Houston, Texas

*/s/ Charles R. Koster*

**WHITE & CASE LLP**
Charles R. Koster (Texas Bar No. 24128278)
609 Main Street, Suite 2900
Houston, Texas 77002
Telephone: (713) 496-9700
Email: charles.koster@whitecase.com


- and -


**WHITE & CASE LLP**
Andrew Zatz (*pro hac vice* pending)
Laura J. Garr (*pro hac vice* pending)
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
Email:  azatz@whitecase.com
        lgarr@whitecase.com

**WHITE & CASE LLP**
Brian Pfeiffer (*pro hac vice* pending)
Amanda Parra Criste (*pro hac vice* pending)
200 South Biscayne Boulevard, Suite 4900
Miami, Florida 33131
Telephone: (305) 371-2700
Email:  brian.pfeiffer@whitecase.com
        aparracriste@whitecase.com

- and -

**WHITE & CASE LLP**
Jason N. Zakia (*pro hac vice* pending)
Adam T. Swingle (*pro hac vice* pending)
111 South Wacker Drive, Suite 5100
Chicago, Illinois 60606
Telephone: (312) 881-5400
Email: jason.zakia@whitecase.com
        adam.swingle@whitecase.com

**<u>Certificate of Service</u>**

      I certify that on January 27, 2026, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Charles R. Koster*          
Charles R. Koster
