IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | ) | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| FAT Brands Inc., *et al.*, | ) | Case No. 26-90126 (ARP) |
| | ) | |
| Debtors.[1] | ) | (Jointly Administered) |
| | ) | |

**OMNIBUS OBJECTION BY THE AD HOC
GROUP OF SECURITIZATION NOTEHOLDERS
TO (I) THE DEBTORS' CASH COLLATERAL MOTION
AND (II) THE DEBTORS' CASH MANAGEMENT MOTION**

The Ad Hoc Group of Securitization Noteholders (the "**Ad Hoc Group**"), collectively holding approximately $990 million (or 85%) of the notes outstanding under the Prepetition Securitizations, hereby submits this objection (the "**Objection**") to (i) the *Emergency Motion of Debtors For Entry of Interim and Final Orders (I) Authorizing Debtors to Use Cash Collateral, (II) Granting Adequate Protection For the Use of Cash Collateral, (III) Scheduling a Final Hearing, and (IV) Granting Related Relief* [Docket No. 18] (the "**Cash Collateral Motion**") and (ii) the *Emergency Motion of Debtors For Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Continue Existing Cash Management System, (B) Maintain Existing Business Forms and Intercompany Arrangements, and (C) Continue Intercompany Transactions; and (II) Granting Related Relief* [Docket No. 14] (the "**Cash Management Motion**," and together with the Cash Collateral Motion, the "**Motions**").  In support of this objection, the Ad Hoc Group relies upon the *Declaration of Laura J. Garr in Support of the Ad Hoc Group of Securitization*

---

[1]    A complete list of the Debtors in the Chapter 11 Cases and the last four digits of each Debtor's taxpayer identification number (if applicable) may be obtained on the website of the Debtors' proposed claims and noticing agent at https://omniagentsolutions.com/FATBrands.  The Debtors' mailing address for purposes of the Chapter 11 Cases is 9720 Wilshire Blvd., Suite 500, Beverly Hills, CA 90212.

*Noteholders' (I) Motion For an Order Appointing a Chapter 11 Trustee and (II) Omnibus Objection to the Debtors' Cash Collateral Motion and Cash Management Motion* (the "**Garr Declaration**").

## PRELIMINARY STATEMENT

1.      The Debtors want this Court to believe that their financial distress is the result of a securitization structure that left their Managers with insufficient cash to operate.[2]  In truth, the Debtors' operating businesses, which are separately financed and securitized, generate sufficient income to support their basic operating expenses.  And the agreed management fee should be sufficient for the parent company to provide the management services to support the securitizations.  The Debtors' severe financial distress and these non-consensual Chapter 11 Cases were caused by the systematic looting of company profits (substantially all of which are the Securitization Noteholders' cash collateral) for the personal benefit of the Debtors' CEO, Andrew Wiederhorn, and his family.

2.      Mr. Wiederhorn is a convicted felon who, according to allegations made by the U.S. Department of Justice and SEC, recently engaged in a fraudulent scheme to strip the Debtors of approximately 40% of their revenues for his personal gain.  Both the Debtors' public filings and the First Day Declaration admit that the Debtors misappropriated hundreds of millions of dollars of the Securitization Noteholders' cash collateral by systemically violating the carefully negotiated cash controls set forth in the Securitization Indentures.[3]

---

[2]    Capitalized terms used but not immediately defined in this Preliminary Statement shall have the meaning ascribed to such terms elsewhere in this Objection.

[3]    *Declaration of John C. Didonato in Support of Debtors' Chapter 11 Petitions and First Day Relief* [Docket No. 15] (the "**First Day Declaration**") ¶ 13 (claiming that "the Debtors had no choice but to resort to using certain WBS collections [*i.e.*, the Securitization Noteholders' cash collateral] to fund their operations rather than depositing such collections into certain accounts as required under the Base Indentures.").

3.      For months prior to the filing of these Chapter 11 Cases, the Ad Hoc Group urged the Debtors' boards and management to implement corrective measures to prevent the further dissipation of the Securitization Noteholders' collateral and to preserve the value of the Debtors' enterprise.  They refused.

4.      In the lead-up to the filing of these chapter 11 cases, the Ad Hoc Group proposed a consensual chapter 11 process in which the Debtors would market and sell the Securitization Debtors (funded by a DIP facility to be provided by members of the Ad Hoc Group) that would either result in the repayment of the Securitization Notes or a credit bid by the Securitization Noteholders.  This market test would determine the true value of the Debtors' assets and provide a fair recovery to equity if such excess value exists.

5.      Rather than engage with the Ad Hoc Group on its proposal, the Debtors' board—which is controlled by Mr. Wiederhorn and stocked with his family members—allowed Mr. Wiederhorn and the entities that manage the Securitization Debtors' restaurant operations to continue siphoning the Securitization Noteholders' cash collateral for their own benefit.  This cash was used for, among other things:

- Mr. Wiederhorn's legal expenses related to his alleged violations of civil and criminal laws and related settlement payments;

- exorbitant dividends to the Wiederhorn family, totaling at least $17 million since 2021;

- $1.1 million in bonuses and a near-doubling of salaries awarded to Mr. Wiederhorn's family on the eve of filing; and

- Mr. Wiederhorn's personal expenses, including for private jets, jewelry, travel, and mortgage payments.

The Debtors made these improper expenditures in violation of the Securitization Notes, their governing documents, and their management agreements.  They admit this, saying that they had

"no choice" but to turn to "self help."[4]  Misappropriating cash and willfully breaching credit and organizational documents is a violation of the fiduciary duties of the Debtors' officers and directors.  For these reasons, among many others, the Securitization Noteholders have filed a motion seeking appointment of a chapter 11 trustee for the Securitization Debtors.

6.      The Ad Hoc Group also files this Objection because the Motions ask this Court to permit the continued diversion and improper management of the Securitization Noteholders' cash collateral without their consent, while the Debtors use the shield of the automatic stay to preserve Mr. Wiederhorn's equity ownership of the Debtors.  The Ad Hoc Group objects to the Debtors' request to continue  prepetition cash management practices that violate the Securitization Debtors' limited liability company agreements, the Securitization Indentures, and the Debtors' management agreements.  This Court should not approve a cash management system premised on continuing wrongful conduct.

7.      The Ad Hoc Group further objects because the relief requested in the Cash Collateral Motion does not satisfy the requirements of section 363 of the Bankruptcy Code. Section 363(c)(2) states that, unless the entity with an interest in cash collateral consents to its use (which the requisite Securitization Noteholders do not), the Court can only authorize its use if that creditor is adequately protected.  Notwithstanding their attempt to label an indeterminate amount of cash as unencumbered despite it clearly being subject to the Securitization Noteholders' prepetition liens (which continue in these Chapter 11 Cases under section 552(b) of the Bankruptcy Code), the Debtors concede that they require the Securitization Noteholders' cash collateral to fund the Chapter 11 Cases.  It is therefore the Debtors' burden to prove that they are adequately protecting the Securitization Noteholders by preserving the value of their collateral.  The Debtors

---

[4]      *Id.* ¶¶ 13, 104.

fail to meet their burden.  The Debtors' proposed "adequate protection" package—administrative expense claims, replacement liens on assets already subject to the Securitization Noteholders' liens, and reporting rights—does nothing to ensure that the value of the Securitization Noteholders' collateral will be preserved during these Chapter 11 Cases.  For these reasons, the Cash Collateral Motion and the Cash Management Motion should be denied.

## BACKGROUND

### I.    The Prepetition Securitizations

8.    Four whole-business securitizations issued by certain Securitization Debtors—Fat Brands Royalty I, LLC ("**FBR**"), Fat Brands Fazoli's Native I, LLC, ("**FZ**"), FAT Brands GFG Royalty I, LLC ("**GFG**"), and Twin Hospitality I, LLC ("**Twin**")—were outstanding as of the Petition Date, totaling more than $1.15 billion in funded indebtedness (the "**Prepetition Securitizations**").  The members of the Ad Hoc Group (the "**Securitization Noteholders**") hold approximately $990 million (or 85%) of the notes outstanding under the Prepetition Securitizations.

9.    The Debtors issued the Prepetition Securitizations to finance their brand acquisitions.  For each Prepetition Securitization, the Debtors contributed the operating assets associated with specific brands (including the brands' intellectual property, franchise agreements, other contracts, accounts receivable, and inventory) to certain newly-created, special purpose financing subsidiaries (the "**Securitization Debtors**").  Those Securitization Debtors used their newly contributed brand assets as credit support to issue secured notes under each Prepetition Securitization (the "**Securitization Notes**"), subject to the terms of indentures and related documentation (the "**Securitization Indentures**").[5]

---

[5]    The Securitization Indentures and other transaction documentation related to the Prepetition Securitizations are substantially similar in all relevant respects.  The Securitization Indentures are attached to the Garr Declaration

10.     The Securitization Notes are secured by "substantially all the assets" of each issuer and its subsidiaries.[6]  The Securitization Noteholders hold liens against "all of the following property to the extent now owned or at any time hereafter acquired by" the applicable issuer or its subsidiaries, as applicable: accounts; books and records; equity interests; intellectual property; franchise agreements; leases; material contracts; product sourcing agreements; real property; "any and all other property of the Issuer now or hereafter acquired, including, without limitation, all accounts, chattel paper, commercial tort claims, deposit accounts, documents, equipment, fixtures, general intangibles, instruments, inventory, securities, securities accounts and other investment property and letter-of-credit rights (in each case, as defined in the New York UCC)"; and "all payments, proceeds, supporting obligations and accrued and future rights to payment with respect to the foregoing."[7]  The Securitization Noteholders' liens on this collateral are properly perfected under applicable law, are first in time, and, thus, are senior to any other liens potentially asserted against the Securitization Debtors.[8]

11.     Nearly all of the Securitization Debtors' revenue is received from third-party franchisees in the form of royalty payments, franchise fees, advertising fees, and inventory purchases.[9]  Certain of the Securitization Debtors also generate revenue through stores and restaurants they own directly.  The Securitization Debtors are restricted under their organizational documents and the Securitization Indentures in their ability to transfer such revenues to other

---

as Ex. 1 (FBR Securitization Indenture), Ex. 2 (FZ Securitization Indenture), Ex. 3 (GFG Securitization Indenture), and Ex. 4 (Twin Securitization Indenture).

[6]    First Day Decl. ¶¶ 55, 58, 60, 65.

[7]    *See* Securitization Indentures § 3.1; FBR Guarantee and Collateral Agreement, Garr Decl., Ex. 33, § 3.1; FZ Guarantee and Collateral Agreement, Garr Decl., Ex. 34, § 3.1; GFG Guarantee and Collateral Agreement, Garr Decl., Ex. 35, § 3.1; Twin Guarantee and Collateral Agreement, Garr Decl., Ex. 36, § 3.1.

[8]    *See, e.g.,* Twin UCC-1 Financing Statement, Filing No. 2024 8152009, Del. Sec'y of State (filed Nov. 21, 2024), Garr Decl. Ex. 42.  The Garr Declaration attaches UCC-1 Financing Statements filed against each Securitization Debtor, perfecting the Securitization Noteholders' liens in substantially all assets of the Securitization Debtors.

[9]    First Day Decl. ¶ 28; FAT Brands Inc., Annual Report (Form 10-K) (FY 2024), Garr Decl., Ex. 12, at 4-6, 12-13.

Debtor entities (including the Securitization Debtors' ultimate parents, Fat Brands Inc. and Twin Hospitality Inc. (the "**Managers**")) without first paying all amounts then due under the Securitization Notes.[10]

12. To ensure that the Securitization Notes have top priority with respect to the revenues of the Debtors' franchises, the Securitization Indentures incorporate certain restrictive covenants and noteholder protections. These protections include: (i) strict cash management requirements mandating that all brand collections at the Securitization Debtors be deposited into designated accounts within one business day and prohibiting commingling with non-securitization funds;[11] (ii) springing Deposit Account Control Agreements ("**DACAs**") over the Securitization Debtors' accounts in favor of the Securitization Noteholders; (iii) a waterfall that establishes the order in which collections must be applied on a monthly basis, with debt service payments to Securitization Noteholders receiving priority over distributions to equity holders (the "**Payments Waterfall**");[12] (iv) negative covenants restricting dividends,[13] additional indebtedness,[14] and

---

[10] First Day Decl. ¶ 49.

[11] *See* Securitization Indentures §§ 8.35 ("The Issuer shall, and shall cause the Manager to, cause each Guarantor to deposit all Guarantor Collections into the Concentration Account within one Business Day after receipt (or calculation, in the case of Monthly Fiscal Period Company Restaurant Profits True-up Amounts and Monthly Fiscal Period Estimated Company Restaurant Profits Amounts) as a distribution by such Guarantor to the Issuer."); 8.24(a)(i) ("The Issuer will, and will cause each other Securitization [Debtor] to: (i) maintain their own deposit and securities account, as applicable, or accounts, separate from those of any of its Affiliates (other than the other Securitization [Debtors]), with commercial banking institutions and ensure that the funds of the Securitization [Debtors] will not be diverted to any Person who is not a Securitization [Debtor] or for other than the use of the Securitization [Debtors], nor will such funds be commingled with the funds of any of its Affiliates (other than the other Securitization [Debtors]) other than as provided in the Transaction Documents[.]").

[12] *See id.* § 5.10.

[13] *See id.* § 8.18 ("Except as described in the 2024-1 Series Supplement dated as of the date hereof, the Issuer will not declare or pay any distributions on any of its limited liability company interests[.]").

[14] *See id.* § 8.13 ("The Issuer will not, nor will it permit any other Securitization [Debtor] to, create, assume, incur, suffer to exist or otherwise become or remain liable in respect of any Indebtedness other than [among other exceptions] (i) Indebtedness hereunder or under the Guarantee and Collateral Agreement or any other Transaction Document . . .").

additional liens;[15] and (v) separate existence requirements designed to maintain the Securitization Debtors as legally distinct from their non-securitization affiliates[16] and to ensure they have no secured creditors other than the holders of the applicable Securitization Notes.[17]  The Debtors also agreed to notify the Securitization Noteholders within three business days of becoming aware of any default or failure to abide by these requirements.[18]  The failure to abide by any of these requirements constitutes an Event of Default.[19]

13.     These protections are the hallmarks of whole-business securitization structures and distinguish these financings from traditional corporate debt issued at the parent company level. The basic premise of the Prepetition Securitizations is that the Securitization Noteholders hold the sole secured claims against the Securitization Debtors, paired with a structurally senior entitlement to the collections from those issuers' restaurant operations.  In addition, the Securitization Indentures ensure that each brand's revenue streams will be isolated from the Managers' other operations and brands, will be subject to rigorous monitoring, and will be applied according to a contractual priority of payments that subordinates equity holders and unsecured creditors to the

---

[15]     *See id.* § 8.12 ("The Issuer will not, nor will it permit any other Securitization [Debtor] to, create, incur, assume or permit to exist any Lien upon any of its property (including the Collateral), other than (i) Liens in favor of the Trustee for the benefit of the Secured Parties and (ii) other Permitted Liens.").

[16]     *See id.* § 8.24(a)(v) ("The Issuer will, and will cause each other Securitization [Debtor] to: . . . (v)(A) conduct its affairs in its own name and in accordance with its Charter Documents and observe all necessary, appropriate and customary limited liability company or corporate formalities (as applicable), including, but not limited to, holding all regular and special meetings appropriate to authorize all of its actions, keeping separate and accurate minutes of its meetings, passing all resolutions or consents necessary to authorize actions taken or to be taken, and maintaining accurate and separate books, records and accounts, including, but not limited to, payroll and intercompany transaction accounts, (B) hold all of the its assets in its own name and in such a manner that it will not be costly or difficult to segregate, ascertain or identify its assets from those of any other Affiliate or any other Person and (C) be, and at all times hold itself out to the public as, a legal entity separate and distinct from any other Person and, to the extent known by it, correct any misunderstanding regarding its separate identity").

[17]     *See id.* § 8.24(a)(vi) ("The Issuer will, and will cause each other Securitization [Debtor] to: . . . (vi)(C) except as arising under or expressly permitted by the Transaction Documents, not incur, create or assume any Indebtedness and not make any loans or advances to, or pledge its assets for the benefit of, any other Person or entity.").

[18]     *See id.* § 8.8.

[19]     *See id.* § 9.2.

Securitization Noteholders. This structure is what allowed the Debtors to obtain a greater amount of financing at a lower interest rate than would otherwise be available in the corporate credit markets.

14. The Securitization Debtors are also parties to two management agreements with their parent companies as Managers, under which the Managers are required to provide various services to the Securitization Debtors, including franchising, marketing, real estate, intellectual property, operational, and reporting services.[20] The terms of these management agreements, including the Managers' compensation, were a crucial part of the Managers' ability to obtain the financing provided to the Securitization Entities.

15. In addition to serving as contractual managers, the Managers have also been appointed as managing members under each of the Securitization Debtors' limited liability company (LLC) agreements. The LLC agreements contain various restrictions on actions that can be taken by the Managers, including prohibiting the Securitization Debtors from commingling cash with other entities (except in accordance with the Securitization Indentures) or providing intercompany loans.[21] These LLC agreements also note that each Manager has fiduciary obligations of loyalty and care to the applicable Securitization Debtor.[22]

---

[20] *See, e.g.*, FBR Management Agreement, Garr Decl., Ex. 31; FZ Management Agreement, Garr Decl., Ex. 32; GFG Management Agreement, Garr Decl., Ex. 33; Twin Management Agreement, Garr Decl., Ex. 34.

[21] *See, e.g.*, FBR Limited Liability Company Agreement, Garr Decl., Ex. 25, § 9(c)(v)(C); FZ Limited Liability Company Agreement, Garr Decl., Ex. 26, § 9(c)(v)(C); GFG Limited Liability Company Agreement, Garr Decl., Ex. 27, § 9(c)(v)(C); Twin Limited Liability Company Agreement, Garr Decl., Ex. 28, § 9(c)(v)(C).

[22] *See, e.g.*, Twin Limited Liability Company Agreement, Garr Decl., Ex. 28, § 11(h).

II.      **The Debtors' Prepetition Misconduct and Violations of the Prepetition Securitizations**

16.      Consistent with the numerous other instances of fraud prior to the commencement of these Chapter 11 Cases that have been revealed in the Managers' public reporting, the Managers have been continuously siphoning assets away from their rightful owners.

17.      Prior to the Petition Date, the Managers admitted to transferring cash (including the Securitization Noteholders' cash collateral) from the securitization silos in violation of the terms of the Securitization Indentures.[23]   The Managers have systematically failed to deposit brand collections into authorized accounts as and when required; commingled brand collections in non-securitization accounts with non-securitization cash; paid non-securitization expenses in violation of the Payments Waterfall (including substantial payments to Mr. Wiederhorn for legal fees, bonuses, and payments for his personal expenses); and actively concealed their ongoing violations of the Securitization Indentures from the Securitization Noteholders.  Despite requests by the Ad Hoc Group, the Managers refused to take any steps to remedy these violations or to prevent the further conversion and dissipation of the Securitization Noteholders' collateral.  The Managers— controlled by Mr. Wiederhorn—have been looting the Securitization Debtors without any regard for their obligations under the Securitization Indentures and applicable law.

A.      **The Managers Failed to Segregate Cash Collateral As Required**

18.      The Securitization Indentures require the Managers, on behalf of the Securitization Debtors, to deposit all restaurant collections into a specified Concentration Account for each Prepetition Securitization within one business day of receipt.[24]  To the extent any collections are misdirected and not immediately transferred to the Concentration Account, "the Issuer . . . will

---

[23]     First Day Decl. ¶ 104.
[24]     Securitization Indentures § 8.35.

deposit such amounts to a Concentration Account within three (3) Business Days following the earlier of (x) Actual Knowledge by the Manager or any Securitization Debtor of such misdirected payments and (y) the end of the week in which such misdirected payments are received."[25]  Then, on a monthly basis, amounts in the Concentration Account are to be transferred to a Collection Account "to make payments and deposits in the order of priority" under each Securitization Indenture's Payments Waterfall.[26]  The Concentration Accounts in each securitization silo were pledged to UMB Bank, N.A. (as the "**Prepetition Trustee**") and subject to its control under a DACA.[27]  The Collection Accounts in each securitization silo are also owned (and controlled) by the Prepetition Trustee for the benefit of the Securitization Noteholders.[28]

19.     For several months prior to the Petition Date, if not longer, the Managers have ignored their obligation to collect receipts in the Concentration Accounts for monthly transfer to the Collection Accounts.  On October 23, 2025, the Prepetition Trustee posted a notice stating that it had not received amounts required to be transferred from the Concentration Accounts to the Collection Accounts in September and October 2025.[29]  The Managers then filed quarterly reports with the SEC disclosing their receipt of the Prepetition Trustee's notice, and admitting that they have "caus[ed] amounts owed to the Securitization Issuers to be deposited into accounts not held by the Securitization Issuers or the [Prepetition] Trustee, as required by the related [Securitization Indentures]."[30]

---

[25]   *Id.* § 5.9(a)(i).

[26]   *Id.* § 5.9(b)(iv).

[27]   *Id.* § 5.1.

[28]   *Id.* § 5.4.

[29]   FAT Brands Inc., Quarterly Report (Form 10-Q) (2025 Q3), Garr Decl., Ex. 13 at 15.

[30]   *Id.*

20.     The Managers compounded the breach by commingling the cash collateral of the Prepetition Securitizations.  In the same quarterly reports, the Managers admitted that "the Company utilized certain cash receipts to support operation of the business during the fiscal quarter ended September 28, 2025, which would likely give rise to Events of Default and/or Manager Termination Events" and that the defaults included "commingling cash receipts owed to the Securitization Issuers and cash of non-securitization entities."[31]  The Debtors' first day filings in these cases confirm that the Managers have been improperly transferring cash between accounts contained at the different Securitization Debtors.[32]

21.     The Ad Hoc Group cannot currently estimate the total amount of cash collateral that the Managers have improperly siphoned and commingled since they began breaching the Securitization Indentures.  The limited information made available to date confirms that the net cash balance in the securitization deposit accounts has not changed over the last several months. It therefore appears that the Managers have caused all restaurant collections—totaling hundreds of millions of dollars over the last several months—to be deposited in accounts not owned by the Securitization Debtors.

**B.      The Managers Have Paid Exorbitant Amounts to Insiders**

22.     The Managers complain that the structure of the Prepetition Securitizations and the management fees are insufficient to support the business.[33]  But they fail to disclose that a substantial portion of the Managers' revenues are being used to fund payments to insiders.  From

---

[31]     *Id.*
[32]     First Day Decl. ¶¶ 104-105.
[33]     *Id.* ¶¶ 101-103.

the limited information available,[34] these payments, totaling more than $200 million, include at least the following:

- **Indemnification Payments**.  Since 2021, the Debtors have paid almost $86 million in litigation costs for Mr. Wiederhorn and certain directors and officers to defend against litigation brought against them by the U.S. Department of Justice, Securities and Exchange Commission, and shareholders (among other plaintiffs) arising from Mr. Wiederhorn's misconduct and mismanagement of the Debtors.[35]  None of the litigations concern the restaurant operations of the Securitization Debtors; all are based on Mr. Wiederhorn scheming to enrich himself and his family through the improper use of the Debtors' funds.[36]

- **Insider Dividends**.  Since 2021, the Debtors have distributed dividends to Mr. Wiederhorn and his family totaling at least $17 million, which is 25% of the total dividends paid to all shareholders (including non-insiders) over the same period.[37]

- **Family Compensation**.  From 2022 through October 31, 2025, Mr. Wiederhorn has received approximately $20 million in compensation from the Debtors.  Of that amount, approximately $15 million was structured as "consulting fees" as opposed to ordinary course salary or business payments.[38]  In addition, other members of the Wiederhorn family have received approximately $15.7 million in compensation from the Debtors during the same time period.[39]

- **Personal Expenses**.  Mr. Wiederhorn has caused the Debtors to spend at least $27 million for his personal expenses (including luxury vacations and other

---

[34]   The amounts discussed in this section are based on public information available to the Ad Hoc Group as of the time of this filing.  The Ad Hoc Group expects to uncover additional instances of insider payments and misappropriation of the Securitization Noteholders' cash collateral following this filing.  It reserves all rights to identify any further improper payments to the Court and to pursue objections, claims, and any other available remedies on account of such transfers at the appropriate time.

[35]   First Day Decl. ¶ 99.

[36]   *See Collura v. FAT Brands Inc.,* No. 2024-1305-NAC (Del. Ch. Dec. 23, 2024); *Kates v. FAT Brands Inc.*, No. 2:24-cv-04775-MWF-MAA (C.D. Cal. Nov. 7, 2025); *SEC v. FAT Brands Inc.*, No. 2:24-cv-03913-MCS-AGR (C.D. Cal. May 10, 2024); *United States v. Wiederhorn*, No. 2:24-CR-00295-RGK (C.D. Cal. May 9, 2024); *Harris v. FAT Brands Inc.,* No. 2021-0511-SG (Del. Ch. June 15, 2021); *Harris v. FAT Brands Inc.*, No. 2022-0254-SG (Del. Ch. Mar. 22, 2022); *Matthews v. FAT Brands Inc.*, No. 2:22-cv-01820-MCS-RAO (C.D. Cal. Mar. 18, 2022).

[37]   Insider dividends were calculated using Fat Brands Inc.'s historical SEC filings—10-Ks, 10-Qs, Form 3s, and Form 4s—which list total dividends paid, total number of existing shares, and total numbers of shares owned by the Wiederhorn family.

[38]   *See* FAT Brands Inc., Notice of Annual Meeting of Stockholders (FY2024 Proxy Statement (Schedule 14A)), Garr Decl. Ex. 37, at 22; FAT Brands Inc., Notice of Annual Meeting of Stockholders (FY2025 Proxy Statement (Schedule 14A)), Garr Decl. Ex. 38, at 23, 30.

[39]   *Id.*

13

travel expenses, private jets, rent and mortgage payments, shopping, and jewelry).[40]

- ***Shareholder "Loans"***.  The Debtors made at least $47 million of "shareholder loans" to Mr. Wiederhorn that he allegedly never repaid and allegedly caused the Debtors to forgive.[41]

- ***Preferential Bonuses***.  On January 2, 2026, after admitting to Events of Default, including the misappropriation of the securitization cash collateral, the Debtors paid $1,600,000 in bonuses, including $550,000 to each of Mr. Wiederhorn's two sons and $500,000 to the Debtors' Chief Financial Officer (Kenneth Kuick).  The salaries of these officers were also nearly doubled, increasing from $550,000 to $950,000.[42]

23.     It is no wonder why the Manager entities have not been able to cover their expenses from management fees alone and have been tapping into the Securitization Debtors' cash. These insider payments would be prohibited under the Payments Waterfall, which provides that all debt service obligations and operating expenses must be paid in full before any discretionary amounts are paid.  The Securitization Debtors' transfers to upstream Managers and their payments to insiders could only be authorized under the Payments Waterfall if they were funded with the "Residual Amount"—the last priority in the Payments Waterfall (number 26), defined as "the amount allocated to the Collection Account [that] exceeds the sum of the amounts to be paid and/or allocated . . . pursuant to priorities [1] through [25] of the Priority of Payments."[43]  But the Securitization Debtors' cash flow has never been sufficient to satisfy each category in the Payments Waterfall, and to then fund the payments to insiders summarized above.

---

[40]   FAT Brands Inc., Annual Report (Form 10-K) (FY 2024), Garr Decl., Ex. 12, Note 16, at F-28; Indictment, *United States of America v. Andrew A. Wiederhorn, et. al*, Case No. 24-CR-00295-RGK (C.D. Cal. May 9, 2024), Garr Decl. Ex. 15.

[41]   FAT Brands Inc., Annual Report (Form 10-K) (FY 2024), Garr Decl., Ex. 12, Note 16, at F-28; Shareholder Derivative Complaint, *Collura v. Wiederhorn*, No. 2024-1305-NAC (Del. Ch. Dec. 23, 2024), Garr Decl. Ex. 18; Indictment, *United States v. Wiederhorn,* No. 24-CR-00295-RGK (C.D. Cal. May 9, 2024), Garr Decl. Ex. 15.

[42]   FAT Brands Inc., Current Report (Form 8-K) (January 7, 2026), Garr Decl., Ex. 11, at 1.

[43]   Securitization Indentures § 5.10; *see also id.* Annex A, at A-49.

### C.      Mr. Wiederhorn's Prepetition Misconduct

24.      The Debtors are undeniably controlled by Mr. Wiederhorn and his family members. Of the fifteen board members currently sitting on the FAT Brands board (the "**Board**"), one is Mr. Wiederhorn and six are members of his family.[44]  Several of these Wiederhorn-related Board members also hold officer positions.  Below is an abbreviated summary of Mr. Wiederhorn's family tree, with current positions noted:



While the remainder of the Board are not related to Mr. Wiederhorn, they are still controlled by him.  Because the Wiederhorn family—in their individual capacity and through Mr. Wiederhorn's investment company—controls 55% of the Managers' voting stock, he has the ability to appoint or remove board members.[45]   And these directors know it.  In fact, the current board was constituted in 2023 when Mr. Wiederhorn removed every director other than himself after those directors cooperated with federal prosecutors in an investigation into Mr. Wiederhorn's misconduct.[46]

---

[44]   FAT Brands Inc., Annual Report (Form 10-K) (FY 2024), Garr Decl., Ex. 12, at 43.

[45]   FAT Brands Inc., Notice of Annual Meeting of Stockholders (FY2025 Proxy Statement), Garr Decl. Ex. 38, at 26.

[46]   Indictment, *United States v. Wiederhorn,* No. 24-CR-00295-RGK (C.D. Cal. May 9, 2024) ¶ 6.

25.     In 2004, Mr. Wiederhorn pled guilty to two federal felony charges: filing a false tax return and paying an illegal gratuity, both arising from his conduct as CEO of Wilshire Credit Corporation ("**Wilshire**").  While CEO of Wilshire, Mr. Wiederhorn took approximately $65 million in shareholder loans from Wilshire and subsequently caused the company to forgive those loans without properly reporting the forgiven amounts as taxable income.  In addition, he paid an illegal gratuity to an investment associate in violation of ERISA's prohibition on self-dealing and conflicts of interest involving Wilshire's pension fund investments.  Mr. Wiederhorn served fifteen months in federal prison and paid a $2 million fine—though he caused his investment company, Fog Cutter Capital Group, to reimburse that fine and continue paying his Wilshire salary while in prison.[47]

26.     Mr. Wiederhorn engaged in similar conduct while in control of the Debtors.  In 2024, a federal grand jury indicted him (among others) on 20 felony counts, including obstructing the administration of the Internal Revenue Code, tax evasion, wire fraud, making false statements and omissions to auditors, certifying faulty financial reports, and being a convicted felon in possession of a firearm and ammunition.  The federal government alleged that Mr. Wiederhorn extracted more than $47 million in shareholder loans from the Debtors, never paid interest on those loans, used their proceeds to fund his personal expenses, and then caused the Debtors to forgive the loans without reporting that cancellation as taxable income.[48]

27.     As discussed above, after members of the Board communicated with the government regarding its federal criminal investigation, Mr. Wiederhorn removed every Board

---

[47]   *Id.* ¶¶ 25-32.

[48]   *Id.* ¶¶ 1-6.

member other than himself and reconstituted the Board with a majority of non-independent directors under his control.[49]

28.    On July 29, 2025, federal prosecutors filed a motion to dismiss the indictment—allegedly this was because the prosecutor in charge of Mr. Wiederhorn's case left the U.S. Department of Justice.[50]  While the criminal charges were dropped, Mr. Wiederhorn has not rebutted the government's allegations that he received $47 million in shareholder loans that he did not repay.

29.    At the same time as the criminal indictment, the SEC filed a civil complaint against Mr. Wiederhorn (among others) for fraud arising from deficient disclosures concerning the Debtors' related-person transactions.  The SEC complaint alleges that from October 2017 through March 2021, Wiederhorn used almost $27 million of the Debtors' cash for personal expenses including private jets, first-class airfare, luxury vacations, rent and mortgage payments, shopping, and jewelry.[51]  He allegedly made false and misleading statements to make it appear that the millions of dollars the Debtors were spending on his personal expenses were actually company loans to Fog Cutter Capital Group for business expenses, which he diverted to himself, treated as "personal loans," and never repaid.[52]  According to the SEC, Wiederhorn's fraudulent scheme stripped the Debtors of approximately 40% of their revenue, often leaving them with insufficient cash to pay their own bills.[53]  The SEC litigation remains pending.

---

[49]    *Id.* ¶ 6.

[50]    Matt Hamilton & Harriet Ryan, *Fired Federal Prosecutor Alleges Ex-Fatburger CEO's 'Smears' Reached White House*, L.A. Times (May 3, 2025), Garr Decl., Ex. 14, available at https://www.latimes.com/california/story/2025-05-03/wiederhorn-justice-department.

[51]    *SEC v. Wiederhorn,* No. 24-CV-03913 (May 10, 2024) ¶¶ 4–9.

[52]    *Id.* at ¶¶ 4–9, 61–62, 133.

[53]    *Id.* ¶ 6.

30.     In addition to claims brought by the government, the Managers have faced a torrent of litigation from shareholders and other private plaintiffs over the past several years related to Mr. Wiederhorn's criminal corporate management, fraudulent public disclosures, and theft of creditor collateral.[54]   Each action contains allegations regarding Mr. Wiederhorn's scheme to enrich himself and his family using corporate funds.   In total, over the past four years, Mr. Wiederhorn has caused the Debtors to indemnify him (along with other officer and director co-defendants) for almost $86 million in defense costs related to these claims—which has severely depleted the Managers' available cash and hastened the Debtors' distress.[55]

## III.   The Ad Hoc Group's Attempted Restructuring Negotiations

31.     It has been clear for quite some time that the Managers were not sustainable and that a solution needed to be reached to protect the value of the Securitization Debtors and their assets.   Therefore, the Ad Hoc Group attempted to negotiate with the Managers prior to these Chapter 11 Cases to reach a consensual transaction that would efficiently transfer the Securitization Debtors' assets to new, third-party ownership.   The Managers refused to engage or to take any measures to prevent the further conversion of collateral.   To the contrary, the Debtors

---

[54]   *See, e.g.,* Second Amended Class Action Complaint, *Kates v. FAT Brands Inc.*, No. 2:24-cv-04775-MWF-MAA (C.D. Cal. Nov. 7, 2025) (class action alleging misleading material statements and omissions due to FAT Brands' SEC filings failing to report distributions to Andrew Wiederhorn, as well as making false statements regarding federal and state investigations into Andrew Wiederhorn's conduct), Garr Decl., Ex. 17; Shareholder Derivative Complaint, *Collura v. FAT Brands Inc.*, No. 2024-1305-NAC (Del. Ch. Dec. 23, 2024) (derivative suit alleging breach of fiduciary duties, unjust enrichment, abuse of control, gross mismanagement and waste, on account of scheme to distribute money to Wiederhorn and his family), Garr Decl., Ex. 18; Class Action Complaint, *Matthews v. FAT Brands Inc.*, No. 2:22-cv-01820 (C.D. Cal. Mar. 18, 2022) (class action alleging false and misleading statements by the Debtors, given failure to disclose interested transactions involving Andrew Wiederhorn and his son, Thayer Wiederhorn (as FAT Brands' COO)), Garr Decl., Ex. 19; Verified Stockholder Derivative Complaint, *Harris v. FAT Brands Inc.*, No. 2021-0511-SG (Del. Ch. June 15, 2021) (derivative action arising from Andrew Wiederhorn's fraudulent shareholder loans), Garr Decl., Ex. 20; Verified Stockholder Derivative Complaint, *Harris v. FAT Brands Inc.*, No. 2022-0254-SG (Del. Ch. Mar. 22, 2021) (derivative action alleging Andrew Wiederhorn improperly maintained voting control of Fat Brands through a recapitalization of the Company without consideration and without approval by a majority of minority stockholders), Garr Decl., Ex. 21.

[55]   First Day Decl. ¶ 104.

have refused to abide by the terms of the Securitization Indentures or limit Mr. Wiederhorn's ultimate control over the Securitization Debtors' funds.

32.     On September 29, 2025, the Ad Hoc Group entered into a confidentiality agreement with the Debtors to negotiate a forbearance agreement and eventually a sale or other restructuring transaction.  The Debtors insisted that the forbearance agreement affirmatively authorize the Managers to continue converting cash collateral of the Securitization Notes to pay junior obligations not permitted under the Securitization Indentures and the Payments Waterfall.  The Ad Hoc Group made clear that it would not agree to that condition.  Afterwards, the Managers stopped responding to the Ad Hoc Group and the confidentiality agreement expired without agreement on a forbearance.

33.     In light of the breakdown in forbearance agreement negotiations and the Debtors' admitted defaults under the Securitization Indentures, the Ad Hoc Group directed the acceleration of all amounts due and owing under the Securitization Notes on November 17, 2025.  At the same time, the Ad Hoc Group transmitted a letter to the Managers urging their boards and management to "take immediate corrective action" so that the Ad Hoc Group would not be forced to exercise remedies to protect its interests.[56]

34.     Facing the possibility of the Securitization Noteholders exercising their remedies under the Prepetition Securitization Indentures, the Manager boards failed to take any meaningful steps to cure the Securitization Debtors' and Managers' defaults or prepare a viable sale or restructuring proposal.  The Ad Hoc Group prepared a transaction proposal, which it delivered to the Managers on December 16, 2025 and which largely went unanswered.[57]

---

[56]    B. Pfeiffer, Letter to Debtors (Nov. 18, 2025), Garr Decl., Ex. 22.
[57]    B. Pfeiffer, Letter to Debtors (Dec. 16, 2025), Garr Decl., Ex. 23.

35.     Even at the brink, the Managers refused meaningful engagement with the Ad Hoc Group on the terms for a value-maximizing chapter 11 transaction.  Instead, they opted to commence these Chapter 11 Cases "without an agreed path forward"[58] and to seek the non-consensual use of the Securitization Noteholders' cash collateral for the continued benefit of Mr. Wiederhorn.[59]

36.     The Debtors claim that they seek the use of both cash collateral and cash they argue is unencumbered subject to a four-week budget, during which time the Debtors intend to mediate with the Ad Hoc Group.[60]  But the proposed order that the Debtors attach to their Cash Collateral Motion (the "**Proposed Cash Collateral Order**") meaningfully deviates from that narrative. ***First***, the Proposed Cash Collateral Order would authorize the use of "Unencumbered Cash" in the ordinary course of business, which use "shall not be subject to the restrictions of this Interim Order."[61]  And budget testing applies only to cash collateral—not Unencumbered Cash.[62] ***Second***, there is no time limitation on the Debtors' use of cash collateral in the interim period.[63] ***Third***, the Proposed Cash Collateral Order would not only allow for the expenditure of the Securitization Noteholders' cash collateral, but it would impose priming intercompany liens and a Carve-Out for the payment of estate professional fees without the Securitization Noteholders' consent.[64]

---

[58]   First Day Decl. ¶ 116.

[59]   In light of the Debtors' breaches of the Securitization Indentures, other misconduct, and utter failure to engage with the Ad Hoc Group in good faith, the Ad Hoc Group believes that the Securitization Noteholders hold valuable breach of fiduciary duty, fraudulent transfer, preference, corporate waste, and breach of contract claims, among others, against the Debtors, Mr. Wiederhorn, each member of his family holding positions at the Debtors, other members of management, and each member of the Debtors' boards of directors. The Ad Hoc Group reserves its rights to bring such claims at the appropriate time.

[60]   Cash Collateral Mot. ¶¶ 15, 57.

[61]   Proposed Cash Collateral Order ¶ 2.

[62]   *Id.* ¶ 3.

[63]   *Id.* ¶ 2.

[64]   *Id.* ¶¶ 5-6.

**ARGUMENT**

**I.      The "Unencumbered Cash" Is the Securitization Noteholders' Cash Collateral.**

37.      The Debtors claim in the Cash Collateral Motion that they seek to use Unencumbered Cash "to preserve the Prepetition Secured Parties' collateral pursuant to the Budget. . . . "[65]  But the Proposed Cash Collateral Order provides otherwise, stating: "For the avoidance of doubt, the Debtors are authorized to use Unencumbered Cash, including the Postpetition Restaurant Revenues, in the ordinary course of business, and the use of Unencumbered Cash *shall not be subject to the restrictions of this Interim Order*."[66]  Further, the Proposed Cash Collateral Order states that the Debtors are authorized to use cash collateral (with no mention of Unencumbered Cash) in accordance with the Interim Budget.[67]

38.      The Debtors' request for Court authorization to use Unencumbered Cash "in the ordinary course of business" should be denied, given that the Debtors have admitted that their "ordinary course of business" involved diverting cash from the Securitization Debtors in violation of the Securitization Indentures and their organizational documents and using that cash to make indefensible (and possibly illegal) payments to insiders.  Moreover, the Debtors seek to deprive the Securitization Noteholders of basic protections for the use of such cash, such as compliance with a budget, reporting, and any other protections the Proposed Cash Collateral Order otherwise provides.  Meanwhile, the Debtors fail to even attempt to quantify how much of their cash is cash collateral and how much they believe is unencumbered.

39.      The Debtors define Unencumbered Cash in an extremely broad fashion.  They argue it includes the following:

---

[65]    Cash Collateral Mot. ¶ 70.

[66]    Proposed Cash Collateral Order ¶ 2 (emphasis added).

[67]    *Id.* ¶ 3(a).

- Postpetition Restaurant Revenues: defined as "the Debtor's postpetition revenue from the operation of the Company Owned Restaurants," *i.e.*, all restaurants owned and operated by the Securitization Debtors;

- Excluded Cash: defined as cash that falls within certain "Collateral Exclusions" under the Securitization Indentures;

- FAT Brands Securitization Receivables: defined as (i) Management Fees (i.e., monthly management fees paid to or for the benefit of either of the Managers) and (ii) residual amounts owed to FAT Brands Inc., as Manager; and

- "[A]ny other funds or receipts that do not constitute Cash Collateral, pursuant to Section 552 of the Bankruptcy Code or otherwise."[68]

40.      The Securitization Noteholders hold valid, enforceable, and perfected security interests and liens in each of these categories of cash and, thus, all of this cash constitutes cash collateral.  The only exception is for Collateral Exclusions, which is a relatively small amount of the Debtors' cash and which the Debtors fail to quantify or provide any mechanism to track.  As such, all of the Debtors' cash must be subject to the terms of any order authorizing the use of cash collateral and the Securitization Noteholders must be given related protections (*e.g.*, budget compliance, reporting, and adequate protection) in connection with its use.

**A.      The Securitization Noteholders Retain Security Interests in Postpetition Restaurant Revenues.**

41.      The Securitization Noteholders have valid and perfected liens over all revenues of the Company Owned Restaurants, and the Debtors do not argue otherwise.[69]  Instead, the Debtors argue that those liens are cut off by section 552 of the Bankruptcy Code.[70]  Section 552(a) provides that property acquired postpetition is generally not subject to prepetition security interests, but section 552(b) creates an exception to this rule for proceeds, products, offspring, or profits of

---

[68]   Cash Collateral Mot. ¶¶ 55, 59.

[69]   *See supra* ¶ 10.

[70]   Cash Collateral Mot. ¶¶ 63–65.

prepetition collateral to the extent the underlying security agreement attaches liens to those proceeds.

42.    Here, the Securitization Noteholders hold liens on substantially all assets of the Securitization Debtors, including inventory, accounts, intellectual property, equity interests, and all proceeds thereof.[71]  This is demonstrated by the Securitization Indentures, Guarantee and Collateral Agreements, and UCC filings attached to the Garr Declaration.[72]  Therefore, the Ad Hoc Group has satisfied its burden under section 363(p)(2) of the Bankruptcy Code to prove the validity and extent of its security interests.

43.    The Securitization Indentures are governed by New York law.[73]  Under the New York Uniform Commercial Code, "proceeds" is defined as:

A.  whatever is acquired upon the sale, lease, license, exchange, or other disposition of collateral;

B.  whatever is collected on, or distributed on account of, collateral;

C.  rights arising out of collateral;

D.  to the extent of the value of collateral, claims arising out of the loss, nonconformity, or interference with the use of, defects or infringement of rights in, or damage to, the collateral; or

E.  to the extent of the value of collateral and to the extent payable to the debtor or the secured party, insurance payable by reason of the loss or nonconformity of, defects or infringement of rights in, or damage to, the collateral.[74]

44.    When a secured creditor holds a blanket lien on all assets, a debtor's postpetition revenues are proceeds of that secured creditor's prepetition collateral.  *See, e.g., In re Bumper*

---

[71]   Securitization Indentures § 3.1.

[72]   *See supra* ¶ 10; Securitization Indentures; FBR Guarantee and Control Agreement, Garr Decl., Ex. 33; FZ Guarantee and Control Agreement, Garr Decl. Ex. 34; GFG Guarantee and Control Agreement, Garr Decl. Ex. 35; Twin Guarantee and Control Agreement, Garr Decl. Ex. 36; FBR Securitization UCC Statements, Garr Decl., Ex. 39; FZ Securitization UCC Statements, Garr Decl., Ex. 40; GFG Securitization UCC Statements, Garr Decl., Ex. 41; Twin Securitization UCC Statements, Garr Decl., Ex. 42.

[73]   Securitization Indentures § 14.8.

[74]   N.Y. U.C.C. § 9-102(64).

*Sales, Inc.*, 907 F.2d 1430, 1439 (4th Cir. 1990) (finding that postpetition receivables and cash generated by the debtor were proceeds of a secured creditor's prepetition blanket lien and therefore remained subject to the secured creditor's lien under section 552(b) of the Bankruptcy Code); *Qmect, Inc. v. Burlingame Capital Partners II, L.P.*, 373 B.R. 682, 687–88 (N.D. Cal. 2007) ("Nothing other than secured lenders' collateral could have generated revenue, so all proceeds, even the increase in value, were proceeds of secured lenders' collateral.").

45.     The Securitization Noteholders have blanket liens over substantially all of the Securitization Debtors' assets, which includes the inventory used to create food and beverage products; the real property and fixtures used to operate restaurants; certain contracts with suppliers, vendors, technology providers, and service providers to which the Securitization Debtors are party; and the Securitization Debtors' intellectual property, including brands, trademarks, and franchise systems, without each of which the Securitization Debtors could not operate any of their respective restaurants or generate the Postpetition Restaurant Revenues.  And those liens, under the New York Uniform Commercial Code, extend to proceeds, which includes anything collected on account of that collateral, rights arising out of that collateral, and anything acquired as a result of the sale of that collateral.

46.     Therefore, all Postpetition Restaurant Revenues are protected by section 552(b) of the Bankruptcy Code and remain subject to the Securitization Noteholders' liens.  *See In re T-H New Orleans Ltd. P'ship*, 10 F.3d 1099, 1106 (5th Cir. 1993) (holding that postpetition revenues remained subject to prepetition lenders' security interests); *In re ModivCare, Inc.*, Case No. 25-90309, Dec. 12, 2025, Hr'g. Tr. 12:17-13:13 (holding that the debtors' postpetition receivables were proceeds of prepetition collateral subject to a blanket lien); *In re Bumper Sales, Inc.*, 907 F.2d 1430, 1439 (4th Cir. 1990) (finding that postpetition receivables and cash generated by the

debtor were proceeds of a secured creditor's prepetition blanket lien and therefore remained subject to the secured creditor's lien under section 552(b)).[75]

47.     The Debtors overread certain cases applying section 552(a) to limit secured creditors' liens against assets of restaurant debtors.  For instance, the Debtors rely primarily on *In re Cafeteria Operators, L.P.*, where the bankruptcy court held that a secured lender's prepetition liens continued on the "portion of the revenues acquired as a result of the disposition of the food and beverage inventory [as] proceeds of such inventory," but did not attach to "revenues [that] are derived primarily from services" provided by the restaurant's cooks, waitstaff, and other employees.  299 B.R. 400, 408–10 (Bankr. N.D. Tex. 2003).  The court's ruling was "based on th[e] record" evidence provided by the debtors, which established that "the value of the food component of a meal [*i.e.*, inventory subject to the lender's liens] is less than one-third of the price charged for the final plate of food."  *Id.* at 408.  Here, the Debtors make no effort to quantify the value of the "food component" of meals sold at their restaurants, and ignore that the Securitization Noteholders hold liens in intellectual property and prepetition contracts essential for the operations of the restaurants.

48.     The Debtors' other cases are also inapposite.  Nearly all of the Debtors' cases involved single location restaurants, with minimal scale and operations and without the franchise agreements, intellectual property, and related collateral that are critical to the Securitization Debtors' ability to operate.  *See, e.g., U.S. Bank Tr. Nat. Ass'n v. Venice MD LLC.*, 92 Fed. App'x

---

[75]    *See also In re Sunberg*, 729 F.2d 561, 561-63 (8th Cir.1984) (holding that a properly perfected postpetition security interest in "crops, growing crops, livestock, farm products, equipment inventory, fixtures, contract rights, accounts and general intangibles" meant that the creditor retained a perfected lien in proceeds arising from a prepetition contract, even though payment would occur postpetition.); *United Va. Bank v. Slab Fork Coal Co. (In re Slab Fork Coal Co.)*, 784 F.2d 1188, 1190-91 (4th Cir.1986), *cert. denied*, 477 U.S. 905, 106 S.Ct. 3275, 91 L.Ed.2d 565 (1986) (holding that the cash proceeds generated both prepetition and postpetition under a prepetition contract were subject to a prepetition security interest, irrespective of 11 U.S.C. § 552).

948, 954 (4th Cir. 2004) (unpub.) (addressing section 552(b) in the context of a single "hotel and restaurant"); *In re Mid-City Hotel Assocs.*, 114 B.R. 634, 643 (Bankr. D. Minn. 1990) (same); *In re Inman*, 95 B.R. 479, 481 (Bankr. W.D. Ky. 1988) (addressing section 552(b) with respect to restaurant debtor with $220,000 in corporate debt).  Other cases cited by the Debtors did not involve blanket liens, instead covering limited pockets of collateral like rents, and are therefore inapplicable.  *See In re McCann*, 140 B.R. 926 (Bankr. D. Mass. 1992) (addressing section 552 in the context of a lender's "assignment of rents").  In addition, the Debtors' cases predate the rise of technology that underpins major-chain restaurant operations today, including (for example) the rise of third-party apps and delivery services that connect customers to restaurants, facilitate orders and food delivery, and pay restaurant operators.  Restaurants owned by the Securitization Debtors utilize those services under contracts with the applicable vendors, and any revenues earned through those channels are proceeds of those agreements and subject to the Securitization Noteholders' liens.

49.    Even if the Debtors are correct (which they are not) that a portion of the Securitization Noteholders' liens in Postpetition Restaurant Revenues are cut off under section 552, such unencumbered value can only benefit the Securitization Debtors.  First, the Securitization Noteholders hold DACAs over the Securitization Debtors' accounts in favor of the Securitization Noteholders, rendering all Postpetition Restaurant Revenue subject to the control of the Securitization Noteholders.  Second, all of the equity of each of the Securitization Debtors that are subsidiaries of the issuers of the Securitization Notes is the collateral of the Securitization Noteholders.[76]  Therefore, any attempt by the Debtors to dividend cash from the Securitization Debtors to the Managers or any other entity above the Securitization Debtors in the Debtors'

---

[76]    *See supra* ¶ 10.

organizational structure would not remove such cash from the Securitization Noteholders' blanket liens, and would necessarily cause a diminution in the value of the Securitization Noteholders' collateral requiring adequate protection.  The Debtors attempt to circumvent this by providing for secured intercompany loans from one Debtor to another, but that cannot be approved for the reasons set forth in Section IV below.

**B.      Collateral Exclusions Cannot be Excluded Unless Tracked and Quantified.**

50.      Collateral Exclusions, which provide for discrete exceptions to the Securitization Noteholders' collateral package, include, among others, advertising fees, bank fees, withholding taxes, and intellectual property registration and maintenance costs and fees that are funded by the Securitization Debtors via transfers to the Managers for payment.[77]

51.      The Securitization Indentures require regular disclosure of the Collateral Exclusions.  On a monthly basis, the Managers must deliver a Manager's Certificate to the Securitization Noteholders that includes line items disclosing the amount of each category of Collateral Exclusions for the prior month.[78]  The same reporting is required under the Quarterly Noteholder Reports that the Manager must deliver every three months.[79]

52.      The Managers have historically reported a low amount of Collateral Exclusions. For instance, in the fourth quarter of 2024, the Managers reported $0 in Collateral Exclusions for FZ, $0 in Collateral Exclusions for Twin, $413,693 in Collateral Exclusions for FBR, and

---

[77]   *See, e.g.*, FBR Securitization Indenture, Annex A at A-7.

[78]   Securitization Indentures § 4.1(a); *see also id.* Ex. A, Monthly Manager's Certificate at A-1 (including line-item disclosures for each Collateral Exclusion, including amounts for advertising fees, bank fees, tax withholdings, and intellectual property registration and maintenance costs and fees paid by the Securitization Debtors in the prior month).

[79]   *Id.* § 4.1(c).

$4,331,406 in Collateral Exclusions for GFG.[80]  The Collateral Exclusions reported by the Debtors have never exceeded $6 million in total for an individual quarter.

53.     The Debtors' cash only qualifies as a Collateral Exclusion if it is used for one of the discrete enumerated uses described in the Securitization Indentures.  If the Debtors seek to use this cash "in the ordinary course" because it is unencumbered, they must be required to do so only for those specific purposes and no other.  And the Debtors should be required to track and quantify any cash qualifying as a Collateral Exclusion to ensure that the Debtors do not attempt to inflate this number and overstate their unencumbered cash position.

### C.     Management Fees are Not Unencumbered Cash.

54.     As described above, the Securitization Debtors are contractually required to pay monthly management fees to the Managers.[81]  But that requirement is simply a contractual entitlement by the Managers.  Nothing about that arrangement renders the cash used by the Securitization Debtors to pay management fees unencumbered.  This cash remains cash collateral and must be subject to the terms of any order authorizing the use of cash collateral.

### D.     Any Cash Subject to a Dispute Over Whether it is Encumbered Must Be Subject to the Cash Collateral Order.

55.     The Debtors state that they "do not seek a determination at this time as to which receipts do or do not constitute cash collateral (and all rights of parties in interest with respect thereto are reserved)."[82]  With the exception of Collateral Exclusions under the Securitization

---

[80]   *See* FBR Q4 2024 Quarterly Noteholders Report, Garr Decl., Ex. 43; FZ Q4 2024 Quarterly Noteholder Report, Garr Decl., Ex. 44; GFG Q4 2024 Quarterly Noteholders Report, Garr Decl., Ex. 45; Twin Q4 2024 Quarterly Noteholders Report, Garr Decl., Ex. 46.

[81]   Securitization Indentures § 5.10(iv).

[82]   Cash Collateral Mot. ¶ 65 n.16; *see also* Proposed Cash Collateral Order ¶ F n.5 ("Notwithstanding the foregoing, 'Cash Collateral' shall not include cash that constitutes after-acquired property pursuant to section 552 of the Bankruptcy Code and is not subject to the exceptions set forth in section 552(b) of the Bankruptcy Code for postpetition proceeds, products, offspring, or profits of Prepetition Collateral.  All interested parties' rights with respect to whether the Debtors' postpetition cash receipts or other property constitute Cash Collateral are reserved.").

Indentures, which are discrete and must be tracked and quantified, the Ad Hoc Group contests that the Debtors' cash is unencumbered.  With respect to this contested cash, the Debtors are not respecting the Securitization Noteholders' rights.  Instead, under the unproven theory that the Debtors have significant amounts of unencumbered cash, the Debtors seek broad authority to use such cash "in the ordinary course" and not subject to the terms of the Proposed Cash Collateral Order, even though their "ordinary course" prepetition was to misappropriate the Securitization Noteholders' cash collateral.  If the intent is to preserve all parties' rights for this interim period while parties attempt to reconcile in mediation, the appropriate way to do so is to require that ***all*** of the Debtors' cash (whether or not alleged to be unencumbered) must be subject to the requirements of any cash collateral order.

## II.     The Debtors Cannot Adequately Protect the Securitization Noteholders.

56.     A debtor may not use cash collateral without the consent of each entity that has an interest in cash collateral unless "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section."  11 U.S.C. § 363(c)(2).  Here, given the Securitization Noteholders' blanket liens, substantially all of the Debtors' cash is the Securitization Noteholders' cash collateral.  Even if the Debtors are correct in their belief that they have meaningful unencumbered cash (which they are not), the Debtors concede that they must also use the Securitization Noteholders' cash collateral.[83]  The Ad Hoc Group does not consent to the Debtors' proposed use of cash collateral on the requested terms.  The members of the Ad Hoc Group hold 85% of the Securitization Notes in the aggregate and more than 50% of the Securitization Notes issued under each Prepetition Securitization.  Because the Ad Hoc Group

---

[83]    Cash Collateral Mot. ¶ 71 (stating that "the Debtors require access to Cash Collateral in addition to use of Unencumbered Cash.").

controls a majority of the Securitization Notes, under the Securitization Indentures, it alone can direct the Prepetition Trustee to either consent to the proposed use of cash collateral or not.[84]

57.     Under section 363(e) of the Bankruptcy Code, the court may authorize a debtor to use cash collateral on a nonconsensual basis only if the applicable secured creditor is adequately protected.  The debtor bears the burden of proving that it can adequately protect the secured creditor's interest in cash collateral.  11 U.S.C. § 363(p)(2).

58.     The Bankruptcy Code does not expressly define what constitutes "adequate protection" nor does it prescribe a specific form it must take.  *In re Las Torres Dev., L.L.C.*, 413 B.R. 687, 696–97 (Bankr. S.D. Tex. 2009).  Section 361 of the Bankruptcy Code identifies non-exhaustive examples of adequate protection, including (a) lump-sum or periodic cash payments in an amount equal to the decrease in the value of the secured creditor's interest in property, (b) additional or replacement liens on the debtor's property, and/or (c) other relief "as will result in the realization by [the secured creditor] of the indubitable equivalent of such entity's interest in such property."  11 U.S.C. § 361.

59.     Adequate protection is clearly required under the circumstances here.  The Debtors' proposed 4-week budget shows their ending cash position going from $2.8 million to $3.1 million.[85]  But this excludes cash escrowed for estate professional fees, which will certainly exceed

---

[84]    *See, e.g.*, Twin Securitization Indenture §§ 9.8 ("Notwithstanding any other provision hereof, the Control Party (acting at the direction of the Controlling Class Representative) may, subject to the terms hereof, cause the institution of and direct the time, method and place of conducting any proceeding for any remedy available to the Trustee or exercise any trust or power conferred on the Trustee."); 1.4(m) ("to the broadest extent possible, a Majority of Controlling Class may operate as the Controlling Class Representative under this Base Indenture and the other Transaction Documents, and any rights, powers, remedies or privileges of the Controlling Class Representative under this Base Indenture and the other Transaction Documents may also be exercised, enforced, enjoyed and received by the Majority of Controlling Class, including but not limited to, the authority to make decisions, provide consents, give directions, and take any other actions that the Controlling Class Representative is authorized or permitted to undertake under this Base Indenture and the other Transaction Documents.").

[85]    Proposed Cash Collateral Order, Ex. A.

$300,000 over this period.[86]  The Debtors do not argue (nor could they) that the use of cash during the Chapter 11 Cases will increase the value of the Debtors' non-cash assets.  The depletion of the Debtors' cash shows that the total collateral pool on the Petition Date exceeds its future value, which is the test for diminution.  *In re Stembridge*, 394 F.3d 383, 387 (5th Cir. 2004).  Therefore, the Debtors' argument that the use of cash to maintain and preserve other assets constitutes adequate protection fails.[87]  The Debtors must provide the Securitization Noteholders with something of real value (that exceeds expected diminution) in order to adequately protect them.

60.    The Debtors' proposed adequate protection package for the Securitization Noteholders is (i) administrative expense claims, (ii) replacement liens on assets already subject to the Securitization Noteholders' liens, and (iii) reporting rights.[88]  None of these provisions adequately protect the Securitization Noteholders.

61.    ***First***, administrative claims cannot provide adequate protection.  Section 361(3) specifically states that "entitling such entity to compensation allowable under section 503(b)(1)" is not a legitimate form of adequate protection.  *See Memphis-Shelby Cty. Airport Auth. v. Braniff Airways, Inc. (In re Braniff Airways, Inc.)*, 783 F.2d 1283, 1286 n.5 (5th Cir. 1986) (holding that adequate protection "may not take the form of entitling the creditor to an administrative expense.").  Likewise, a claim under section 507(b) of the Bankruptcy Code is intended to redress a failure of adequate protection, but is not itself an independent form of protection.  *In re UAL Corp.*, No. 02-48191 (ERW), 2005 WL 3118411, at *6 n.1 (Bankr. N.D. Ill. Nov. 21, 2005).

62.    ***Second***, the proposed adequate protection liens are meaningless.  The Securitization Noteholders have prepetition liens on all of the applicable Debtors' assets, including

---

[86]    *Id.*; *see also infra* ¶ 68–70.
[87]    Cash Collateral Mot. ¶¶ 81–84.
[88]    *Id.* ¶ 57 at "Adequate Protection."

their intellectual property, franchise agreements, and other operating assets and the proceeds thereof.[89]   The only legitimately unencumbered asset the Debtors identify is Collateral Exclusions, which—by their nature—the Debtors intend to spend.[90]   The Debtors do not even offer the Securitization Noteholders liens on all assets—these liens would be limited to (i) assets over which the Securitization Noteholders already have liens, (ii) intercompany claims funded with cash collateral, (iii) proceeds of Avoidance Actions (only upon entry of a final order) and (iv) cash not subject to section 552 of the Bankruptcy Code.[91]   As stated above, the Securitization Noteholders contest that any of the Debtors' cash is unencumbered under section 552 and, as such, the Debtors are not offering the Securitization Noteholders adequate protection liens on an interim basis on any asset that has been agreed as unencumbered (or will be determined to be, as the Debtors do not seek a Court order on this issue at this time).   Moreover, the Debtors fail to quantify the value of the supposed unencumbered assets or demonstrate that their value exceeds the diminution of the Securitization Noteholders' collateral.   Therefore, the proposed replacement liens are incapable of adequately protecting the securitization noteholders for diminution in value of their collateral. *See In re LTAP US, LLLP*, No. 10-14125 (KG), 2011 WL 671761, at *3 (Bankr. D. Del. Feb. 18, 2011) (denying cash collateral motion for lack of adequate protection and holding that providing the secured creditor "with a replacement lien on assets against which it already has a lien is illusory. Debtor must provide [the secured creditor] with additional collateral, and there is none."); 3 COLLIER ON BANKRUPTCY ¶ 364.05 (16th ed., 2022) ("Providing a lender with a replacement lien on assets on which it already has a lien is illusory and will not support an adequate protection finding.").

---

[89]   *See supra* ¶ 10.

[90]   Securitization Indentures § 3.1.

[91]   Proposed Cash Collateral Order ¶ 4(a).

63.     **Third**, cash flow and variance reporting to the Securitization Noteholders does not provide them with adequate protection.  While reporting will be helpful (particularly given the Debtors' prepetition failure to provide complete information about cash transfers to the Ad Hoc Group), it does nothing to prevent or compensate for a diminution in value of the Securitization Noteholders' interests in collateral.  *See In re Timbers of Inwood Forest Assocs., Ltd.*, 793 F.2d 1380, 1389 (5th Cir. 1986) ("[E]xamination of the language of the adequate protection provisions suggests that they were intended to protect a secured creditor against a decrease in the value of its collateral due to the debtor's use, sale or lease of that collateral during the stay.").

64.     The Debtors claim preservation of their going-concern value collateral constitutes adequate protection.[92]  Even if true, the Debtors bear the burden of showing that the Securitization Noteholders' collateral will be preserved or enhanced through the Debtors' use of that cash collateral over the course of these Chapter 11 Cases.  *See In re La Torres Dev.*, 413 B.R. at 687; *In re Kessler*, 86 B.R. 384, 136 (Bankr. C.D. Ill. 1988) ("Adequate protection is intended to protect a creditor in the period between the filing of the case and confirmation."); *In re Residential Capital, LLC*, 501 B.R. 549 (Bankr. S.D.N.Y. 2013) (once a secured creditor proves its lien, the burden shifts to the debtors to prove adequate protection against diminution of the value of the secured creditor's collateral).  Here, the Debtors cannot show that their use (and depletion) of cash collateral will preserve or enhance the Securitization Noteholders' collateral.

65.     The cases the Debtors cite in support of their argument do not change that conclusion.  For instance, in *True Religion*, the court found that there was adequate protection only in the context of agreed-upon DIP financing and expert testimony demonstrating that collateral

---

[92]    Cash Collateral Mot. ¶¶ 81–84.

would be enhanced as compared to the petition date.[93]  Here, the Debtors lack the Securitization Noteholders' consent and have not offered any expert valuation of the Securitization Noteholders' collateral.  Other cases cited by the Debtors require the showing of an equity cushion to determine a secured creditor is adequately protected, or are otherwise distinguishable.[94]  These cases establish that the Debtors must prove that their use of cash collateral will enhance the value of the Secured Noteholders' aggregate collateral, which they simply have not done.

66.   Given that the Debtors fail to satisfy their burden of adequately protecting the Securitization Noteholders, their request to use cash collateral on a nonconsensual basis should be denied.  *See In re Energy Partners, Ltd.*, 409 B.R. 211, 235–37 (Bankr. S.D. Tex. 2009) (denying use of cash collateral based on debtor's failure to demonstrate the secured creditor was adequately protected).

## III.   The Debtors' Four-Week Interim Period Is Illusory.

67.   The Debtors claim that the interim relief they seek in the Cash Collateral Motion is only for a four-week period (consistent with their proposed Initial Budget), during which time they intend to enter into formal mediation with the Ad Hoc Group and attempt to negotiate DIP financing.[95]  But the Proposed Cash Collateral Order is not consistent with those representations.

---

[93]   *In re True Religion Apparel, Inc.*, No. 20-10941 (CTG) (Bankr. D. De. May 6, 2020) [Docket No. 210] at 141:6–142:23 (crediting expert witness testimony showing that the value of the secured creditor's collateral would be enhanced through the debtors' use of cash collateral).

[94]   *In re Prospect Med. Holdings, Inc.*, No. 25-8002 (SGJ) (Bankr. N.D. Tex. Jan. 14, 2025) [Docket No. 165] at 133:12–23 (authorizing debtor to use cash collateral in the context of a "a necessary [DIP] loan" that expert testimony concluded would preserve value);  *In re Constable Plaza Assocs.*, L.P., 125 B.R. 98, 105 (Bankr. S.D.N.Y. 1991) (authorizing debtor to use cash collateral to operate and maintain office building that enjoyed an equity cushion); *McCombs Props VI, Ltd. v. First Tx. Savings Ass'n (In re McCombs Props. VI, Ltd.)*, 88 B.R. 261, 267 (Bankr. C.D. Ca. 1988) (finding adequate protection on account of equity cushion); *In re 495 Central Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (finding adequate protection where "there is no question that the [collateral] would be improved" by proposed renovations and that "the money spent for improvements will be transferred into value.").

[95]   First Day Decl. ¶ 116.

While the Initial Budget is only for four weeks, it can be updated for future periods.[96]  And the interim period for authorized use of cash collateral under the Proposed Cash Collateral Order is not limited to four weeks—it terminates only upon the earlier of (i) two business days after the final hearing (which can be adjourned or avoided entirely) and (ii) a Court order determining that the Debtors have violated the order.[97]  This effectively would give the Debtors the ability to use cash collateral indefinitely—not for their advertised initial four week period.

## IV.     The Intercompany Liens and Carve-Out Cannot Be Approved.

68.     In addition to seeking authority to use the Securitization Noteholders' cash collateral without providing them adequate protection, the Debtors also seek to prime the Securitization Noteholders' liens in violation of the Bankruptcy Code.  The Debtors attempt to do this in two ways.  *First*, the Proposed Order would authorize the Debtors to make intercompany loans during the Chapter 11 Case on a secured basis senior to the Securitization Noteholders' liens.[98]  *Second*, the Proposed Order would create a Carve-Out whereby estate professional fees (accrued plus an additional $500,000 post-termination) would be escrowed and excluded from the Securitization Noteholders' liens.[99]

69.     The Debtors have not satisfied the requirements of the Bankruptcy Code to provide for secured intercompany loans.  These loans would be postpetition loans subject to section 364 of the Bankruptcy Code, like any other postpetition financing.  11 U.S.C. § 364(d)(1) (requiring court approval and adequate protection for "the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien").  But the Debtors do not

---

[96]   Proposed Cash Collateral Order ¶ 3(a).

[97]   *Id.* ¶ 2.

[98]   *Id.* ¶ 5.

[99]   *Id.* ¶ 6.

even cite to section 364, let alone attempt to satisfy the requirements of it.  Nor could they, as section 364(d) requires a showing of adequate protection in order to impose priming liens, which the Debtors fail to provide.

70.     The Debtors also cannot impose a nonconsensual Carve-Out on the Securitization Noteholders.  In a cash collateral order, "it is essential to note that the carve out is a product of agreement between the secured party and the beneficiary of the carve out."  *In re White Glove*, No. 98-12493, 1998 WL 731611, at *6 (Bankr. E.D. Pa. Oct. 14, 1998).  Further, the Bankruptcy Code "establishes that a secured creditor's interest may only be diminished to the extent that the secured creditor waives its right to the protections afforded by the [Bankruptcy] Code, or to the extent that the expense granted priority directly confers a benefit on the secured creditor."  *In re Blackwood Assocs., L.P.*, 153 F.3d 61, 68 (2d Cir. 1998).  This is consistent with Fifth Circuit authority, which provides that "[t]he default rule in bankruptcy is . . . that administrative expenses are paid out of the estate and not by the secured creditors of the debtor."  *In re Grimland, Inc.*, 243 F.3d 228, 233 (5th Cir. 2001).  The Ad Hoc Group does not consent to the Carve-Out and, thus, this is simply yet another use of the Securitization Noteholders' cash collateral that must satisfy the requirements of section 363 of the Bankruptcy Code, including adequate protection that the Debtors cannot provide.

## V.     The Debtors' Cash Management System Violates Their Governance and Debt Documents.

71.     Through the Cash Management Motion, the Debtors seek the Court's approval to continue their "ordinary course" cash management practices.[100]  But, as discussed above, the Debtors' "ordinary course" practices prior to the Petition Date were fraudulent.  The Managers have admitted to converting the Securitization Debtors' cash for improper purposes and

---

[100]   Cash Management Mot. ¶ 1.

commingling it with non-securitization cash, which violated the terms of the Securitization Debtors' governance documents, the Management Agreements, and the Securitization Indentures. The Court should not bless the continuation of that fraudulent scheme while the Debtors are subject to its jurisdiction. Instead, the Court should require that the Debtors adhere to the terms of their governance documents, the Management Agreements, and the Securitization Indentures when operating their cash management system postpetition.

72. The Debtors' cash management system, as proposed, is premised on the Debtors' continued commission of wrongful acts that violate the securitization structure. To begin, the Securitization Debtors' organizational documents require strict corporate separateness and adherence to the Securitization Indentures. Their limited liability company agreements provide, among other things, that each Securitization Debtor shall "not commingle its assets with those of any other Person (except as permitted by the [Securitization Indentures]) and hold all of its assets in its own name"; "pay its own liabilities and expenses only out of its own funds and assets"; "maintain an arm's length relationship with its Affiliates and enter into transactions with Affiliates only on a commercially reasonable basis"; "not hold out its credit or assets as being available to satisfy the obligations of any other Person"; "not operate or purport to operate as an integrated single economic unit with respect to itself and any of its Affiliates"; "cause the Manager, Officers[,] agents and other representatives of the [Securitization Debtor] to act at all times with respect to the [Securitization Debtor] consistently and in furtherance of the foregoing and in the best interests of the [Securitization Debtor]"; and "comply with all requirements of applicable law regarding its operations and comply with the provisions of this Agreement."[101] The Managers' admitted practice of sweeping funds from the Securitization Debtors and commingling cash is a

---

[101] *See, e.g.,* Twin Limited Liability Company Agreement, Garr Decl., Ex. 28, § 9(c)(v).

blatant violation of the separateness requirements contained in the Securitization Debtors' foundational documents. The Court should not allow this wrongful conduct to continue post-petition.

73. In addition, the Management Agreements between the Managers and the Securitization Debtors contain substantially similar covenants requiring each Manager to respect the corporate separateness of the Securitization Debtors.[102] The Management Agreements further provide that each Manager "shall pay from its own funds all expenses it may incur in performing its obligations hereunder," including the costs of each Manager's employees.[103] Yet the Debtors request authority to pay obligations owed to the Managers' employees using bank accounts of the Securitization Debtors.[104] The Debtors' cash management system therefore contemplates the Managers' continued violation of the Management Agreements.

74. The Securitization Indentures mandate that all payments and transfers of cash by the Securitization Debtors strictly comply with the Payments Waterfall.[105] The Payments Waterfall ensures that cash is held within the Securitization Debtors and applied first to debt service and other priority obligations before any distributions can be made to equity holders or insiders. The Managers admit that they have directed intercompany transfers in express violation of the Payments Waterfall, openly acknowledging in the Cash Management Motion that they routinely make intercompany transfers from Securitization Debtors to "fund operations in other Silos."[106] That act—using funds generated by one Securitization Debtor to pay the obligations of

---

[102] *See, e.g.,* Twin Management Agreement, Garr Decl., Ex. 32, § 4.7(d) ("the Manager shall not (and shall not permit any of its Affiliates that is not a [Securitization Debtor] to) commingle its funds with any funds of any [Securitization Debtor]").

[103] *Id.* § 2.6.

[104] Cash Management Mot. ¶ 15 (admitting to using funds from Securitization Debtor bank accounts to fund "payroll to corporate employees of [Manager] FAT Brands").

[105] Securitization Indentures § 5.10.

[106] Cash Management Mot. ¶ 23.

an affiliate, including the Managers—is a blatant violation of the Securitization Indentures.  And then, once funds have been transmitted outside of the Securitization Debtors, the Managers have used those funds to pay for the various personal costs of management and for other improper purposes.[107]

75.     The Debtors are asking this Court to approve a cash management system that openly violates the Securitization Debtors' organizational documents, the Management Agreement, and the Securitization Indentures.  The Court should deny that request.

## RESERVATION OF RIGHTS

76.     The Ad Hoc Group reserves all rights to amend or supplement this Objection, to raise additional issues with the Cash Collateral Motion, Cash Management Motion, and any of the Debtors' other first day motions at the first day hearing, and to present evidence at the hearing.  The Ad Hoc Group further reserves all rights and claims, including causes of action against the Debtors and their insiders, and waives none.

## CONCLUSION

77.     For the foregoing reasons, the Ad Hoc Group respectfully requests that the Court deny the Motions, or alternatively modify the Debtors' proposed interim orders with the modifications discussed herein, and grant the Ad Hoc Group such other and further relief as the Court deems just and proper.

[*Remainder of Page Intentionally Left Blank*]

---

[107]   *See supra* ¶¶ 22-23.

Dated:  January 27, 2026
        Houston, Texas

*/s/ Charles R. Koster*

**WHITE & CASE LLP**
Charles R. Koster (Texas Bar No. 24128278)
609 Main Street, Suite 2900
Houston, Texas 77002
Telephone: (713) 496-9700
Email:  charles.koster@whitecase.com


- and -

**WHITE & CASE LLP**
Andrew Zatz (*pro hac vice* pending)
Laura J. Garr (*pro hac vice* pending)
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
Email:   azatz@whitecase.com
         lgarr@whitecase.com

**WHITE & CASE LLP**
Brian Pfeiffer (*pro hac vice* pending)
Amanda Parra Criste (*pro hac vice* pending)
200 South Biscayne Boulevard, Suite 4900
Miami, Florida 33131
Telephone: (305) 371-2700
Email:  brian.pfeiffer@whitecase.com
        aparracriste@whitecase.com


- and -

**WHITE & CASE LLP**
Jason N. Zakia (*pro hac vice* pending)
Adam T. Swingle (*pro hac vice* pending)
111 South Wacker Drive, Suite 5100
Chicago, Illinois 60606
Telephone: (312) 881-5400
Email:  jason.zakia@whitecase.com
        adam.swingle@whitecase.com

**<u>Certificate of Service</u>**

I certify that on January 27, 2026, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

<u>/s/</u> Charles R. Koster
Charles R. Koster